## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **OFS INTERNATIONAL LLC**, *et al.*, | § **Case No. 21-31784 (DRJ)** |
| | § |
| **Debtors.**[1] | § **(Joint Administration Pending)** |
| | § **(Emergency Hearing Requested)** |

**DEBTORS' EMERGENCY MOTION
FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364, AND 507 AND FED. R. BANKR. P. 2002,
4001 AND 9014 (I) APPROVING POSTPETITION FINANCING, (II) ALLOWING USE
OF CASH COLLATERAL; (III) GRANTING LIENS AND PROVIDING
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING
ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI)
SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. A HEARING WILL BE CONDUCTED ON THIS MATTER ON JUNE 2, 2021 AT 12:00 P.M. IN COURTROOM 400, 4TH FLOOR, 515 RUSK STREET, HOUSTON, TEXAS 77002. IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST EITHER APPEAR AT THE HEARING OR FILE A WRITTEN RESPONSE PRIOR TO THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **RELIEF IS REQUESTED NOT LATER THAN JUNE 2, 2021.**
>
> **PLEASE NOTE THAT ON MARCH 24, 2020, THROUGH THE ENTRY OF GENERAL ORDER 2020-10, THE COURT INVOKED THE PROTOCOL FOR EMERGENCY PUBLIC HEALTH OR SAFETY CONDITIONS.**
>
> **IT IS ANTICIPATED THAT ALL PERSONS WILL APPEAR TELEPHONICALLY AND ALSO MAY APPEAR VIA VIDEO AT THIS HEARING. THE DIAL-IN NUMBER IS 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG-DISTANCE CHARGES. YOU WILL BE ASKED TO KEY IN THE CONFERENCE CODE NUMBER. JUDGE JONES' CONFERENCE CODE NUMBER IS 205691.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: OFS International LLC (3527); Threading and Precision Manufacturing LLC (3527); OFSI Holding, LLC (3419).

> **PARTIES MAY PARTICIPATE IN ELECTRONIC HEARINGS BY USE OF AN INTERNET CONNECTION. THE INTERNET SITE IS HTTPS://WWW.GOTOMEET.ME/JUDGEJONES.**
>
> **ONCE CONNECTED TO HTTPS://WWW.GOTOMEET.ME/JUDGEJONES. THE CONFERENCE ID FOR JOINING THE HEARING BEFORE JUDGE JONES IS JUDGEJONES. THE NEXT SCREEN WILL HAVE A PLACE FOR THE PARTICIPANT'S NAME.**

OFS International LLC ("OFSI") and certain of its affiliates, as debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors") hereby move (the "Motion") for entry of interim (the "Interim Order") and final orders (the "Final Order", and collectively with the Interim Order, the "Orders"), pursuant to sections 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas (the "Complex Case Procedures") among other things, (i) authorizing the Debtors to obtain access to the DIP Facilities (as defined below) and enter into the DIP Documents (as defined below), attached to the proposed Interim Order as **Exhibit A**,[2] (ii) authorizing the Debtors to continue to use cash collateral in which the DIP Lender or Pre-Petition Revolving Lender (each as defined below) have an interest, subject to certain restrictions, (iii) granting post-petition liens and providing the DIP Superpriority Claims and the Adequate Protection Superpriority Claim (each as defined below) on account of the obligations incurred by the Debtors under the DIP Facility, (iv) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the Orders, and (v) granting related relief. In support of the Motion, the Debtors rely upon and incorporate by

---

[2]   Capitalized terms used but not defined herein have the meanings given to such terms in the DIP Documents or the Orders, as applicable.

reference the *Declaration of Alexey Ratnikov in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed with the Court concurrently with this Motion.

## SUMMARY

1.     The Debtors seek to continue their operations in the ordinary course of business while they develop their plan of reorganization during these chapter 11 cases. By this Motion, the Debtors are seeking approval of a senior secured, super-priority credit facility of up to $16,500,000.00, consisting of a $12,500,000 revolving loan facility (the "DIP ABL Facility," and all amounts extended under the DIP ABL Facility, the "DIP ABL Loans") and a term loan facility in the aggregate amount not to exceed $4,000,000 (the "DIP Term Loan Facility," and all amounts extended under the DIP Term Loan Facility, the "DIP Term Loans"),[3] pursuant to the terms and conditions of that certain Senior Secured, Priming and Super-Priority Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Agreement"), dated as of June 2, 2021, by and among OFSI, as borrower (the "Borrower"), TPM, as a Loan Guarantor (the "Guarantor"), and Sandton Capital Solutions Master Fund V, LP, as lender ("Sandton" or the "DIP Lender").[4]

2.     The Debtors submit that the DIP Facilities are a sound exercise of the Debtors' business judgment.

## JURISDICTION AND VENUE

3.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over these cases, the Debtors, property of the Debtors' estates and this

---

[3]     The DIP ABL Facility and the DIP Term Loan Facility shall be collectively referred to herein as the "DIP Facilities," and the DIP ABL Loans and the DIP Term Loans shall be collectively referred to herein as the "DIP Loans."

[4]     A copy of the DIP Agreement is attached to the proposed Interim Order as Exhibit A.

matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. § 1408.

4.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1, and the Complex Case Procedures.

### CONCISE STATEMENT OF THE MATERIAL TERMS OF THE ORDER PURSUANT TO BANKRUPTCY RULE 4001 AND THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS PROCEDURES FOR COMPLEX CHAPTER 11 CASES

| DIP Facility Term | Relief Requested[5] |
|---|---|
| **DIP Facility** | The DIP Facility includes the senior secured, superpriority, priming DIP ABL Facility in the amount of $12.5 million and the DIP Term Facility in an amount of up to $4 million. |
| **Loan Documents** | Authorize the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents |
| **Adequate Protection** | Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Debtors hereby grant to the Pre-Petition Lender continuing, valid, binding, enforceable, and perfected post-petition security interests in and liens on all DIP Collateral (the "Adequate Protection Liens"). |
|  | Subject and subordinate to the Carve Out as set forth in this Interim Order, as further adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Pre-Petition Lender is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed super-priority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "Adequate Protection Superpriority Claim"). |
|  | As further adequate protection, the Debtors are authorized and directed to provide adequate protection to the Pre-Petition Lender in the form of payment in cash of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Pre-Petition Lender arising prior to the Petition Date, |

---

[5] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Interim Order or the Ratification Agreement, as applicable.

4

| DIP Facility Term | Relief Requested[5] |
|---|---|
| | including reasonable and documented fees and expenses of McGuireWoods LLP, without the need for the filing of a formal fee application. |
| **Cash Collateral** | Authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the DIP Documents and the Orders. |
| **Superpriority Claims and DIP Liens** | Subject to the Carve Out, granting to the DIP Lender: (i) superpriority administrative claims; (ii) perfected senior priming liens pursuant to section 364(d) of the Bankruptcy Code on all assets other than the Debtors' real property; (iii) perfected senior liens pursuant to section 364(c)(2) of the Bankruptcy Code on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date, excluding Avoidance Actions, but including, subject to entry of the Final Order, Avoidance Proceeds solely to the extent that all other Collateral is insufficient to satisfy the Secured Obligations; and (iv) perfected junior security interests on other assets of the Debtors subject to permitted liens on the Petition Date pursuant to section 364(c)(3) of the Bankruptcy Code. |
| **Use of DIP Facility Proceeds** | Authorizing the Debtors to use proceeds of the DIP Facility as set forth in the Loan Documents, solely in accordance with the Orders and the Approved Budget. |
| **Automatic Stay** | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit the DIP Lender to (i) require proceeds from Collateral and other collections received by the Debtors to be deposited in accordance with the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Documents in accordance with any requirements of the DIP Documents, and (ii) require mandatory prepayments in accordance with the requirements of the DIP Documents, in each case, without further order of this Court; and (iii) immediately upon the occurrence and during the continuation of an Event of Default (as defined in DIP Documents), allow the DIP Lender to deliver a written notice of its intention to declare a termination of the Debtors' ability and rights to access or use proceeds of the Financing (any such declaration, a "Termination Declaration"). The Termination Declaration shall be given by written notice (including electronic mail) to the Debtors, the U.S. Trustee and counsel to the Committee, if any.

If a Termination Declaration is delivered as provided above, the Debtors hereby consent to a hearing being held before this Court on an expedited basis and a motion shall be filed with the Court by the DIP Lender on at least five (5) business days' notice (subject to the Court's availability) to cause the automatic stay to be lifted to enable the DIP Lender to exercise rights and remedies against the DIP Collateral in accordance with this Interim Order, the DIP Documents, or applicable law.  The Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the DIP Lender under this paragraph. |
| **506(c) and 552(b) Waiver** | Upon entry of a Final Order, the DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to the DIP Documents and/or the Collateral.  Upon entry of a Final Order, no person or entity shall be entitled, directly or indirectly, to, except as expressly provided by paragraph |

| DIP Facility Term | Relief Requested[5] |
|---|---|
| | 4 of the Interim Order with respect to the Carve Out, charge or recover from the Collateral, whether by operation of section 506(c) of Bankruptcy Code, sections 105 or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of this Bankruptcy Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or the Interim Order. |

5.     The following chart contains a summary of the material terms of the Orders, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[6]

| Summary of Material Terms[7] | | Location |
|---|---|---|
| **Parties to the DIP Loan Documents**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Borrower:** OFS International LLC<br><br>**Guarantor:** Threading and Precision Manufacturing LLC<br><br>**DIP Lender:** Sandton Capital Solutions Master Fund V, LP | Credit Agreement Preamble |
| **Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) | December 31, 2021, or any earlier date on which the Revolving Commitment is reduced to zero or otherwise terminated pursuant to the DIP Credit Agreement; provided that such date shall be extended by six months upon satisfaction of the Extension Conditions. | Credit Agreement, Terms Schedule<br><br>Definition of Maturity Date |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | $12,500,000 Revolving Commitment<br><br>Commitment of up to $4,000,000 in multi-tranche, one-time term loans, of which $800,000 will be available as a first tranche upon entry of the Interim Order, $700,000 will be available as a second tranche upon entry of the Final Order, and the $2,500,000 balance potentially available as a discretionary third tranche at the DIP Lender's sole discretion for purposes of funding working capital purchases acceptable to Sandton and depending upon Borrowing Base Availability.  For the avoidance of doubt, the DIP Lender shall have no obligation to fund the $2.5 million discretionary third tranche. | Credit Agreement, Terms Schedule<br><br>Definition of Revolving Commitment<br><br>Credit Agreement Section 2.02(a) (Term Loans) |
| **Conditions of Borrowing** | (a)      The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects (except that any representation and warranty that is qualified by materiality shall be true and correct in all respects) with the same effect as though | Credit Agreement Section 4.02 (Each Credit Event) |

---

[6]  The summaries contained in this Motion are qualified in their entirety by the provisions of the Interim Order. To the extent anything in this Motion is inconsistent with the Interim Order, the terms of the Interim Order shall control.

[7]  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Interim Order or the Ratification Agreement, as applicable.

| | Summary of Material Terms[7] | Location |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).<br><br>(b)     At the time of and immediately after giving effect to such Borrowing, (i) no Default or Event of Default shall have occurred and be continuing, except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases to the extent the Pre-Petition Obligations have not been converted to the Obligations under (and in accordance with) this Agreement and (ii) no Protective Advance shall be outstanding.<br><br>(c)     the Actual Net Paydown Amount for the most recently ended Cumulative Four-Week Period is not less than the Budgeted Net Paydown Amount for such Cumulative Four-Week Period.<br><br>(d)     After giving effect to any Borrowing of a Revolving Loan, Availability shall not be less than zero.<br><br>(e)     (i) The Final Order shall have been entered following the expiration of the Interim Order, (ii) the Interim Order or Final Order, as applicable, shall not have been vacated, stayed, reversed, modified or amended without the Lender's consent and shall otherwise be in full force and effect, and (iii) no motion for reconsideration of the Interim Order or Final Order, as applicable, shall have been filed by any Loan Party.<br><br>(f)     The Lender shall have received a Borrowing Request in accordance with the requirements hereof, and the Borrowing requested therein (other than a Borrowing consisting of (i) the Initial Term Loan or (ii) a Specified Term Loan which shall otherwise comply with the Specified Term Loan Draw Conditions) shall be not more than the amount set forth for the Budgeted Disbursement Amount for such week (less the amount of any other Borrowings previously made during such week).<br><br>(g)     The Lender shall have received (i) a Borrowing Request in accordance with the requirements hereof, (ii) a certificate of a Responsible Borrower of the Borrower certifying as to the matters described in clauses (a), (b) and (f) of this Section, (iii) with respect to the week in which such Loan is to be made, a Budget Compliance Certificate for such week required to be delivered to the Lender pursuant to Section 5.18(c) (attaching the Approved Budget Variance Report for the Prior Week) and (B) the 13-week cash flow forecast for such week required to be delivered to the Lender pursuant to Section 5.18(e). | |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | 11% interest rate, 5.0% PIK and 6% Cash | Credit Agreement<br><br>Section 2.12 (Interest) |

| Summary of Material Terms[7] | | Location |
|---|---|---|
| **Parties with an Interest in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(i) | The DIP Lender and the Pre-Petition Lender (both of which are Sandton) | Interim DIP Order Preamble |
| **Purposes for Use of Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The proceeds of the Loans will be used by the Borrower solely on or after the Effective Date (i) to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to variances permitted under <u>Section 5.18</u>), and (ii) for the financing of the Borrower's and its Subsidiaries' ordinary working capital and other general corporate needs, including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve-Out, in each case to the extent permitted under this Agreement and in accordance with the Approved Budget, (iii) for certain other pre-petition and pre-filing expenses and payments that are approved by the Court and permitted by the Approved Budget, and (iv) to pay the Pre-Petition Obligations, including as provided in <u>Section 2.01</u>. | Credit Agreement<br><br>Sections 5.08 |
| **Budget**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget, attached as **<u>Exhibit C</u>** to the Interim Order. | Interim DIP Order<br><br>Exhibit C |
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Closing Fee of $100,000<br><br>Exit Fee of $100,000<br><br>"<u>Extension Fee</u>" means, on any date of determination, an amount equal to (a) the sum of the principal amount (including any PIK Interest) of Pre-Petition Loans and Loans outstanding on such date (or, if such date is after the Maturity Date, the sum of the principal amount (including any PIK Interest) of Pre-Petition Loans and Loans outstanding immediately prior to the Maturity Date), <u>multiplied by</u> (b) 2.5%. | Credit Agreement<br><br>Section 2.11 (Fees)<br><br>Terms Schedule, Definitions of Closing Fee, Exhibit Fee, Extension Fee |
| **Adequate Protection**<br><br>Bankruptcy Rule 4001(b)(1)(B)(ii) | Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Debtors hereby grant to the Pre-Petition Lender continuing, valid, binding, enforceable, and perfected post-petition security interests in and liens on all DIP Collateral (the "<u>Adequate Protection Liens</u>").<br><br>Subject and subordinate to the Carve Out as set forth in this Interim Order, as further adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Pre-Petition Lender is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed super-priority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "<u>Adequate Protection Superpriority Claim</u>").<br><br>As further adequate protection, the Debtors are authorized and directed to provide adequate protection to the Pre-Petition Lender in the form of payment in cash of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented | Interim Order at paragraphs 14-18 |

| Summary of Material Terms[7] | | Location |
|---|---|---|
| | fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Pre-Petition Lender arising prior to the Petition Date, including reasonable and documented fees and expenses of McGuireWoods LLP, without the need for the filing of a formal fee application. | |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | Among other reporting requirements, the Borrower shall provide on a weekly and monthly basis: a Borrowing Base Certificate, aging accounts receivable report, summary of Inventory. | Credit Agreement, Reporting Schedule |
| **Chapter 11 Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The Loan Parties shall have filed a plan of reorganization or liquidation in form and substance acceptable to the Lender on or before 90 days after the Petition Date. | Credit Agreement, Section 5.22 (Required Milestone) |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | As security for the DIP Obligations, effective and perfected as of entry of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the Debtors of, or over, any DIP Collateral, the following security interests and liens, hereby are granted by the Debtors to the DIP Lender (all property of the Debtor identified in clauses (i), (ii), and (iii) below being collectively referred to as the "<u>DIP Collateral</u>"), subject only to the Carve Out (all such liens on and security interests in the DIP Collateral granted to the DIP Lender, pursuant to this Final Order, the DIP Documents, the "<u>DIP Liens</u>"):<br><br>(i)     <u>First Lien on Unencumbered Property</u>. Pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to valid, perfected, and non-avoidable liens, if any (collectively, "<u>Unencumbered Property</u>"), including (i) any unencumbered cash of the Debtors (wherever maintained) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and any claims and causes of the Debtors; (ii) any claims and causes of action against any directors or officers of the Debtors as well as including any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Debtors; and (iii) excluding any claims and causes of action of the Debtors under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "<u>Avoidance Actions</u>"), but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in this Interim Order, any proceeds of, or property recovered in connection | Interim Order at paragraph 11 |

| Summary of Material Terms[7] | Location |
|---|---|
| with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not, the "Avoidance Proceeds")[8]; <br><br> (ii)    Priming Liens Senior to the Pre-Petition Lender's Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected, first priority (subject to any Permitted Encumbrances, as defined in the DIP Agreement) senior priming security interest in and lien upon all prepetition and post-petition property of the Debtors (including any Cash Collateral), whether now existing or hereafter acquired, excluding any Avoidance Actions but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in the Interim Order, Avoidance Proceeds. Such security interests and liens shall be senior in all respects to the interests in such property of the Pre-Petition Lender arising from current and future liens of the Pre-Petition Lender and shall be subject to the Carve Out in all respects; <br><br> (iii)    Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all pre-petition and post-petition property of the Debtors (other than the property described in clauses (i) or (ii) above, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses) excluding any Avoidance Actions but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in this Interim Order, Avoidance Proceeds, whether now existing or hereafter acquired, that is (i) subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or (ii) subject to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and unavoidable liens are senior in priority to the security interests and liens of the Pre-Petition Lender; and <br><br> (iv)    Liens Senior to Certain Other Liens. The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors. For the avoidance of doubt, the DIP Liens shall be subject to the Carve Out in all respects. | |
| **Carve Out** | "Carve Out" shall mean the sum of (i) to the extent allowed by the Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the | Interim Order at paragraph 4 |

---

[8]  For the avoidance of doubt, the DIP Lender is not taking a senior lien with respect to any real property interests of the Debtors which are subject to the liens of PAO TMK.

| | **Summary of Material Terms[7]** | **Location** |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | Committee (to the extent one is appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, to the extent provided for in the Approved Budget; (ii) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed by the Court (the amounts set forth in this clause (ii) being the "Post-Carve Out Trigger Notice Cap"); and (iii) fees owed pursuant to 28 U.S.C. §1930 or fees owed the clerk of the Bankruptcy Court. "Carve Out Trigger Notice" shall mean the written notice, including by email, delivered by the DIP Lender to the Debtors, their counsel, the U.S. Trustee and counsel to the Committee, if any, appointed in the Chapter 11 Case, which notice may be delivered following the occurrence and continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Documents, stating that the Post-Carve Out Trigger Cap has been invoked. | |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Credit Agreement contains events of default that are usual and customary for debtor in possession financings, including without limitation, breach of the milestone and conversion or dismissal. Additionally, entry of an order granting relief from stay to allow PAO TMK to foreclosure on its real property collateral shall constitute an Event of Default. | Credit Agreement Article VII |
| **Waiver/Modification of the Automatic Stay** | The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified without further notice, application or order of the Court to the extent necessary to permit the DIP Lender to (i) require proceeds from Collateral and other collections received by the Debtors to be deposited in accordance with the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Documents in accordance with any requirements of the DIP Documents, and (ii) require mandatory prepayments in accordance with the requirements of the DIP Documents, in each case, without further order of this Court; and (iii) immediately upon the occurrence and during the continuation of an Event of Default (as defined in DIP Documents), allow the DIP Lender to deliver a written notice of its intention to declare a termination of the Debtors' ability and rights to access or use proceeds of the Financing (any such declaration, a "Termination Declaration"). The Termination Declaration shall be given by written notice (including electronic mail) to the Debtors, the U.S. Trustee and counsel to the Committee, if any.<br><br>If a Termination Declaration is delivered as provided above, the Debtors hereby consent to a hearing being held before this Court on an expedited basis and a motion shall be filed with the Court by the DIP Lender on at least five (5) business days' notice (subject to the Court's availability) to cause the automatic stay to be lifted to enable the DIP Lender to exercise rights and remedies against the DIP Collateral in accordance with this Interim Order, the DIP Documents, or applicable law.  The Debtors hereby waive their right to and shall not be entitled to seek relief, including under | Interim Order at paragraph 22 |

| Summary of Material Terms[7] | | Location |
|---|---|---|
| | section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the DIP Lender under this paragraph | |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the Interim Order Entry Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Lender to perfect such liens and security interests. Subject to entry of the Final Order, and subject to applicable non-bankruptcy law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Lender a first-priority lien on and security interest in the Debtors' interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by the Debtors in favor of the DIP Lender in accordance with the terms of the DIP Agreement and the other DIP Documents. | Interim Order at paragraph 11(c) |
| **Waiver of Rights under Section 506(c)**<br><br>Bankruptcy Rule 4001(c)(1)(x) | Upon entry of a Final Order, no person or entity shall be entitled, directly or indirectly, to, except as expressly provided by paragraph 4 of the Interim Order with respect to the Carve Out, charge or recover from the Collateral, whether by operation of section 506(c) of Bankruptcy Code, sections 105 or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of this Bankruptcy Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or the Interim Order. | Interim Order at paragraph 37 |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, and any refinancing of the obligations hereunder or any "exit financing" requested by Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability | Credit Agreement, § 8.03(b) |

| Summary of Material Terms[7] | Location |
|---|---|
| related in any way to a Loan Party or a Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to <u>Section 2.16</u>, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. **WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE LOAN PARTIES AND THE LOAN PARTIES AGREE THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE, BUT NOT GROSS NEGLIGENCE, OF SUCH (AND/OR ANY OTHER) INDEMNITEE.** This <u>Section 8.03(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim. | |

## **STATEMENT REGARDING SIGNIFICANT PROVISIONS**

6.     The Orders contain the following provisions (the "<u>Significant Provisions</u>") identified in the Complex Case Procedures.

    a.     **Sale or Plan Confirmation Milestones**. The Debtors shall file a plan of reorganization or liquidation within 90 days of the petition date.

    b.     **Cross-Collateralization**. None.

    c.     **Roll Ups**.[9] Upon entry of the Interim Order and the occurrence of the Effective Date (as defined in the DIP Agreement), without any further action by the Debtors or any other party, all collections received by the Debtors shall be applied to reduce, on a dollar-for-dollar basis, the Pre-Petition Obligations, with each post-petition advance made by the DIP Lender constituting DIP Loans (the "<u>DIP Roll Up Obligations</u>"). This conversion, or "roll up" shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Pre-

---

[9]   Although effective upon entry of the Interim Order, the Roll Up remains subject to a Challenge.

Petition Lender to fund amounts and provide other consideration to the Debtors under the DIP Facilities and not as payments under, adequate protection for, or otherwise on account of, any Pre-Petition Obligations.

d.     **Liens on Avoidance Actions or Proceeds of Avoidance Actions**. Subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in the Interim Order, any proceeds of, or property recovered in connection with, any successful Avoidance Action

e.     **Default Provisions and Remedies**. If a Termination Declaration is delivered as provided above, the Debtors hereby consent to a hearing being held before this Court on an expedited basis and a motion shall be filed with the Court by the DIP Lender on at least five (5) business days' notice (subject to the Court's availability) to cause the automatic stay to be lifted to enable the DIP Lender to exercise rights and remedies against the DIP Collateral in accordance with this Interim Order, the DIP Documents, or applicable law.  The Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the DIP Lender under this paragraph.

f.     **Releases of Claims**. (i) any action arising under the Bankruptcy Code against the DIP Lender and/or each of its former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees"); (ii) any so-called "lender liability" claims and causes of action against a Releasee; (iii) any action with respect to the legality, enforceability, validity, extent, perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Documents, or the legality, enforceability, validity, extent, perfection, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the DIP Liens, DIP Obligations, or the DIP Superpriority Claims, in whole or in part; (v) appeal or otherwise challenge the Interim Order, the DIP Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Lender's rights in respect of its liens on and security interests in the Collateral or any of its rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world

14

g.    **Limitations on the use of cash collateral other than the carve out**. The DIP Facilities, the DIP Collateral, the Pre-Petition Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP Lender's or the Pre-Petition Lender's permitted enforcement or realization upon any of the DIP Collateral or Pre-Petition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Lender or as permitted by the DIP Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender; (d) incurring Indebtedness (as defined in the DIP Agreement) without the prior consent of the DIP Lender, except to the extent permitted under the DIP Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Lender or the Pre-Petition Lender under this Interim Order, the DIP Documents, or the Pre-Petition Loan Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Pre-Petition Liens, Pre-Petition Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Pre-Petition Collateral, or any other claims or liens, held by or on behalf of either of the DIP Lender or the Pre-Petition Lender, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against either the DIP Lender or the Pre-Petition Lender, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Pre-Petition Liens, the Pre-Petition Obligations or any other rights or interests of the DIP Lender or the Pre-Petition Lender; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the DIP Liens, the Pre-Petition Obligations, or the Pre-Petition Liens; *provided, however,* that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for allowed fees and expenses, in an amount not to exceed $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the Prepetition Lien and Claim Matters (as defined herein).

h.    **Priming Liens**. The Interim Order provides the DIP Lender, pursuant to section 364(d) of the Bankruptcy Code, perfected senior priming liens on all prepetition and post-petition property of the Debtors, excluding the Debtors' real property.

i.    **Any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law**.  None.

10669294v3

7.      The explanation for the inclusion of the foregoing Significant Provisions, as required by Complex Case Procedures is that is that such Significant Provisions were necessary to obtain the Lender's agreement to provide the DIP Facilities on the terms and conditions reflected in the DIP Agreement and Interim Order. As set forth herein, the DIP Facilities are critical to ensure that the Debtors have sufficient liquidity to maintain their operations, pursue and achieve a successful restructuring transaction, and maximize the value of the Debtors' estates for all parties in interest.

8.      In light of the foregoing, the Debtors submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 Cases. Accordingly, the Significant Provisions in the Orders should be approved.

## BACKGROUND

**A.      General Background**

9.      On May 31, 2021 (the "<u>Petition Date</u>"), the Debtors each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "<u>Chapter 11 Cases</u>").

10.     The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

11.     To date, no creditors' committee has been appointed in the Chapter 11 Cases by the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>"). No trustee or examiner has been appointed in the Chapter 11 Cases.

12.     The Debtors are providers of oil and gas production and processing equipment and services headquartered in Houston, Texas with operations in the Permian, Barnett and Marcellus regions.  The Debtors' services include field services, inspections, couplings, threading and accessories.

10669294v3

13.     Additional information regarding the Debtors and the Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of the Chapter 11 Cases, is set forth in the First Day Declaration, filed contemporaneously with this Motion

**B.      Summary of the Debtors' Pre-Petition Capital Structure**

14.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

15.     OFSI, as borrower, and PAO TMK, as lender, entered into that certain Loan Agreement dated as of September 19, 2017, with an advancing line of credit of up to $25,000,000 (the "PAO TMK Loan Agreement").  The PAO TMK Loan Agreement references a Security Agreement that was to be executed at the same time as the PAO TMK Loan Agreement, but the parties did not execute such a Security Agreement at that time, and the Debtor's obligation to PAO TMK was unsecured until July 2018.

16.     On July 13, 2018, PAO TMK and OFSI entered into an Amendment to the PAO TMK Loan Agreement which extended the maturity date to December 20, 2021.

17.     On July 13, 2018, OFSI executed a Security Agreement with PAO TMK granting PAO TMK a lien on OFSI's equipment.

18.     On July 13, 2018, OFSI executed a Deed of Trust, Assignment of Rights, Security Agreement, and Financing Statement which was recorded in the real property records of Harris County and Ector County, Texas, granting PAO TMK a lien on OFSI's real property.

19.     The Debtors, as borrowers, entered into a Credit Agreement dated as of July 13, 2018 (the "JPMorgan Credit Agreement"), with JPMorgan Chase Bank, N.A. ("JPMorgan"), as lender, with an initial revolving commitment in the amount of $20 million.  The JPMorgan Credit

17

Agreement is an asset-based lending credit facility.  On July 13, 2018, the Debtors executed a Security Agreement granting JPMorgan a first lien on all assets of the Debtors except for their real property.

20.    On July 13, 2018, JPMorgan entered into an Intercreditor Agreement with PAO TMK.  In the Intercreditor Agreement, PAO TMK agreed and acknowledged that its liens on the Debtors' equipment were junior to the liens of JPMorgan and, other than this junior lien on equipment and its lien on real property, that it did not hold liens on any other assets of the Debtors. In the event of default on the PAO TMK Loan Agreement, JPMorgan agreed that PAO TMK could foreclose its liens against the Debtors' real property.

21.    On October 26, 2018, the Debtors and JPMorgan executed the First Amendment to the JPMorgan Credit Agreement which increased JPMorgan's commitment to $30 million.

22.    On February 22, 2019, the Debtors and JPMorgan executed the Second Amendment to the JPMorgan Credit Agreement which permitted, under certain conditions, the repayment of a $20 million loan from Volzhsky Pipe Plant.

23.    On August 27, 2019, the Debtors and JPMorgan executed the Third Amendment to the JPMorgan Credit Agreement which increased JPMorgan's commitment to $40 million and specifically permitted the $10 million in additional borrowings to be used as a cash dividend to OFSI Holdings, funds which were then used to fund the Transfer to TMK Steel discussed in detail below.

24.    On April 13, 2020, OFSI received a PPP loan in the amount of $6,048,962.

25.    On April 5, 2021, OFSI received an additional PPP loan in the amount of $2,000,000.

26.     On May 27, 2021, JPMorgan closed the Debtors' revolving credit facility with a balance of $12.5 million.

27.     On May 28, 2021, JPMorgan sold all of its rights, interests, and liens related to the JPMorgan Credit Agreement to Sandton.

28.     As of the Petition Date, the amount due to Sandton is $12.5 million, which is secured by a senior lien on all of the Debtors' assets other than its real property.

29.     As of the Petition Date, the amount due under the PAO TMK Loan Agreement is approximately $14.5 million, including accrued interest, which is secured by a senior lien on the Debtors' real property and a junior lien on the Debtors' equipment.

30.     The Debtors estimate that their total pre-petition trade debt is approximately $50 million, of which approximately $40 million is owed to PAO TMK and related entities.

## THE DEBTORS' NEED FOR DIP FINANCING

31.     The Debtors seek relief under the Motion to utilize their cash and to obtain additional financing to prosecute the Chapter 11 Cases and maintain their business operations in the ordinary course. The Debtors need the immediate use of cash collateral and additional financing to fund operations. Otherwise, the Debtors will experience irreparable harm because they cannot their pay employees or professionals without the use of cash collateral and additional financing. Through the use of cash collateral and the additional financing, the Debtors will have access to the necessary funding to pay (1) employees; (2) rent; (3) insurance; (4)  operating expenses including utilities and supplies; and (5) bankruptcy professionals.

32.     Beginning on or about September 8, 2020, Chiron Financial LLC ("Chiron") professionals screened their proprietary database of potential DIP lenders that might have an interest in providing DIP financing, focusing on DIP size, industry and potential to provide the DIP financing in a second lien position. Chiron contacted 332 potential lenders. Four parties

expressed interest in exploring a potential financing (other than JPMorgan Chase who would have allowed post-petition use of the revolving credit facility but would not have provided additional availability). The competing proposals included higher fees and/or interest rates and had a lower likelihood of closing than the proposed DIP Facility. The proposed DIP Lender first expressed an interest in potentially lending funds to the Debtors outside of a bankruptcy process in September 2020 and, at that time, began conducting diligence. Therefore, when the Debtors needed to obtain DIP financing, the proposed Lender was able to move faster through its updated diligence and had a higher likelihood of closing compared to the other proposals. Based on the feedback from the potential lenders contacted, it is Chiron's and the Debtors' opinion that expanding the scope and length of the DIP marketing process would not yield any material interest in providing DIP financing without a priming lien or on better terms.

33. The Debtors exercised their reasonable business judgment in selecting the financing proposed by Sandton.

34. The provisions of the Interim Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain under the circumstances. Approval of the Motion will ensure the Debtors are able to maintain their operations, pursue and achieve a successful restructuring transaction, and maximize the value of their estates for the benefit of their stakeholders.

## **BASIS FOR RELIEF**

A. **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Documents.**

  i.  ***Entering into the DIP Facilities is an Exercise of the Debtors' Sound Business Judgment.***

35. The Court should authorize the Debtors, in exercising their sound business judgment, to enter into the DIP Documents, obtain postpetition DIP financing under the DIP

Facilities, and continue using Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions and underlying policy considerations of the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

36.     To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

37.     The Debtors' entry into the DIP Facilities represents a sound exercise of their business judgment. The Debtors are requesting authorization to enter into the DIP Agreement for the purpose of ensuring sufficient liquidity to maintain their business operations and funds the additional expenses of these chapter 11 cases. A result of good-faith, arm's-length negotiations, the DIP Facilities are critical for the Debtors to execute and complete their restructuring efforts

successfully. No alternative sources of financing with terms as favorable as those contained in the DIP Facilities are currently available to the Debtors.

38.     Absent the DIP Facilities, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.

### B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Lender.

39.     The Debtors propose to obtain financing under the DIP Facilities, in part, by providing superpriority claims and liens pursuant to section 364(c) and (d) of the Bankruptcy Code. Significantly, the Debtors propose to provide, subject only to the Carve Out: (a) the DIP Superpriority Claim; (b) pursuant to section 364(c)(2) of the Bankruptcy Code, perfected senior liens on all assets of the Debtors not subject to a valid, perfected, and non-avoidable lien in existence as of on the Petition Date (or as such lien may be perfected after the Petition Date to the extent permitted by section 546 of the Bankruptcy Code) including, and effective upon entry of a Final Order, the Avoidance Proceeds; (c) pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, first priority (subject to any Permitted Encumbrances, as defined in the DIP Agreement) senior priming security interest in and lien upon all prepetition and post-petition property of the Debtors (including any Cash Collateral) and effective upon entry of a Final Order, the Avoidance Proceeds, and (d) pursuant to section 364(c)(3) of the Bankruptcy Code, perfected junior security interests on other assets of the Debtors subject to permitted liens on the Petition Date.

40.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in

> section 503(b) or 507(b) of the Bankruptcy Code; (2) secured by a lien on
> property of the estate that is not otherwise subject to a lien; or (3) secured
> by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c); *see also In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing,

upon showing that unsecured credit cannot be obtained).

41.     Courts have articulated a three-part test to determine whether a debtor is entitled to

financing pursuant to section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b)
>        of the Bankruptcy Code, *i.e.*, by allowing a lender only an
>        administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate;
>        and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given
>        the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary*

*Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Group*, 71 B.R. at 549.

42.     No party contacted by the Debtors' advisors during the DIP Facility marketing

process was interested in providing, or willing to provide, a holistic package of postpetition

financing to the Debtors on an unsecured basis. The only option to achieve the terms of the DIP

Facility was for the Debtors to enter into an arrangement with the DIP Lender whereby the DIP

Facilities would be secured by first priority priming liens. No other party offered sufficient

postpetition financing on more favorable terms to meet the Debtors' liquidity and capital needs to

maintain operations through these chapter 11 cases.

43.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain

credit secured by a senior or equal lien on property of the estate already subject to a lien where the

debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest

of the holder of the lien on the property of the estate on which such senior or equal lien is proposed

to be granted." 11 U.S.C. § 364(d)(1). As such, the Debtors may incur "priming" liens under the

DIP Facilities if they are unable to obtain unsecured or junior secured credit and either (a) the DIP

Lender and the Pre-Petition Lender have consented, or (b) the DIP Lender and the Pre-Petition

Lender's interests in collateral are adequately protected. Here, the DIP Lender and the Pre-Petition

Lender, which are both Sandton, have consented to the priming liens securing the DIP Facilities.

The DIP Facilities will not prime the senior liens on the Debtors' real estate held by PAO TMK.

Further, the Debtors will continue to provide adequate protection set forth in the Interim Order,

whereby the Debtors provide the DIP Lender and the Pre-Petition Lender with safeguards to

protect against the postpetition diminution in value of the Cash Collateral resulting from the use,

sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay in the

form of superpriority claims under section 507(b) of the Bankruptcy Code, replacement adequate

protection liens, and adequate protection payments, pursuant to the adequate provisions further

detailed above in the Summary of Material Terms. The DIP Lender and the Pre-Petition Lender

will also receive payment of fees and expenses, current reporting under the DIP Agreement.

Accordingly, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is both

warranted and appropriate under the circumstances.

### C.  No Comparable Alternative to the DIP Facility Is Reasonably Available

44.  A debtor need only demonstrate "by a good faith effort that credit was not available

without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.

*In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber*

*Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only

a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and

unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *Sky Valley,*

*Inc.*, 100 B.R. at 113; *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

45.     Here, the Debtors have made a good faith effort to seek out optimal postpetition financing arrangements to meet their restructuring objectives. The DIP Facilities represent the best solution to the Debtors' financing needs because it represents a consensual path forward in these Chapter 11 Cases that provides sufficient liquidity for the Debtors to maintain operations, thereby maximizing value for the Debtors' creditors. Accordingly, the DIP Facilities represent the best option available to address the Debtors' immediate liquidity needs, and the Debtors respectfully submit that the terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances.

### D.      The Use of Cash Collateral is Warranted and Should Be Approved.

46.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*). Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case by case basis. *See, e.g., In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re*

*Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")); *See In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case"); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (citation omitted)). Courts generally have found that using cash collateral to preserve the value of the secured creditors' collateral is a form of adequate protection in itself. *See, e.g., In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor).

47.    Through this Motion, the Debtors seek the continued use of the Cash Collateral on the terms set forth in the Interim Order, subject to certain limitations. The Interim Order was carefully calibrated and highly negotiated, and provided for the use of the Pre-Petition Collateral in exchange for a comprehensive adequate protection package. That package provides safeguards to protect against the post-petition diminution in value of the collateral resulting from the use, sale, or lease of the collateral by the Debtors and the imposition of the automatic stay. Significantly, the adequate protection package resolved the use of Cash Collateral on a consensual basis.

48.    The Debtors propose to provide an adequate protection package as set forth in the

Orders. The DIP Lender and the Pre-Petition Lender would not have consented to the Debtors' use of collateral, including Cash Collateral, without the adequate protection provided in the Orders. Obtaining the use of collateral consensually saved the Debtors' estates amounts far in excess of what it could cost to litigate non-consensual use.

49.     The Debtors believe that the proposed adequate protection in the Orders and DIP Agreement is necessary and sufficient for the Debtors to continue to use Cash Collateral. Accordingly, the Debtors submit that the adequate protection is (a) fair and reasonable, (b) necessary to satisfy the requirements of sections 363(c)(2) and 363(e) of the Bankruptcy Code, and (c) in the best interests of the Debtors and their estates.

50.     Courts in this district and others have approved similar adequate protection packages in other recent chapter 11 cases. *See, e.g.*, *In re EXCO Resources, Inc.*, No. 18-30155 (MI) (Bankr. S.D. Tex. Jan. 16, 2018) (granting superpriority administrative claims, adequate protection replacement liens, adequate protection payments, and fees and expenses on an interim basis to the applicable prepetition secured creditors); *In re LINN Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 13, 2016) (same); *In re Energy XXI LTD.*, No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (same); *In re Goodrich Petrol. Corp.*, No. 16-31975 (MI) (Bankr. S.D. Tex. Apr. 18, 2016) (same); *In re Midstates Petrol. Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Mar. 29, 2016) (same).

51.     Further, the DIP Lender and the Pre-Petition Lender will likely benefit from the Debtors' continued use of the Cash Collateral, which will limit avoidable diminution in value of the Cash Collateral and enhance the likelihood of preserving the Debtors' overall value. *See, e.g., 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (noting that, in determining

whether protection is "adequate," courts consider "whether the value of the debtor's property will increase as a result of the" use of collateral or provision of financing); *In re Sky Valley, Inc.*, 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117 (N.D. Ga. 1989).

52.     The Debtors believe continuation of the consensual use of Cash Collateral set forth in the Orders is reasonable, consistent with the Bankruptcy Code and applicable Fifth Circuit law, and in the best interest of the Debtors' estates and all stakeholders. The Debtors therefore seek authority to continue to use Cash Collateral on the terms of the Orders, as incorporated by reference and modified by the terms of the Orders.

###### E.        The Roll-up is a Necessary Component of the DIP Facilities

53.     The Court should approve the refinancing of the Pre-Petition Credit Facility from the Debtors' receipts on a dollar-for-dollar basis with each post-petition advance made by the DIP Lender constituting DIP Loans (the "Roll-Up"), as an exercise of the Debtors' sound business judgment. Prepetition secured claims are routinely paid outside of a plan of reorganization, including through a "roll-up" where the proceeds of the debtor in possession financing are used to pay off or replace prepetition debt. Refinancing prepetition debt is a common feature in debtor in possession financing arrangements, in particular where the facility is a revolving debt facility and the roll-up occurs on an incremental basis (i.e. a "creeping" roll-up).

54.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval. Courts in the Fifth Circuit have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going concern value. *See, e.g.*, *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (authorizing

payment of certain prepetition claims pursuant to "doctrine of necessity"); *In re Equalnet Commc'ns Corp.*, 258 B.R. 368, 369–70 (Bankr. S.D. Tex. 2000) (business transactions critical to the survival of the business of the debtor are exceptions to the general rule of nonpayment of prepetition claims prior to plan confirmation).

55.     Inclusion of the Roll-Up was a topic of negotiation between the Debtors and the DIP Lender and was a necessary condition to obtaining the DIP Facilities. The Debtors would not have access to any new money financing without the Roll-Up. As explained above, the Debtors extensively explored third party debtor in possession financing, but did not receive a better proposal from any such party.

56.     Although the Roll-Up will take effect upon the entry of the Interim Order, any Committee or party-in-interest (other than the Debtors) will retain the right to object to the Roll-Up before the hearing to approve entry of the Final Order, and may challenge the liens even after entry of the Final Order.[10] In other words, the Roll-Up does not insulate the DIP Lender from any challenge to the rolled-up portion of their claims or liens. The Debtors believe that this adequately preserves the rights of all parties.

**F.     The DIP Lender Should Be Afforded Good-Faith Protection Under Section 364(e).**

57.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant

---

[10] Pursuant to paragraph 38 of the Interim Order, any committee has 60 days from the date of its appointment and other parties in interest have until 75 days after the Petition Date to challenge the pre-petition liens or assert claims against the Pre-Petition Lender.

under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

58.     The DIP Facilities are the result of the Debtors' reasonable judgment and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, and extensive arm's-length, good-faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Facilities are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facilities will be used only for purposes that are permissible under the Bankruptcy Code. Accordingly, the Court should find that the obligations arising under the DIP Facilities and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the DIP Lender is entitled to all of the protections afforded thereby.

**G.     The Automatic Stay Should be Modified on a Limited Basis.**

59.     The Orders provide that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lender to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Orders. The proposed Orders further provides that the automatic stay is modified to the extent necessary to implement and effectuate the terms of the Orders. Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases. *See, e.g., In re Vanguard Natural Resources, Inc.* (DRJ) (Bankr. S.D. Tex. Apr. 30, 2019) (modifying automatic

30

stay as necessary to effectuate the terms of the order); *In re Westmoreland Coal Company*, (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Autoseis, Inc.*, No. 14-20130 (RSS) (Bankr. S.D. Tex. Mar. 27, 2014) (same); *In re ATP Oil & Gas Corp.*, No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 17, 2012) (same); *In re MPF Holdings US LLC*, No. 08-36084 (JB) (Bankr. S.D. Tex. Feb. 18, 2009) (same). The Debtors therefore submit that the modification of the automatic stay as set forth in the Orders should be approved.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

60.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

61.     Nothing contained herein is intended or shall be construed as: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay prepetition claims; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## NOTICE

62.     Notice of this Motion will be given to: (a) the Office of the United States Trustee

31

for the Southern District of Texas (the "U.S. Trustee"); (b) counsel for Sandton; (c) counsel for PAO TMK; (d) the Debtors' 30 largest unsecured creditors; (e) the United States Attorney's Office for the Southern District of Texas; (f) the Internal Revenue Service; (g) the Texas attorney general; and (h) all parties that have requested or that are required to receive notice pursuant to Rule 2002 of the Bankruptcy Rules.  The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

63.     The Debtors respectfully request that the Court enter the Orders substantially in the form attached hereto, granting the relief requested in this Motion, and granting such other and further relief the Court may deem proper.

Dated: June 1, 2021.
      Houston, Texas

**PORTER HEDGES LLP**

By:    */s/ Joshua W. Wolfshohl*
      Joshua W. Wolfshohl (TX 24038592)
      Aaron J. Power (TX 24058058)
      Megan Young-John (TX 24088700)
      1000 Main Street, 36th Floor
      Houston, Texas 77002
      Telephone: (713) 226-6000
      Fax: (713) 226-6248

**PROPOSED COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

10669294v3