

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

ENTERED
06/02/2021

| | |
|---|---|
| **In re:** | § **Chapter 11** |
| | § |
| **OFS INTERNATIONAL LLC,** *et al.*, | § **Case No. 21-31784 (DRJ)** |
| | § |
| **Debtors.**[1] | § **(Jointly Administered)** |
| | § |

**INTERIM ORDER (I) APPROVING POSTPETITION FINANCING, (II) ALLOWING USE OF CASH COLLATERAL; (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY <u>AND (VI) SCHEDULING A FINAL HEARING</u>** (Docket No. 19)

Upon the emergency motion (the "<u>Motion</u>"),[2] dated May 31, 2021, of OFS International LLC ("<u>OFSI</u>") and Threading and Precision Manufacturing LLC ("<u>TPM</u>"), each as a debtor and debtor-in-possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), for entry of interim and final orders pursuant to sections 105, 107(b), 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101¬1532 (as amended, the "<u>Bankruptcy Code</u>"), rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "<u>Bankruptcy Rules</u>"), Rules 1075-1, 2002-1, 4001-1(b), 4002-1(i) and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (as amended, the "<u>Local Bankruptcy Rules</u>"), and the Procedures for Complex Chapter 11 Cases promulgated by the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>"), seeking to:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: OFS International LLC (3527); Threading and Precision Manufacturing LLC (3527); OFSI Holding, LLC (3419).

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Credit Agreement (as defined below), as applicable.

(i) authorize the Debtors to obtain postpetition financing (the "Financing") on a super-priority basis consisting of a senior secured, super-priority credit facility of up to $16,500,000.00, consisting of a $12,500,000 revolving loan facility (the "DIP ABL Facility," and all amounts extended under the DIP ABL Facility, the "DIP ABL Loans") and a term loan facility in the aggregate amount not to exceed $4,000,000 (the "DIP Term Loan Facility," and all amounts extended under the DIP Term Loan Facility, the "DIP Term Loans"),[3] pursuant to the terms and conditions of that certain Senior Secured, Priming and Super-Priority Debtor-In-Possession Credit Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Agreement"), dated as of June 2, 2021, by and among OFSI, as borrower (the "Borrower"), TPM, as a Loan Guarantor (the "Guarantor"), and Sandton Capital Solutions Master Fund V, LP, as lender ("Sandton" or the "DIP Lender"), a copy of which in substantially final form is attached hereto as **Exhibit A**;

(ii) authorize the Debtors to execute and deliver the DIP Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, and documents related thereto (including any security agreements, intellectual property security agreements, control agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, and collectively, with the DIP Agreement, the "DIP Documents") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii) grant the DIP Facilities and all obligations owing thereunder and under, or secured by, the DIP Documents or otherwise to the DIP Lender (collectively, and including all "Secured Obligations" as described in the DIP Agreement, the "DIP Obligations") allowed super-priority

---

[3] The DIP ABL Facility and the DIP Term Loan Facility shall be collectively referred to herein as the "DIP Facilities," and the DIP ABL Loans and the DIP Term Loans shall be collectively referred to herein as the "DIP Loans."

administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined herein);

(iv) grant to the DIP Lender and each other Secured Party (as defined in the DIP Agreement) under the applicable DIP Documents automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth herein;

(v) authorize the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become earned, due, and payable, including, without limitation, all reasonable fees and expenses of the DIP Lender's attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents;

(vi) authorize the Debtors to use, on the terms described herein, the Pre-Petition Collateral (as defined herein), including the Cash Collateral of the Pre-Petition Lender under the Pre-Petition Credit Agreement;

(vii) provide adequate protection to the Pre-Petition Lender for any diminution in value of its interests in the Pre-Petition Collateral, including Cash Collateral, for any reason provided for under the Bankruptcy Code, including the imposition of the automatic stay, the Debtors' use, sale, or lease of the Pre-Petition Collateral, including Cash Collateral, and the priming of its interests in the Pre-Petition Collateral, including Cash Collateral (including by the Carve Out) ("Diminution in Value");

(viii) vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

3

(ix) schedule a final hearing (the "Final Hearing") within twenty (20) days of the Petition Date to consider the relief requested in the DIP Motion, on a final basis, and approving the form of notice with respect to the Final Hearing;

The Court having considered the Motion, the exhibits attached thereto, the Declaration of Alexey Ratnikov in Support of Chapter 11 Petitions and First Day Pleadings, the DIP Documents, and the evidence submitted and argument made by the Debtors at the interim hearing held on June 2, 2021 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Bankruptcy Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable in the best interests of the Debtors and their estates, and is essential for the continued operation of the Debtors' businesses and the maximization of the value of the Debtors' assets; and it appearing that the Debtors' entry into the DIP Agreement is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

---

[4] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

11088946v5

A.      Petition Date. On May 31, 2021 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Cases.

B.      Debtors in Possession.  The Debtors are operating their businesses and managing their affairs as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.      Jurisdiction and Venue. The Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(D). Venue of the Chapter 11 Cases and the proceedings on the Motion are proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.      Committee Formation. As of the date hereof, the United States Trustee for the Southern District of Texas (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors or any other statutory committee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.      Notice.  Notice of the Motion and the Interim Hearing have been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing shall be required.

F.      Stipulations. After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 38 herein, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows

5

(paragraphs F(i) through F(vii) below are referred to herein, collectively, as the "Debtors' Stipulations"):

(i)      *Pre-Petition Credit Agreement*.   Pursuant to that certain Credit Agreement, dated as of July 13, 2018 (as amended, restated, supplemented, or otherwise modified from time to time, the "Pre-Petition Credit Agreement," and collectively with the Loan Documents (as defined in the Pre-Petition Credit Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "Pre-Petition Loan Documents"), originally among (a) the Borrower, (b) the Guarantor, (c) the other Loan Parties thereto, and (d) JPMorgan Chase Bank, N.A. ("JPM"), as lender, the lender provided revolving credit and other financial accommodations to, and issued letters of credit for the account of, the Borrower pursuant to the Pre-Petition Loan Documents (the "Pre-Petition Credit Facility").

(ii)      *Sale and Assignment Agreement*.   Pursuant to that certain Sale and Assignment Agreement, dated as of May 28, 2021 (as amended, restated, supplemented, or otherwise modified from time to time, the "Assignment Agreement"), Sandton (the "Pre-Petition Lender") agreed to purchase, and did purchase, all of the Pre-Petition Loan Documents from JPM in exchange for an assignment of all of JPM's right, title, and interest in and to such Pre-Petition Loan Documents.

(iii)      *Pre-Petition Obligations*.   The Pre-Petition Credit Facility provided the Borrower with, among other things, a Revolving Commitment (as defined in the Pre-Petition Credit Agreement) up to $13,500,000 in the aggregate (as of May 17, 2021).   As of the Petition Date, the aggregate principal amount outstanding under the Pre-Petition Credit Facility was not less than $12,500,000.00 (collectively, together with accrued and unpaid interest, any fees,

expenses, and disbursements (including, without limitation, attorneys' fees, accountants' fees, auditor fees, appraisers' fees, and financial advisors' fees, and related expenses and disbursements), treasury, cash management, bank product and derivative obligations, indemnification obligations, guarantee obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Borrower's or the Guarantor's obligations pursuant to, or secured by, the Pre-Petition Loan Documents, including all "Secured Obligations" as defined in the Pre-Petition Credit Agreement, and all interest, fees (including amendment fees), prepayment premiums, costs, and other charges allowable under section 506(b) of the Bankruptcy Code, the "Pre-Petition Obligations").

(iv)     *Pre-Petition Liens and Pre-Petition Collateral*.  As more fully set forth in the Pre-Petition Loan Documents and in the Motion, prior to the Petition Date, the Borrower and the Guarantor granted to the Pre-Petition Lender, for the benefit of itself and the other Secured Parties (as defined in the Pre-Petition Credit Agreement), a first priority security interest in and continuing lien (the "Pre-Petition Liens") on substantially all of their assets and property (except for real property), and all proceeds, products, accessions, rents, and profits thereof, in each case whether then owned or existing or thereafter acquired or arising (collectively, the "Pre-Petition Collateral"), subject only to the Permitted Prior Liens (as defined herein).

(v)     *Validity, Perfection, and Priority of Pre-Petition Liens and Pre-Petition Obligations*.  The Debtors acknowledge and agree that as of the Petition Date: (a) the Pre-Petition Liens on the Pre-Petition Collateral were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Pre-Petition Lender for fair consideration and reasonably equivalent value; (b) the Pre-Petition Liens were senior in priority over any and all

11088946v5

other liens on the Pre-Petition Collateral, subject only to liens senior by operation of law (solely to the extent any such liens were valid, properly perfected, non-avoidable, and senior in priority to the Pre-Petition Liens as of the Petition Date or that are perfected subsequently to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code) or permitted by the Pre-Petition Loan Documents (the "Permitted Prior Liens"); (c) the Pre-Petition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Debtors enforceable in accordance with the terms of the applicable Pre-Petition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Pre-Petition Liens or Pre-Petition Obligations exist, and no portion of the Pre-Petition Liens or Pre-Petition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their estates have no claims, objections, challenges, causes of action, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against the Pre-Petition Lender or any of its affiliates, agents, attorneys, advisors, professionals, officers, directors, and/or employees arising out of, based upon, or related to the Pre-Petition Credit Facility; (f) the Debtors waive, discharge, and release any right to challenge any of the Pre-Petition Obligations, the priority of the Debtors' obligations thereunder, and the validity, extent, and priority of the liens securing the Pre-Petition Obligations; and (g) the aggregate value of the Pre-Petition Collateral exceeds the amount of the Pre-Petition Obligations and the claims of the Pre-Petition Lender arising under, or secured by, the Pre-Petition Loan Documents constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.

11088946v5

(vi)     *Cash Collateral*.  All of the Debtors' cash, including any cash in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the Pre-Petition Lender.

(vii)    *Default by the Debtors*.  The Debtors acknowledge and stipulate that they are in default of their obligations under the Pre-Petition Loan Documents, including as a result of the commencement of these Chapter 11 Cases, and that an Event of Default has occurred under the Pre-Petition Loan Documents.

G.     Permitted Prior Liens. Nothing herein shall constitute a finding or ruling by the Court that any alleged Permitted Prior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors, the DIP Lender, the Pre-Petition Lender, or a Committee (if appointed), to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Lien and/or security interests.  The right of a seller of goods to reclaim such goods under section 546(c) of the Bankruptcy Code is not a Permitted Prior Lien, rather, any such alleged claim arising or asserted as a right of reclamation (whether asserted under section 546(c) of the Bankruptcy Code or otherwise) shall have the same rights and priority with respect to the DIP Liens (as defined herein) as such claims had with respect to the Pre-Petition Liens.

H.     Intercreditor Agreement.  The Pre-Petition Lender and PAO TMK are parties to that certain Intercreditor Agreement dated July 13, 2018 (the "Intercreditor Agreement"), a copy of which is attached hereto as **Exhibit B**, and which is enforceable in accordance with its terms.

I.     Findings Regarding Corporate Authority.  Each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents to which it is a party and to perform its obligations thereunder.

J.     Findings Regarding Post-Petition Financing.

(i)       *Request for Post-Petition Financing*.  The Debtors seek authority to (a) use Cash Collateral on the terms described herein, and (b) enter into the DIP Facilities on the terms described herein and in the DIP Documents, to administer their Chapter 11 Cases, and to fund the Debtors' operations.  At the Final Hearing, the Debtors will seek final approval of the DIP Facilities and use of Cash Collateral pursuant to a proposed final order (the "Final Order"), which shall be in form and substance acceptable to the DIP Lender.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)      *Priming of the Pre-Petition Liens*.  The priming of the Pre-Petition Liens on the Pre-Petition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Facilities and as further described below, will enable the Debtors to obtain the DIP Facilities and to continue to operate their businesses to the benefit of their estates and their creditors.  The Pre-Petition Lender is entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, for any Diminution of Value of its interests in the Pre-Petition Collateral (including Cash Collateral).

(iii)     *Need for Post-Petition Financing and Use of Cash Collateral*.  The Debtors have an immediate and critical need to use Cash Collateral on an interim basis and to obtain credit on an interim basis pursuant to the DIP Facilities in order to, among other things, enable the orderly continuation of their operations and administer and preserve the value of their estates.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facilities and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtors, their estates, and parties-in-interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their

11088946v5

businesses or maintain their properties in the ordinary course of business without the DIP Facilities and use of Cash Collateral.

(iv)     *No Credit Available on More Favorable Terms*.  The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, or other financing under sections 364(c) or (d) of the Bankruptcy Code, on equal or more favorable terms than those set forth in the DIP Documents. A loan facility in the amount provided by the DIP Documents is not available to the Debtors without granting the DIP Lender super-priority claims, priming liens and security interests, pursuant to sections 364(c)(1), (2), (3), and 364(d) of the Bankruptcy Code, as provided in this Interim Order and the DIP Documents. After considering all alternatives, the Debtors have concluded, in the exercise of their prudent business judgment, that the DIP Facilities provided under the DIP Documents represents the best and only working capital financing available to them at this time. Given their current financial condition, the Debtors have been unsuccessful in their attempts to find any alternative financing. Additionally, the terms of the Financing are fair and reasonable and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties.

(v)     *Purpose of Financing*. The Debtors require the Financing described in the Motion and as expressly provided in the DIP Documents to: (i) pay costs, fees and expenses associated with or payable under the Financing under the terms of this Interim Order; (ii) pay Allowed Professional Fees (as defined below) subject to the Approved Budget (as defined below); (iii) provide ongoing working capital requirements of the Debtors and to pay fees, costs, expenses and other administrative expenses relating to the Chapter 11 Cases, in each case, subject to the conditions set forth in the DIP Documents (including in respect to Availability under the Borrowing Base), subject to any necessary Bankruptcy Court approvals, and consistent with the

Approved Budget subject to any Budget Variances (each as defined below); and (iv) make other payments of post-petition payables as permitted under the DIP Documents, in each case subject to the conditions as set forth herein and in the DIP Documents (including in respect to Availability under the Borrowing Base) and consistent in all material respects with the Approved Budget and any Budget Variances.

(vi)     *Application of Proceeds of Collateral*.  As a condition to entry into the DIP Agreements, the extension of credit under the DIP Facilities, and authorization to use Cash Collateral, the Debtors, DIP Lender and the Pre-Petition Lender have agreed that as of and commencing on the date of the Interim Hearing, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the Approved Budget.

(vii)    *Roll-Up of Prepetition Obligations into DIP Obligations*.  Upon entry of this Interim Order and the occurrence of the Effective Date (as defined in the DIP Agreement), without any further action by the Debtors or any other party, all collections received by the Debtors shall be applied to reduce, on a dollar-for-dollar basis, the Prepetition Obligations, with each post-petition advance made by the DIP Lender constituting DIP Loans (the "DIP Roll Up Obligations"). This conversion, or "roll up" shall be authorized as compensation for, in consideration for, and solely on account of, the agreement of the Pre-Petition Lender to fund amounts and provide other consideration to the Debtors under the DIP Facilities and not as payments under, adequate protection for, or otherwise on account of, any Pre-Petition Obligations.  The Pre-Petition Lender would not otherwise consent to the use of its Cash Collateral or the subordination of its liens to the DIP Liens, and the DIP Lender would not be willing to provide the DIP Facilities or extend credit to the Debtors thereunder without the inclusion of the DIP Roll Up Obligations in the DIP Obligations.  Moreover, the reduction of the Pre-Petition Obligations will enable the Debtors to

11088946v5

obtain urgently needed financing that they need to administer these Chapter 11 Cases and fund their operations.  Because the DIP Roll Up Obligations are subject to the reservation of rights in paragraph 38 below, they will not prejudice the right of any other party-in-interest.  Moreover, the "roll up" will create availability under the DIP ABL Facility and will result in interest savings to the Debtors and their estates.

   K. <u>Adequate Protection</u>. The Pre-Petition Lender is entitled to receive adequate protection to the extent of any Diminution in Value of its interests in the Pre-Petition Collateral (including Cash Collateral) pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code. Pursuant to sections 361, 363 and 507(b) of the Bankruptcy Code, as adequate protection, the Pre-Petition Lender shall receive post-petition replacement liens, super-priority adequate protection claims, and reasonable professional fees allowed under § 506(b).

   L. <u>Approved Budget</u>. Attached hereto as **<u>Exhibit C</u>** is a summary of the budget setting forth the Debtors' anticipated cash receipts and expenditures during the thirteen-week period through August 29, 2021 (the "<u>Approved Budget</u>").  The Approved Budget shall be in form and substance acceptable to the DIP Lender and shall reflect the Debtors' good-faith projection of all weekly cash receipts and disbursements in connection with the operation of the Debtors' business during such thirteen-week period, delivered pursuant to the terms of the DIP Agreement, delivered by the Debtors to counsel for the DIP Lender.

   M. <u>Good Cause</u>. Based upon the record presented to the Court by the Debtors, it appears that the ability of the Debtors to obtain sufficient working capital and liquidity under the DIP Documents is vital to the Debtors and the Debtors' estates and creditors. The Debtors reasonably believe that the liquidity to be provided under the DIP Documents will enable the

Debtors to continue to operate their businesses in the ordinary course and preserve the value of their businesses. Good cause has, therefore, been shown for the relief sought in the Motion.

N.      Good Faith. The Financing and the DIP Documents have been negotiated in good faith and at arm's length among the Debtors and the DIP Lender, and all of the obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents shall be deemed to have been extended by the DIP Lender in accordance with the DIP Documents, in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Lender's claims, super-priority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents shall be entitled to the full protection of section 364(e) of the Bankruptcy Code and the terms, conditions, benefits, and privileges of this Interim Order regardless of whether this Interim Order is subsequently reversed, vacated, modified, or otherwise is no longer in full force and effect or the Chapter 11 Cases are subsequently converted or dismissed.

O.      Consideration. The Debtors will receive and have received fair consideration and reasonably equivalent value in exchange for access to the Financing, and all other financial accommodations provided under the Financing, the DIP Documents and this Interim Order.

P.      Immediate Entry of Interim Order. The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to enter into the DIP Documents and to obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Interim Order is in the best interests of the Debtors and the Debtors' estates and creditors as its implementation will, among other things, allow for the continued flow of supplies and services to

the Debtors necessary to sustain the operation of the Debtors' existing businesses during the pendency of these Chapter 11 Cases. Based upon the foregoing findings, acknowledgements, and conclusions, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor;

## IT IS HEREBY ORDERED:

1.      <u>Disposition</u>. The Motion is granted on an interim basis and on the terms set forth herein. Any objections to the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein are hereby denied and overruled on their merits.

2.      <u>Effectiveness</u>. Subject to the terms hereof, this Interim Order shall be immediately effective and enforceable upon the date this order is signed and entered by the Court on the docket in the Chapter 11 Cases (the "<u>Interim Order Entry Date</u>").

3.      <u>Authorization of the Financing and DIP Documents</u>

(a)      The Debtors are hereby authorized to execute and enter into the DIP Documents. The DIP Documents and this Interim Order shall govern the financial and credit accommodations to be provided to the Debtors by the DIP Lenders in connection with the Financing.

(b)      The Debtors are hereby authorized on an interim basis to borrow up to the principal amount of $800,000.00 under the DIP Term Loan Facility, all of which shall be used by the Debtors as expressly permitted by the DIP Documents, the Approved Budget and any Budget Variances. The Debtors are authorized to use proceeds of the Financing in accordance with the Approved Budget in an amount that would not cause net cash flows and total disbursements for the trailing four weeks to vary from the applicable

11088946v5

amounts in the Approved Budget by more than fifteen percent (15%) (a "Budget Variance"). The first variance report showing budget to actual and any variance shall be delivered by the Debtors to the DIP Lender on June 9, 2021.

(c)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized to, and, if so required under the terms of the DIP Documents, perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all related fees and expenses, that may be required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery, and performance of the DIP Documents, including, without limitation, the DIP Agreement, any security and pledge agreements, and any mortgages contemplated thereby;

(ii)     subject to paragraph 19 hereof, the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in such form as agreed among the Debtors and the required other parties as set forth in more detail in Paragraph 19 below;

(iii)     the non-refundable payment of the fees referred to in the DIP Documents and described in more detail in the Motion, including the fees of the DIP Lender, and, subject to paragraph 12, costs and expenses payable under the DIP Documents; and

16

(iv)     the performance of all other acts required under or in connection with the DIP Documents.

(d)     All of the DIP Liens described herein shall be valid, enforceable, effective and perfected as of the Interim Order Entry Date and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements.

(e)     The DIP Documents and DIP Obligations constitute valid, binding and non-avoidable obligations of the Debtors enforceable against each of their successors and assigns, and each person or entity party to the DIP Documents in accordance with their respective terms and the terms of this Interim Order and shall survive conversion of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or the dismissal of the Chapter 11 Cases. No obligation, payment, transfer, or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance (whether equitable or otherwise), impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity.

4.     Carve Out. The Debtors' obligations to the DIP Lender and the liens, security interests and superpriority claims granted herein and/or under the DIP Documents, including the DIP Liens, the DIP Superpriority Claims and the Adequate Protection Claims, shall be subject and subordinate to the Carve Out. "Carve Out" shall mean the sum of (i) to the extent

17

allowed by the Court, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee (to the extent one is appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the DIP Lender of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, to the extent provided for in the Approved Budget; (ii) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $200,000 incurred after the first business day following delivery by the DIP Lender of the Carve Out Trigger Notice, to the extent allowed by the Court (the amounts set forth in this clause (ii) being the "Post-Carve Out Trigger Notice Cap"); (iii) fees owed pursuant to 28 U.S.C. §1930 plus interest at the statutory rate pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth below) or fees owed the clerk of the Bankruptcy Court, and (iv) all reasonable and documented fees and expenses, in an aggregate amount not to exceed $50,000, incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth below). "Carve Out Trigger Notice" shall mean the written notice, including by email, delivered by the DIP Lender to the Debtors, their counsel, the U.S. Trustee and counsel to the Committee, if any, appointed in the Chapter 11 Case, which notice may be delivered following the occurrence and continuation of an Event of Default or the Termination Date in accordance with the terms of the DIP Documents, stating that the Post-Carve Out Trigger Cap has been invoked.

     5.     <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve Out</u>.  The DIP Facilities, the DIP Collateral, the Pre-Petition Collateral, the Cash Collateral and the Carve Out may not be used in connection with: (a) preventing, hindering, or delaying any of the DIP

Lender's or the Pre-Petition Lender's permitted enforcement or realization upon any of the DIP Collateral or Pre-Petition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral without the consent of the DIP Lender or as permitted by the DIP Documents; (c) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Lender; (d) incurring Indebtedness (as defined in the DIP Agreement) without the prior consent of the DIP Lender, except to the extent permitted under the DIP Agreement; (e) seeking to amend or modify any of the rights granted to the DIP Lender or the Pre-Petition Lender under this Interim Order, the DIP Documents, or the Pre-Petition Loan Documents, including seeking to use Cash Collateral and/or DIP Collateral on a contested basis; (f) objecting to or challenging in any way the DIP Liens, DIP Obligations, Pre-Petition Liens, Pre-Petition Obligations, DIP Collateral (including Cash Collateral) or, as the case may be, Pre-Petition Collateral, or any other claims or liens, held by or on behalf of either of the DIP Lender or the Pre-Petition Lender, respectively; (g) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions to recover or disgorge payments, against either the DIP Lender or the Pre-Petition Lender, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees; (h) litigating, objecting to, challenging, or contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Pre-Petition Liens, the Pre-Petition Obligations or any other rights or interests of the DIP Lender or the Pre-Petition Lender; or (i) seeking to subordinate, recharacterize, disallow or avoid the DIP Obligations, the DIP Liens, the Pre-Petition Obligations, or the Pre-Petition Liens; *provided, however,* that the Carve Out and such collateral proceeds and loans under the DIP Documents may be used for

11088946v5

allowed fees and expenses, in an amount not to exceed $50,000 in the aggregate (the "Investigation Budget Amount"), incurred solely by a Committee (if appointed), in investigating (but not prosecuting or challenging) the Prepetition Lien and Claim Matters (as defined herein).

6.     DIP Lender Superpriority Claim. Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims against the Debtors with priority over any and all other administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, or 1114 of the Bankruptcy Code (the "DIP Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which shall be payable from and have recourse to all pre- and postpetition property of the Debtors and their estates and all proceeds thereof, excluding Avoidance Actions (as defined below) but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in this Interim Order, without limitation, all Avoidance Proceeds (as defined below), subject only to the Carve Out.

7.     No Obligation to Extend Credit.  Except as may be required to fund the Carve Out as set forth in this Interim Order (and subject to the occurrence of the Effective Date), the DIP Lender shall have no obligation to make any loan or advance under the DIP Documents,

unless all of the conditions precedent to the making of such extension of credit under and subject to the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Lender in its sole discretion, and in accordance with the terms of the applicable DIP Documents.

8.       Use of Proceeds of DIP Facilites.   From and after the Petition Date, the Debtors shall use advances made under the DIP Facilities, in accordance with the Approved Budget (subject to such variances as permitted in the DIP Documents), only for the purposes specifically set forth in this Interim Order, the DIP Documents, and the Approved Budget, and in compliance with the terms and conditions in this Interim Order and the DIP Documents (including with respect to Availability under the Borrowing Base).

9.       Budget Compliance.   The Debtors shall at all times comply with the Approved Budget, subject to the variances set forth in the DIP Agreement. The Debtors shall provide all reports and other information as required in the DIP Agreement. The Debtors' failure to comply with the Budget (including the variances set forth in the DIP Agreement) or to provide the reports and other information required in the DIP Agreement shall constitute an Event of Default, following the expiration of any applicable cure period set forth in the DIP Agreement.

10.       DIP Roll Up Obligations.   Upon (a) entry of this Interim Order and the occurrence of the Effective Date (as defined in the DIP Agreement), without any further action by the Debtors or any other party, all collections received by the Debtors shall be applied to reduce, on a dollar-for-dollar basis, the Prepetition Obligations. The authorization of the DIP Roll-Up Obligations shall be subject to the reservation of rights set forth in paragraph 38 of this Interim Order, and in the event of a successful Challenge or entry of a Final Order which does not approve the roll-up, all DIP Roll-Up Obligations will be Pre-Petition Obligations.

11.       DIP Liens.

11088946v5

(a)      As security for the DIP Obligations, effective and perfected as of entry of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the Debtors of, or over, any DIP Collateral, the following security interests and liens, hereby are granted by the Debtors to the DIP Lender (all property of the Debtor identified in clauses (i), (ii), and (iii) below being collectively referred to as the "DIP Collateral"), subject only to the Carve Out (all such liens on and security interests in the DIP Collateral granted to the DIP Lender, pursuant to this Final Order, the DIP Documents, the "DIP Liens"):

(i)      First Lien on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected, first priority senior security interest in and lien upon all prepetition and postpetition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date or the date acquired (if acquired after the Petition Date) is not subject to valid, perfected, and non-avoidable liens, if any (collectively, "Unencumbered Property"), including (i) any unencumbered cash of the Debtors (wherever maintained) and any investment of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks,

22

trade names, other intellectual property, equity interests, and any claims and causes of the Debtors; (ii) any claims and causes of action against any directors or officers of the Debtors as well as including any proceeds of, or property recovered in connection with, any successful claims and causes of action against any directors or officers of the Debtors; and (iii) excluding any claims and causes of action of the Debtors under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code or other applicable law (collectively, the "Avoidance Actions"), but including, subject to Entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in this Interim Order, any proceeds of, or property recovered in connection with, any successful Avoidance Action (whether by judgment, settlement or otherwise, and unencumbered or not, the "Avoidance Proceeds")[5];

(ii)    Priming Liens Senior to the Pre-Petition Lender's Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected, first priority (subject to any Permitted Encumbrances, as defined in the DIP Agreement) senior priming security interest in and lien upon all prepetition and post-petition property of the Debtors (including any Cash Collateral), whether now existing or hereafter acquired, excluding (i) any real property,

---

[5] For the avoidance of doubt, the DIP Lender is not taking a senior lien with respect to any real property interests of the Debtors which are subject to the liens of PAO TMK.

and (ii) any Avoidance Actions but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in the Interim Order, Avoidance Proceeds. Such security interests and liens shall be senior in all respects to the interests in such property of the Pre-Petition Lender arising from current and future liens of the Pre-Petition Lender and shall be subject to the Carve Out in all respects;

(iii)    <u>Liens Junior to Certain Other Liens</u>. Pursuant to section 364(c)(3) of the Bankruptcy Code and subject to the Carve Out, a valid, binding, continuing, enforceable, fully-perfected junior security interest in and lien upon all pre-petition and post-petition property of the Debtors (other than the property described in clauses (i) or (ii) of this paragraph 11, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses) excluding any Avoidance Actions but including, subject to entry of the Final Order, solely to the extent that all other DIP Collateral is insufficient to satisfy the DIP Claims secured by the DIP Liens as set forth in this Interim Order, Avoidance Proceeds, whether now existing or hereafter acquired, that is (i) subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date or (ii) subject to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected and

24

unavoidable liens are senior in priority to the security interests and liens of the Pre-Petition Lender; and

(iv)     <u>Liens Senior to Certain Other Liens</u>. The DIP Liens shall not be subject or subordinate to (a) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (b) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit, commission, board, or court for any liability of the Debtors. For the avoidance of doubt, the DIP Liens shall be subject to the Carve Out in all respects.

(b)     The DIP Liens shall be effective immediately upon the Interim Order Entry Date.

(c)     The DIP Liens shall be and hereby are fully perfected liens and security interests, effective and perfected upon the Interim Order Entry Date without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, or other agreements or documents, such that no additional steps need be taken by the DIP Lender to perfect such liens and security interests. Subject to entry of the Final Order, and subject to applicable non-bankruptcy law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or approval of one or more landlords, licensors, or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person, in order for any of the Debtors to pledge,

25

grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other collateral, shall have no force or effect with respect to the transactions granting the DIP Lender a first-priority lien on and security interest in the Debtors' interest in such fee, leasehold or other interest or other collateral or the proceeds of any assignment, sale or other transfer thereof, by the Debtors in favor of the DIP Lender in accordance with the terms of the DIP Agreement and the other DIP Documents.

(d)     The DIP Liens, DIP Superpriority Claims, and other rights, benefits, and remedies granted under this Interim Order to the DIP Lender shall continue in the Chapter 11 Cases, in any successor cases under the Bankruptcy Code resulting from conversion of the Chapter 11 Cases ("Successor Cases") and following any dismissal of the Chapter 11 Cases, and such liens, security interests, and claims shall maintain their priority as provided in this Interim Order until all the DIP Obligations have been indefeasibly paid in full in cash and completely satisfied and all of the commitments thereunder have been terminated in accordance with the DIP Loan Documents.

12.     Fees and Expenses of DIP Lender. The Debtors shall no later than ten (10) days after the Debtors' receipt of a summary statement setting forth the applicable timekeepers, as well as the hours worked by and expenses incurred by such timekeepers, in connection with the Chapter 11 Cases (with copies provided via electronic mail to the U.S. Trustee and counsel for the Committee, if any, (collectively, the "Fee Notice Parties")), indefeasibly pay or reimburse, as and when due the DIP Lender for its reasonable fees and out-of-pocket costs, expenses and charges (collectively, the "Lender Professional Fees"), including the reasonable pre-petition and post-petition fees, costs, and expenses of McGuireWoods LLP as counsel to DIP Lender and any other advisors or professionals retained by the DIP Lender. The Debtors and the Fee Notice Parties may

object to the reasonableness of the fees, costs and expenses included in any such professional fee invoice; provided that, any such objection shall be barred and deemed waived unless filed with the Court and served on the applicable professional by 11:59 p.m., prevailing Central Time, on the date that is no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice. If such objection is timely received, the Debtors shall promptly pay the portion of such invoice not subject to such objection, and this Court shall determine any such objection unless otherwise resolved by the applicable parties. Any hearing on an objection to payment of any fees, costs, and expenses of the DIP Lender set forth in a professional fee invoice shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses which are the subject of such objection and whether the DIP Lender is entitled to such fees, costs and expenses under this Interim Order. For the avoidance of doubt, none of the fees, costs, and expenses of the DIP Lender shall be subject to Bankruptcy Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. All fees, costs and expenses payable under the DIP Documents to the DIP Lender shall be included and constitute part of the DIP Obligations and be secured by the DIP Liens. Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Lender under and in connection with negotiation and preparation of the DIP Documents, whether incurred prior to or after the Petition Date, including, without limitation, the legal fees and expenses of any professionals retained by the DIP Lender in accordance with the DIP Documents, shall be deemed fully earned, indefeasibly paid, non-refundable, irrevocable, and non-avoidable on the date due and payable pursuant to the terms of the DIP Documents and, irrespective of any subsequent order approving or denying the Financing

or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code.

13.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order, the DIP Facilities and the DIP Documents and in accordance with the Approved Budget (subject to such variances as permitted in the DIP Documents), the Debtors are authorized to use Cash Collateral until the Maturity Date (as defined in the Credit Agreement) (the "<u>DIP Termination Date</u>"); <u>provided, however</u>, that nothing in this Interim Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order (including the Carve Out), the DIP Facilities, the DIP Documents, and in accordance with the Approved Budget (subject to such variances as permitted in the DIP Documents).

14.     <u>Adequate Protection</u>**.**

(a)     *Adequate Protection Liens*.  Pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, as adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Debtors hereby grant to the Pre-Petition Lender continuing, valid, binding, enforceable, and perfected post-petition security interests in and liens on all DIP Collateral (the "<u>Adequate Protection Liens</u>").

15.     <u>Priority of Adequate Protection Liens</u>.

(a)     The Adequate Protection Liens shall be subject to the Carve Out and shall otherwise be junior (in order of priority) only to: (i) the Permitted Prior Liens; (2) the

DIP Liens; and (3) the Pre-Petition Liens.  The Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Debtors' assets.

(b)       Except as provided herein, the Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The Adequate Protection Liens shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Pre-Petition Liens or the Adequate Protection Liens.

16.       <u>Adequate Protection Super-Priority Claim</u>.  Subject and subordinate to the Carve Out as set forth in this Interim Order, as further adequate protection of the interests of the Pre-Petition Lender in the Pre-Petition Collateral against any Diminution in Value, the Pre-Petition Lender is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed super-priority administrative expense claim in each of the Chapter 11 Cases and any Successor Cases (the "<u>Adequate Protection Superpriority Claim</u>").

17.       <u>Priority of the Adequate Protection Superpriority Claim.</u> Except as set forth herein, the Adequate Protection Superpriority Claim shall have priority, to the extent provided by section 507(b) of the Bankruptcy Code, over all administrative expense claims and unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 328, 330, 331, 503(a), 503(b), 507(a) (other than 507(a)(1)),

506(c) (subject to entry of a Final Order granting such relief), 507(b), 546(c), 726 (to the extent permitted by law), 1113 and 1114 of the Bankruptcy Code; *provided, however,* that the Adequate Protection Superpriority Claim shall be subject to the Carve Out as set forth in this Interim Order and junior to the DIP Superpriority Claim, and subject the lien priorities set forth herein.

18.     <u>Adequate Protection Payments</u>.  As further adequate protection, the Debtors are authorized and directed to provide adequate protection to the Pre-Petition Lender in the form of payment in cash of the reasonable and documented fees, out-of-pocket expenses, and disbursements (including the reasonable and documented fees, out-of-pocket expenses, and disbursements of counsel, financial advisors, auditors, third-party consultants, and other vendors) incurred by the Pre-Petition Lender arising prior to the Petition Date, including reasonable and documented fees and expenses of McGuireWoods LLP, without the need for the filing of a formal fee application.

19.     <u>Amendments, Consents, Waivers, and Modifications</u>. The Debtors, with the express written consent of the DIP Lender and, to the extent required by the DIP Agreement, may enter into any amendments, consents, waivers, or modifications to the DIP Documents that are not materially adverse to the Debtors without the need for further notice and hearing or any order of this Court; <u>provided</u>, <u>however</u>, that, without the consent of this Court on notice and a hearing, no such amendments, consents, waivers or modifications shall (i) shorten the maturity of the Financing, (ii) increase the commitments thereunder or the rate of interest payable under the DIP Documents, (iii) require the payment of any new or additional fees, or (iv) amend the Events of Default or covenants in the DIP Documents to be materially more restrictive to the Debtors. No consent shall be implied by any other action, inaction, or acquiescence of the DIP Lender.

20.     <u>Perfection of DIP Liens</u>.

11088946v5

(a)  The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to it hereunder, in each case, without the necessity to pay any mortgage recording fee or similar fee or tax. Whether or not the DIP Lender in its sole discretion, chooses to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination. The Debtors shall, if requested, execute and deliver to the DIP Lender all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve, and enforce the DIP Liens and all such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)  A certified copy of the Interim Order may be filed by the DIP Lender with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby directed to accept such certified copy of this Interim Order for filing and recording.

21.  <u>Access to Collateral</u>.  Notwithstanding anything contained herein to the contrary, and without limiting any other rights or remedies of the DIP Lender contained in this Interim Order or the DIP Documents (including the Intercreditor Agreement), or otherwise available at law or in equity, upon written notice to the Debtors, the U.S. Trustee, any statutory

committee appointed in the Chapter 11 Cases, and to any landlord, lienholder, licensor (including, but not limited to, Fermata Technologies, LLC), or other third party owner of any leased or licensed premises or intellectual property that an Event of Default under the DIP Documents or a default by the Debtors of any of their obligations under this Interim Order has occurred and is continuing, the DIP Lender (i) may enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon, including but not limited to marketing, selling or reselling any inventory of the Debtors, whether now owned or hereinafter acquired, which contains or is protected by any brand name or trademark owned or held by any licensor, and (ii) subject to applicable law, shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade-names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien or license of any third party and which are used by the Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph without interference from lienholders or licensors thereunder. The DIP Lender's ability to exercise rights under this paragraph shall be subject to the DIP Lender obtaining authorization from the Bankruptcy Court to do so, which the Debtors agree may be sought on an expedited basis on five (5) business days' notice from the date the Event of Default is noticed in accordance with this paragraph (subject to Court availability).  Nothing herein shall require the Debtors or the DIP Lender to assume or assign any lease or license under section 365(a) of the Bankruptcy Code as a precondition to the rights afforded to the DIP Lender in this paragraph.

22.     <u>Automatic Stay Modified</u>. The automatic stay provisions of section 362 of the Bankruptcy Code hereby are vacated and modified without the need for any further order of this Bankruptcy Court to allow the DIP Lender, at its sole discretion, to:

11088946v5

(a)      whether or not an Event of Default under the DIP Documents has occurred, (i) require proceeds from Collateral and other collections received by the Debtors to be deposited in accordance with the requirements of the DIP Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lender under the DIP Documents in accordance with any requirements of the DIP Documents, and (ii) require mandatory prepayments in accordance with the requirements of the DIP Documents, in each case, without further order of this Court; and

(b)      immediately upon the occurrence and during the continuation of an Event of Default (as defined in DIP Documents), allow the DIP Lender to deliver a written notice of its intention to declare a termination of the Debtors' ability and rights to access or use proceeds of the Financing (any such declaration, a "Termination Declaration"). The Termination Declaration shall be given by written notice (including electronic mail) to the Debtors, the U.S. Trustee and counsel to the Committee, if any.

(c)      If a Termination Declaration is delivered as provided above, the Debtors hereby consent to a hearing being held before this Court on an expedited basis and a motion shall be filed with the Court by the DIP Lender on at least five (5) business days' notice (subject to the Court's availability) to cause the automatic stay to be lifted to enable the DIP Lender to exercise rights and remedies against the DIP Collateral in accordance with this Interim Order, the DIP Documents, or applicable law. The Court may fashion any appropriate remedy at the hearing.  The Debtors hereby waive their right to and shall not be entitled to seek relief, including under section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the DIP Lender under this paragraph.

23.     <u>Subsequent Reversal or Modification</u>. This Interim Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code, and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, that action will not affect (i) the validity of any obligation, indebtedness or liability incurred hereunder by the Debtors to the DIP Lender prior to the date of receipt by the DIP Lender of written notice of the effective date of such action, (ii) the payment of any fees required under this Interim Order or the DIP Documents, and/or (iii) the validity and enforceability of any lien, claim, obligation, right, remedy or priority authorized or created under this Interim Order or pursuant to the DIP Documents as of such date. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation or liability incurred by the Debtors to the DIP Lender, prior to written notice being delivered to the DIP Lender of the effective date of such action, shall be governed in all respects by the original provisions of this Interim Order unless the Final Order has been entered, in which case the Final Order shall govern, and the DIP Lender shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligations or liability.

24.     <u>Restriction on Use of Lenders' Funds</u>. Notwithstanding anything herein to the contrary, no Collateral, proceeds thereof, proceeds of the Financing, or any portion of the Carve Out may be used by the Debtors, the Debtors' estates, any Committee, any trustee or examiner appointed in the Chapter 11 Cases or any chapter 7 trustee, or any other person, party or entity to, in any jurisdiction anywhere in the world, directly or indirectly to (a) request authorization to obtain post-petition financing (whether equity or debt) or other financial accommodations pursuant to section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than (i) from the DIP Lender

or (ii) if such financing is sufficient to indefeasibly pay all Obligations in full in cash and such financing is immediately so used; (b) assert, join, commence, support, investigate, or prosecute any action for any claim, counter-claim, action, cause of action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender and/or each of its former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees"), with respect to any transaction, occurrence, omission, or action, including, without limitation, (i) any action arising under the Bankruptcy Code against a Releasee; (ii) any so-called "lender liability" claims and causes of action against a Releasee; (iii) any action with respect to the legality, enforceability, validity, extent, perfection, and priority of the DIP Obligations, the DIP Superpriority Claims, the DIP Documents, or the legality, enforceability, validity, extent, perfection, and priority of the DIP Liens; (iv) any action seeking to invalidate, set aside, avoid, reduce, set off, offset, recharacterize, subordinate (whether equitable, contractual, or otherwise), recoup against, disallow, impair, raise any defenses, cross-claims, or counter claims or raise any other challenges under the Bankruptcy Code or any other applicable domestic or foreign law or regulation against or with respect to the DIP Liens, DIP Obligations, or the DIP Superpriority Claims, in whole or in part; (v) appeal or otherwise challenge this Interim Order, the DIP Documents, or any of the transactions contemplated herein or therein; and/or (vi) any action that has the effect of preventing, hindering, or delaying (whether directly or indirectly) the DIP Lender's rights in respect of its liens on and security interests in the Collateral or any of its rights, powers, or benefits hereunder or in the DIP Documents anywhere in the world; (c) seek to modify

11088946v5

any of the rights granted to the DIP Lender hereunder or under the DIP Documents and/or (d) pay any claim of a pre-petition creditor except as permitted under the DIP Documents and applicable Order of this Court in accordance with the Approved Budget.

25.     <u>Collateral Rights</u>. Except as expressly permitted in this Interim Order or the DIP Documents, in the event that any person or entity that holds a lien on or security interest in Collateral of the Debtors' estate, that is junior and/or subordinate to the DIP Liens receives or is paid the proceeds of such Collateral, prior to indefeasible payment in full in cash and the complete satisfaction of all DIP Obligations under the DIP Documents, and termination of the commitments under the DIP Documents, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such Collateral of the Debtors' estate, in trust for the DIP Lender, and shall immediately turnover such proceeds to the DIP Lender for application in accordance with the DIP Documents and this Interim Order.

26.     <u>Prohibition on Additional Liens</u>. Except as provided in the DIP Documents or this Interim Order, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases until such time as the DIP Obligations have been indefeasibly paid in full, granting liens on or security interests in the Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which liens are junior to, senior to, or *pari passu* with the DIP Liens.

27.     <u>No Waiver</u>. This Interim Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender may have to bring or be heard on any matter brought before this Bankruptcy Court.

28.     <u>Sale/Conversion/Dismissal/Plan</u>.

36

(a)      No order providing for either the sale of the ownership of the stock of the Debtors or the sale of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code shall be sought by the Debtors unless, in connection and concurrently with any such event, (i) the proceeds of such sale shall be used to indefeasibly pay in full in cash and completely satisfy the DIP Obligations and the commitments under the DIP Documents are terminated; (ii) such sale is expressly permitted under the DIP Documents; or (iii) the DIP Lender otherwise consents.

(b)      If an order dismissing or converting the Chapter 11 Cases or an order appointing a chapter 11 trustee or an examiner with expanded powers is at any time entered, and unless otherwise agreed to by the DIP Lender, such order shall provide that, in each case subject to the Carve Out, (i) the DIP Liens, the DIP Lender Superpriority Claim, the DIP Obligations and the DIP Documents shall continue in full force and effect, remain binding on all parties-in-interest, and maintain their priorities as provided in this Interim Order until all DIP Obligations hereunder are indefeasibly paid in full in cash and completely satisfied and the commitments under the DIP Documents are terminated in accordance with the DIP Documents, (ii) to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of enforcing the DIP Liens and the DIP Superpriority Claims, and (iii) all postpetition indebtedness, obligations or liability incurred by the Debtors to the DIP Lender prior to the date of such order, including, without limitation, the DIP Obligations, shall be governed in all respects by the original provisions of this Interim Order unless the Final Order has been entered, in which case the Final Order shall govern, and the DIP Lender shall be entitled to all the

rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligation or liability.

29.     <u>Priority of Terms</u>. To the extent of any conflict between or among (a) the express terms or provisions of any of the DIP Documents, the Motion, any other order of this Court, or any other agreements, on the one hand, and (b) the terms and provisions of this Interim Order, on the other hand, unless such term or provision herein is phrased in terms of "as defined in" or "as more fully described in" the DIP Documents or words of similar import, the terms and provisions of this Interim Order shall govern.

30.     <u>No Third Party Beneficiary</u>. Except as explicitly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor or any direct, indirect or incidental beneficiary.

31.     <u>Rights Under Sections 363(k) and 1129(b)</u>. In connection with any sale process authorized by the Court, (i) the DIP Lender and (ii) subject to entry of a Final Order granting such relief and to the rights preserved in Paragraph 38, the Pre-Petition Lender, or any assignee or designee of any of the foregoing, shall be authorized to credit bid some or all of their claims for their respective collateral (each, a "<u>Credit Bid</u>") to the extent permitted by section 363(k) of the Bankruptcy Code, subject in each case to the provision of consideration sufficient to indefeasibly pay in full in cash any senior liens on the collateral that is subject to the Credit Bid except to the extent otherwise agreed by the holder of such senior lien in their sole and absolute discretion.  Subject to entry of a Final Order granting such relief, the Pre-Petition Lender and the DIP Lender shall be deemed a "Qualified Bidder" with respect to their rights to acquire all or any of the assets by Credit Bid.

32.     <u>Preservation of Pre-petition Priorities</u>. Nothing in this Order is intended to change or otherwise modify the pre-petition priorities among pre-petition secured creditors of the Debtors, including (i) any operators' or nonoperators' lien or recoupment rights to the extent their liens or rights are valid, enforceable, nonavoidable and perfected, and (ii) any claims of the lienholders or any other mechanic or materialmen or mineral lien claimants to the extent their liens are valid, enforceable, non-avoidable and perfected, including as permitted by section 546(b) of the Bankruptcy Code, and nothing in this Order, including the granting of adequate protection liens, shall be deemed to have changed or modified such prepetition priorities, all of which are hereby expressly preserved.

33.     <u>Lienholders</u>. Notwithstanding anything to the contrary in this Order, to the extent that any lienholder has a valid prepetition lien on any collateral, such interest shall be entitled to adequate protection, to secure payment of an amount equal to the diminution in value of such lienholder's interest in such collateral, subject and subordinate to the DIP Liens and Carve Out in all respects, post-petition replacement liens against such collateral (and the proceeds thereof) on which such lienholder holds a valid pre-petition lien in the same priority of such valid pre-petition lien.

34.     <u>Proofs of Claim</u>. Notwithstanding anything to the contrary contained in any prior or subsequent order of the Bankruptcy Court, the DIP Lender shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein in relation to the DIP Credit Agreement and DIP Loan Documents. Notwithstanding any order entered by the Court in relation to the establishment of a bar date to the contrary, the DIP Lender is hereby authorized and entitled, in its sole discretion, but not required to file (and amend and/or supplement, as it sees fit) a proof of claim in the Chapter 11 Cases for any claim allowed herein in relation to the DIP Documents.

11088946v5

35.     <u>Headings</u>. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

36.     <u>No Consent</u>. No action, inaction or acquiescence by the DIP Lender, including funding the Debtors' ongoing operations under this Interim Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the Collateral pursuant to sections 506(c), 552(b) or 105(a) of the Bankruptcy Code.

37.     <u>Sections 506(c) and 552(b)</u>. Upon entry of a Final Order, the DIP Lender shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral. The "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender with respect to the DIP Documents and/or the Collateral.  Upon entry of a Final Order, no person or entity shall be entitled, directly or indirectly, to, except as expressly provided by paragraph 4 of this Interim Order with respect to the Carve Out, charge or recover from the Collateral, whether by operation of section 506(c) of Bankruptcy Code, sections 105 or 552(b) of the Bankruptcy Code, or otherwise, or direct the exercise of remedies or seek (whether by order of this Bankruptcy Court or otherwise) to marshal or otherwise control the disposition of Collateral or Property after an Event of Default under the DIP Documents, or termination or breach under the DIP Documents or this Interim Order.

38.     <u>Effect of Stipulations on Third Parties</u>.

(a)     *Generally.* The admissions, stipulations, agreements, releases, and waivers set forth in paragraph F of this Interim Order (collectively, the "<u>Pre-Petition Lien and Claim Matters</u>") are and shall be binding on the Debtors, any subsequent trustee, responsible person, examiner with expanded powers, any other estate representative, and all creditors and parties-in-interest and all of their successors-in-interest and assigns, including, without limitation,

40

a Committee (if appointed), unless, and solely to the extent that, a party-in-interest with Requisite Standing (other than the Debtors, as to which any Challenge is irrevocably waived and relinquished) (i) has timely filed the pleadings, and timely commenced the proceeding required under the Bankruptcy Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the Bankruptcy Rules (in each case subject to the limitations set forth in this paragraph 38 of this Interim Order) challenging the Pre-Petition Lien and Claim Matters (each such proceeding or pleading commencing a proceeding or other contested matter, a "Challenge") by no later than (A) for a Committee, (if appointed), sixty (60) days from the date of formation of a Committee (if appointed), or (B) seventy-five (75) days following the entry of the Interim Order for any other party in interest with Requisite Standing (each, as applicable, the "Challenge Deadline"), as such applicable date may be extended in writing from time to time in the sole discretion of the Pre-Petition Lender (with respect to the Pre-Petition Loan Documents), or by this Court for good cause shown pursuant to an application filed by a party in interest prior to the expiration of the Challenge Deadline, and (ii) this Court enters judgment in favor of the plaintiff or movant in any such timely commenced Challenge proceeding and any such judgment has become a final judgment that is not subject to any further review or appeal. Notwithstanding the foregoing, if a chapter 11 trustee is appointed or the Chapter 11 Cases are converted to chapter 7 prior to the expiration of the Challenge Deadline, (1) the chapter 11 trustee or chapter 7 trustee, as applicable, shall have until the later of the Challenge Deadline or the sixtieth (60th) day after the appointment of the chapter 11 trustee or the conversion of the Case to chapter 7, as applicable, to commence a Challenge, subject to any further extension by order of the Court for cause, and (2) if the Committee has asserted a Challenge prior to the Challenge Deadline, the chapter 11 trustee or chapter 7 trustee will stand in the shoes of the Committee in such Challenge.

(b)    *Binding Effect.*  To the extent no Challenge is timely commenced by the Challenge Deadline, or to the extent such proceeding does not result in a final and non-appealable judgment or order of this Court that is inconsistent with the Pre-Petition Lien and Claim Matters, then, without further notice, motion, or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Pre-Petition Lien and Claim Matters shall, pursuant to this Interim Order, become binding, conclusive, and final on any person, entity, or party in interest in the Chapter 11 Cases, and their successors and assigns, and in any Successor Case for all purposes and shall not be subject to challenge or objection by any party in interest, including, without limitation, a trustee, responsible individual, examiner with expanded powers, or other representative of the Debtors' estates. Notwithstanding anything to the contrary herein, if any such proceeding is timely commenced, the Pre-Petition Lien and Claim Matters shall nonetheless remain binding on all other parties in interest and preclusive as provided in subparagraph (a) above except to the extent that any of such Pre-Petition Lien and Claim Matters is expressly the subject of a timely filed Challenge, which Challenge is successful as set forth in a final judgment as provided in subparagraph (a) above. To the extent any such Challenge proceeding is timely commenced, the Pre-Petition Lender shall be entitled to payment of the reasonable and documented related costs and expenses, including, but not limited to reasonable and documented attorneys' fees, incurred under the Pre-Petition Loan Documents in defending itself in any such proceeding as adequate protection, unless such Challenge is successful. Upon a successful Challenge brought pursuant to this paragraph, the Court may fashion any appropriate remedy. The filing of a motion seeking standing to file a Challenge before the Challenge Deadline, which attaches a proposed complaint, shall extend the Challenge Deadline with respect to that party until two (2) business days after the Court approved the standing motion, provided that such

extension shall not be greater than thirty (30) days after the filing of such motion, or such other time period ordered by the Court.

39.     <u>Adequate Notice</u>. The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rules 2002 and 4001(c)(2) and the Local Bankruptcy Rules. Under the circumstances, no further notice of the request for the relief granted at the Interim Hearing is required.

40.     <u>Final Hearing Date</u>. The Final Hearing to consider the entry of the Final Order approving the relief sought in the Motion shall be held on June 21, 2021 at 3:30 p.m. (CT) before the Honorable David R. Jones in the United States Bankruptcy Court for the Southern District of Texas.  On or before June 3, 2021, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Interim Order and the Motion, on:  (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with the Court; (c) counsel for any appointed Committee; (d) the Internal Revenue Service; (e) all state taxing authorities in the states in which the Debtors have tax liabilities; (f) all parties known to the Debtors to be asserting liens against or security interests in any of the collateral addressed by this Interim Order; (g) the U.S. Attorney's Office; (h) the Texas Attorney General's office; and (i) the U.S. Trustee.  The Final Hearing Notice shall state that any party-in-interest objecting to entry of the Final Order shall file written objections with the Clerk of the Court no later than June 14, 2021 at 4:00 p.m. (prevailing Central Time), which objections shall be served on or before such date on:  (i) counsel to the Debtors, Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, TX 77002, Attn: Aaron Power (apower@porterhedges.com); (ii) counsel to the DIP Lender and the Pre-Petition Lender,

McGuireWoods LLP, Tower Two-Sixty, 260 Forbes Avenue, Suite 1800, Pittsburgh, PA 15222, Attn: Mark E. Freedlander (mfreedlander@mcguirewoods.com); counsel to the Committee (if appointed); and (iii) the U.S. Trustee.  Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Bankruptcy Court.

      41.    <u>General Authorization</u>.  The Debtors, DIP Lender, and Pre-Petition Lender are authorized to take any and all actions necessary to effectuate the relief granted in this Interim Order.

      42.    <u>Retention of Jurisdiction</u>. This Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

**Signed:  June 02, 2021.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

11088946v5

# EXHIBIT A

SENIOR SECURED, PRIMING AND SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

dated as of

June [__], 2021

among

OFS INTERNATIONAL LLC,
as the Borrower,

THE OTHER LOAN PARTIES PARTY HERETO,

and

SANDTON CAPITAL SOLUTIONS MASTER FUND V, LP,
as the Lender

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ................................................................................................. 2
    SECTION 1.01. Defined Terms ..................................................................................... 2
    SECTION 1.02. [Reserved] ........................................................................................... 2
    SECTION 1.03. Terms Generally .................................................................................. 2
    SECTION 1.04. Accounting Terms; GAAP .................................................................. 2

ARTICLE II THE CREDITS ............................................................................................... 3
    SECTION 2.01. Revolving Commitment ...................................................................... 3
    SECTION 2.02. Term Loans. ........................................................................................ 3
    SECTION 2.03. Borrowing Procedures; Requests for Borrowings ............................... 4
    SECTION 2.04. Protective Advances ........................................................................... 4
    SECTION 2.05. [Reserved]. .......................................................................................... 4
    SECTION 2.06. Funding of Borrowings ...................................................................... 4
    SECTION 2.07. [Reserved] ........................................................................................... 4
    SECTION 2.08. Termination of Commitment ............................................................... 4
    SECTION 2.09. Repayment and Amortization of Loans; Collection and Application of
        Collateral Proceeds; Evidence of Debt. ................................................................. 5
    SECTION 2.10. Prepayment of Loans .......................................................................... 6
    SECTION 2.11. Fees ..................................................................................................... 7
    SECTION 2.12. Interest .................................................................................................. 7
    SECTION 2.13. [Reserved]. .......................................................................................... 8
    SECTION 2.14. Increased Costs .................................................................................... 8
    SECTION 2.15. [Reserved] ........................................................................................... 9
    SECTION 2.16. Taxes ................................................................................................... 9
    SECTION 2.17. Payments Generally; Allocation of Proceeds .................................... 10
    SECTION 2.18. Indemnity for Returned Payments ..................................................... 11
    SECTION 2.19. Super-Priority. .................................................................................... 11

ARTICLE III REPRESENTATIONS AND WARRANTIES ............................................. 11
    SECTION 3.01. Organization; Powers ........................................................................ 11
    SECTION 3.02. Authorization ...................................................................................... 11
    SECTION 3.03. Governmental Approvals; No Conflicts ............................................. 12
    SECTION 3.04. Financial Condition; No Material Adverse Change ............................ 12
    SECTION 3.05. Properties ............................................................................................ 12
    SECTION 3.06. Litigation and Environmental Matters ............................................... 12
    SECTION 3.07. Compliance with Laws and Agreements; No Default .......................... 13
    SECTION 3.08. Investment Company Status ............................................................... 13
    SECTION 3.09. Taxes ................................................................................................... 13
    SECTION 3.10. ERISA ................................................................................................ 13
    SECTION 3.11. Disclosure ........................................................................................... 13
    SECTION 3.12. Material Agreements .......................................................................... 14
    SECTION 3.13. Accounts, Chattel Paper and Inventory ............................................. 14
    SECTION 3.14. Insurance ............................................................................................ 15
    SECTION 3.15. Capitalization and Subsidiaries ......................................................... 15
    SECTION 3.16. Security Interest in Collateral ............................................................ 15
    SECTION 3.17. Employment Matters .......................................................................... 16
    SECTION 3.18. Margin Regulations ............................................................................ 16
    SECTION 3.19. Use of Proceeds .................................................................................. 16
    SECTION 3.20. No Burdensome Restrictions .............................................................. 16

SECTION 3.21. Anti-Corruption Laws and Sanctions ............................................................16
SECTION 3.22. Affiliate Transactions ...................................................................................17
SECTION 3.23. Common Enterprise .......................................................................................17
SECTION 3.24. Plan Assets; Prohibited Transactions ...........................................................17
SECTION 3.25. PAO TMK Indebtedness Documents .............................................................17
SECTION 3.26. Approved Budget ...........................................................................................17
SECTION 3.27. Chapter 11 Cases ..........................................................................................17

ARTICLE IV CONDITIONS ..............................................................................................................18
SECTION 4.01. Effective Date ...............................................................................................18
SECTION 4.02. Each Credit Event .........................................................................................19

ARTICLE V AFFIRMATIVE COVENANTS ....................................................................................20
SECTION 5.01. Financial Statements; Borrowing Base and Other Information .........................20
SECTION 5.02. Notices of Material Events ............................................................................20
SECTION 5.03. Existence; Conduct of Business ....................................................................21
SECTION 5.04. Payment of Obligations .................................................................................21
SECTION 5.05. Maintenance of Properties .............................................................................22
SECTION 5.06. Books and Records; Inspection Rights ..........................................................22
SECTION 5.07. Compliance with Laws and Material Contractual Obligations .........................22
SECTION 5.08. Use of Proceeds ............................................................................................22
SECTION 5.09. Accuracy of Information ................................................................................23
SECTION 5.10. Insurance .......................................................................................................23
SECTION 5.11. Casualty and Condemnation ..........................................................................23
SECTION 5.12. Appraisals ......................................................................................................24
SECTION 5.13. Collection and Application of Collateral Proceeds; Deposit Accounts ............24
SECTION 5.14. Additional Collateral; Further Assurances ....................................................25
SECTION 5.15. Receivables ...................................................................................................26
SECTION 5.16. Inventory and Equipment ..............................................................................26
SECTION 5.17. Amendments of PAO TMK Indebtedness Documents ...................................27
SECTION 5.18. Approved Budget ...........................................................................................27
SECTION 5.19. Loan Party Advisors ......................................................................................28
SECTION 5.20. Lender Advisors .............................................................................................28
SECTION 5.21. Debtor-In-Possession Obligations .................................................................29
SECTION 5.22. Required Milestone ........................................................................................29
SECTION 5.23. Additional Covenants .....................................................................................29

ARTICLE VI NEGATIVE COVENANTS .........................................................................................29
SECTION 6.01. Indebtedness ..................................................................................................29
SECTION 6.02. Liens ..............................................................................................................31
SECTION 6.03. Fundamental Changes ...................................................................................32
SECTION 6.04. Investments, Loans, Advances, Guarantees and Acquisitions .......................32
SECTION 6.05. Asset Sales ....................................................................................................33
SECTION 6.06. Sale and Leaseback Transactions ..................................................................34
SECTION 6.07. Swap Agreements ..........................................................................................34
SECTION 6.08. Restricted Payments; Certain Payments of Indebtedness ..............................34
SECTION 6.09. Transactions with Affiliates ..........................................................................35
SECTION 6.10. Restrictive Agreements .................................................................................35
SECTION 6.11. Amendment of Material Documents ..............................................................36
SECTION 6.12. Amendments to Fermata License; Payments to Fermata ...............................36
SECTION 6.13. Amendment of PAO TMK Indebtedness Documents .....................................36
SECTION 6.14. Subsidiaries ...................................................................................................36

SECTION 6.15. Orders ........................................................................................36
SECTION 6.16. Prepayments of Other Debt .......................................................36
SECTION 6.17. Repayment of Indebtedness ........................................................36
SECTION 6.18. Reclamation Claims ...................................................................37
SECTION 6.19. Chapter 11 Claims ......................................................................37

ARTICLE VII EVENTS OF DEFAULT ........................................................................37

ARTICLE VIII MISCELLANEOUS .............................................................................43
SECTION 8.01. Notices ......................................................................................43
SECTION 8.02. Waivers; Amendments ...............................................................44
SECTION 8.03. Expenses; Indemnity; Damage Waiver ......................................44
SECTION 8.04. Successors and Assigns ..............................................................45
SECTION 8.05. Survival .....................................................................................47
SECTION 8.06. Counterparts; Integration; Effectiveness; Electronic Execution ......47
SECTION 8.07. Severability ................................................................................48
SECTION 8.08. Right of Setoff ...........................................................................48
SECTION 8.09. Governing Law; Jurisdiction; Consent to Service of Process ...........48
SECTION 8.10. WAIVER OF JURY TRIAL .......................................................49
SECTION 8.11. Headings ....................................................................................49
SECTION 8.12. Confidentiality ...........................................................................49
SECTION 8.13. Nonreliance; Violation of Law ...................................................50
SECTION 8.14. USA PATRIOT Act ...................................................................50
SECTION 8.15. Disclosure ..................................................................................50
SECTION 8.16. Interest Rate Limitation ..............................................................50
SECTION 8.17. Marketing Consent .....................................................................50
SECTION 8.18. No Fiduciary Duty, etc ...............................................................50

ARTICLE IX LOAN GUARANTY .............................................................................51
SECTION 9.01. Guaranty ....................................................................................51
SECTION 9.02. Guaranty of Payment .................................................................51
SECTION 9.03. No Discharge or Diminishment of Loan Guaranty .....................51
SECTION 9.04. Defenses Waived ........................................................................52
SECTION 9.05. Rights of Subrogation ................................................................52
SECTION 9.06. Reinstatement; Stay of Acceleration ..........................................52
SECTION 9.07. Information .................................................................................53
SECTION 9.08. Termination ................................................................................53
SECTION 9.09. Taxes .........................................................................................53
SECTION 9.10. Maximum Liability .....................................................................53
SECTION 9.11. Contribution ...............................................................................53
SECTION 9.12. Liability Joint and Several ..........................................................54
SECTION 9.13. Keepwell ....................................................................................54

<u>SCHEDULES AND ANNEXES</u>:

Definitions Schedule
Borrowing Base Schedule
Terms Schedule
Reporting Schedule
Closing Conditions Schedule

Annex A – Initial Approved Budget
Annex B – Eligible Equipment

## SENIOR SECURED, PRIMING AND SUPER-PRIORITY
## DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, PRIMING AND SUPER-PRIORITY, DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of June [__], 2021 (as it may be amended or modified from time to time, together with all Exhibits, Schedules, Annexes and Riders annexed hereto from time to time, each of which is hereby incorporated herein and made a part hereof, this "Agreement"), by and between OFS INTERNATIONAL LLC, a Delaware limited liability company (the "Borrower"), the undersigned Loan Guarantors, the other Loan Parties party hereto (if any), and SANDTON CAPITAL SOLUTIONS MASTER FUND V, LP, an exempted limited partnership registered in the Cayman Islands (the "Lender").

## RECITALS

WHEREAS, on May 31, 2021 (the "Petition Date"), the Borrower and the other Loan Parties commenced Chapter 11 case numbers 21-31784, 21-31786, and 21-31787, jointly administered as Chapter 11 case number 21-31784 (each a "Chapter 11 Case" and collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Borrower and the other Loan Parties continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, prior to the Petition Date, the Lender provided financing to the Borrower pursuant to that certain Credit Agreement, dated as of July 13, 2018, among the Lender (as assignee of JPMorgan Chase Bank, N.A.), the Borrower, and Threading and Precision Manufacturing LLC (as amended, modified or supplemented through the Petition Date, the "Pre-Petition Credit Agreement");

WHEREAS, the Loan Parties stipulate that the Obligations, under and as defined in the Pre-Petition Credit Agreement, are secured by a security interest in certain existing and after-acquired assets of the Loan Parties as more fully set forth in the Pre-Petition Loan Documents and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests;

WHEREAS, the Borrower has requested, and, upon the terms and conditions set forth in this Agreement, the Lender has agreed to make available to the Borrower, a senior secured, super-priority credit facility of up to $16,500,000 in the aggregate to fund the working capital requirements of the Borrower and other transactions more fully set forth in Sections 3.19 and 5.08 herein during the pendency of the Chapter 11 Cases; and

WHEREAS, each Loan Party has agreed to secure all of the Secured Obligations under the Loan Documents by granting to the Lender, a security interest in and lien upon substantially all of their existing and after-acquired personal and real property (subject to the limitations and priorities contained in the Loan Documents and the Orders).

NOW THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

## ARTICLE I
Definitions

SECTION 1.01.  Defined Terms.  As used in this Agreement, the capitalized terms shall have the meanings specified in the Definitions Schedule attached hereto.

SECTION 1.02.  [Reserved].

SECTION 1.03.  Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply) and all judgments, orders and decrees of all Governmental Authorities.  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), (c) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignments set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (e) all references herein to Articles, Sections, Exhibits, Schedules, Annexes and Riders shall be construed to refer to Articles and Sections of, and Exhibits, Schedules, Annexes and Riders to, this Agreement, (f) any reference in any definition to the phrase "at any time" or "for any period" shall refer to the same time or period for all calculations or determinations within such definition, and (g) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

SECTION 1.04.  Accounting Terms; GAAP.  (a) Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, notwithstanding the occurrence of any change after the date hereof in GAAP or in the application thereof on the operation of any provision hereof, such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective unless and until such provision is amended in accordance herewith.

(b)     Notwithstanding anything to the contrary contained in Section 1.04(a) or in the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on the date hereof) that would constitute capital leases in conformity with GAAP on the date hereof shall be considered capital leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

ARTICLE II
The Credits

SECTION 2.01.  <u>Revolving Commitment</u>.  Subject to the terms and conditions set forth herein, the Lender agrees to make Revolving Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in Availability being less than zero, subject to the Lender's authority, in its sole discretion, to make Protective Advances pursuant to the terms of <u>Section 2.04</u>. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Revolving Loans.  Notwithstanding the foregoing, except with respect to the payment of the Closing Fee on the Effective Date, the Borrower shall not request (and the Lender shall have no obligation to make) any other Revolving Loan on the Effective Date.

SECTION 2.02.  <u>Term Loans</u>..

(a)     Subject to the terms and conditions set forth herein, on and after the Effective Date, the Lender agrees to make one or more term loans (each a "<u>Term Loan</u>") to the Borrower from time to time in an aggregate amount not to exceed $4,000,000 (the "<u>Term Loan Commitment</u>").  The Term Loan Commitment shall be made available in multiple draws subject to the following conditions (in addition to those conditions elsewhere in this Agreement):

(i)     a Term Loan in the amount of $800,000 (the "<u>Initial Term Loan</u>") to be made upon the entry of the Interim Order by the Court, which portion of the Term Loan Commitment shall terminate upon the earlier of (A) the making of such Term Loan and (B) the first Business Day after the entry of the Interim Order by the Court;

(ii)     a Term Loan in the amount of $700,000 to be made upon the entry of the Final Order by the Court, which portion of the Term Loan Commitment shall terminate upon the earlier of (A) the making of such Term Loan and (B) the third Business Day after the entry of the Final Order by the Court; and

(iii)     one or more Term Loans (each, a "<u>Specified Term Loan</u>") in an aggregate amount not to exceed $2,500,000, so long as, with respect to each such Term Loan the Specified Term Loan Draw Conditions are satisfied, which portion of the Term Loan Commitment shall terminate upon the earlier of (A) the making of such Term Loans in an aggregate principal amount of $2,500,000 and (B) the Business Day immediately prior to the Maturity Date.

(b)     The Borrower hereby authorizes the making of the Initial Term Loan upon the entry of the Interim Order by the Court and acknowledges and agrees that no further act by the Borrower to request such Term Loan shall be required hereunder, which the Lender agrees to make so long as the conditions in <u>Article IV</u> are satisfied; <u>provided</u>, that if the Interim Order is entered after 2:00 p.m., New York time, on any Business Day, the Lender shall make the Initial Term Loan on the next succeeding Business Day.  To request a Borrowing of a Term Loan other than the Initial Term Loan, the Borrower shall notify the Lender of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through an Electronic System if arrangements for doing so have been approved by the Lender not later than 12:00 noon, New York time, two Business Day prior to the proposed Borrowing.  Each such Borrowing Request shall be irrevocable.  Each such Borrowing Request shall (i) specify the amount of the requested Borrowing, (ii) specify the date of such Borrowing, which shall be a Business Day, and (iii) with respect to any Borrowing of a Specified Term Loan, contain a certification of a Financial Officer of the Borrower that all Specified Term Loan Draw Conditions and the conditions set forth in <u>Article IV</u> have been satisfied.

3

SECTION 2.03.  Borrowing Procedures; Requests for Borrowings.

(a)        [Reserved].

(b)        Request for Borrowings.  To request a Borrowing of a Revolving Loan, the Borrower shall notify the Lender of such request either in writing (delivered by hand or fax) by delivering a Borrowing Request signed by a Responsible Officer of the Borrower or through an Electronic System if arrangements for doing so have been approved by the Lender (or if an Extenuating Circumstance shall exist, by telephone) not later than 12:00 noon, New York time, two Business Days prior to the date of the proposed Borrowing; provided, that the Borrower shall not request Borrowings of Revolving Loans on more than one occasion each week unless the Lender otherwise agrees in its sole discretion.  Each such Borrowing Request shall be irrevocable and each such telephonic Borrowing Request, if permitted, shall be confirmed immediately upon cessation of the Extenuating Circumstance by hand delivery, facsimile, or a communication through Electronic System to the Lender of a written Borrowing Request in a form approved by the Lender and signed by a Responsible Officer of the Borrower.  Each such written (or if permitted, telephonic) Borrowing Request shall specify the following information in compliance with Section 2.01:

(i)        the aggregate amount of the requested Borrowing and a breakdown of the separate wires comprising such Borrowing; and

(ii)        the date of such Borrowing, which shall be a Business Day.

SECTION 2.04.  Protective Advances.  Subject to the limitations set forth below, the Lender is authorized by the Borrower, from time to time in the Lender's sole discretion (but shall have absolutely no obligation to), to make Loans to the Borrower, which the Lender, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations or (iii) to pay any other amount chargeable to or required to be paid by the Borrower pursuant to the terms of this Agreement, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 8.03) and other sums payable under the Loan Documents (any of such Loans are herein referred to as "Protective Advances").  Protective Advances may be made even if the conditions precedent set forth in Section 4.02 have not been satisfied.  The Protective Advances shall be secured by the Liens in favor of the Lender in and to the Collateral and shall constitute Obligations hereunder.  The making of a Protective Advance on any one occasion shall not obligate the Lender to make any Protective Advance on any other occasion.

SECTION 2.05.  [Reserved].

SECTION 2.06.  Funding of Borrowings.  The Lender shall make each Loan to be made by it hereunder on the proposed date thereof available to the Borrower by promptly crediting the amounts in immediately available funds, to the Funding Account; provided that deemed requests for Borrowings under Section 2.17(c), and Protective Advances shall be retained by the Lender.

SECTION 2.07.  [Reserved].

SECTION 2.08.  Termination of Commitment.  (a) Unless previously terminated, the Revolving Commitment shall terminate on the Maturity Date.

(b)        The Borrower may at any time terminate the Revolving Commitment upon the Payment in Full of the Secured Obligations and the Pre-Petition Obligations.

4

(c)     The Borrower shall notify the Lender of any election to terminate the Revolving Commitment under paragraph (b) of this Section at least five Business Days prior to the effective date of such termination, specifying such election and the effective date thereof.  Each notice delivered by the Borrower pursuant to this Section shall be irrevocable; provided that a notice of termination of the Revolving Commitment delivered by the Borrower may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by notice to the Lender on or prior to the specified effective date) if such condition is not satisfied.  Any termination of the Revolving Commitment shall be permanent.

SECTION 2.09.  Repayment and Amortization of Loans; Collection and Application of Collateral Proceeds; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay to the Lender (i) the then unpaid principal amount of each Revolving Loan on the Maturity Date, (ii) the then unpaid principal amount of each Term Loan on the Maturity Date, and (iii) the then unpaid amount of each Protective Advance on the earlier of the Maturity Date and demand by the Lender.

(b)     All funds deposited into any Lock Box subject to a Lock Box Agreement or into a Collateral Deposit Account will be swept on a daily basis into a collection account maintained by the Borrower with the Lender or a depository bank approved by the Lender  (the "Collection Account").  The Lender shall hold (or shall cause any such depository bank to hold) and shall apply funds received into the Collection Account as provided in Section 2.09(c).

(c)     All amounts deposited in the Collection Account shall be deemed received by the Lender in accordance with Section 2.17.  On each Business Day, the Lender shall apply all immediately available funds credited to the Collection Account, first, to prepay the Pre-Petition Loans that may be outstanding in the order and manner provided in the Pre-Petition Credit Agreement, second, to prepay any Protective Advances that may be outstanding, and third, to prepay the Revolving Loans; provided, that the order of payments set forth in this paragraph (c) notwithstanding, the Borrower may request that such amounts deposited in the Collection Account be used to repay any Protective Advances that may be outstanding solely in order to satisfy the requirements of Section 4.02(b) in respect of a request for a new Borrowing.

(d)     The Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to the Lender resulting from each Loan made by the Lender, in which the Lender shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to the Lender hereunder and (iii) the amount of any sum received by the Lender hereunder.  The entries made in such accounts shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of the Lender to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans and other Obligations in accordance with the terms of this Agreement.

(e)     The Lender may request that Loans made by it be evidenced by one or more promissory notes.  In such event, the Borrower shall execute and deliver to the Lender a promissory note payable to the order of the Lender (or, if requested by the Lender, to the Lender and its registered assigns) and in a form prepared by the Lender.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 8.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.10.  Prepayment of Loans.  (a) The Borrower shall have the right at any time and from time to time to prepay any Loan or any Pre-Petition Loan in whole or in part, subject to prior notice in accordance with paragraph (g) of this Section, without the payment of any premium, penalty, costs, or fees of any kind; provided, that any such prepayments shall be applied first, to the Pre-Petition Loans (in the order and manner provided in the Pre-Petition Credit Agreement) and second, to the Loans.

(b)      In the event and on such occasion that Availability is less than zero, the Borrower shall prepay the Revolving Loans in an amount equal to such excess.

(c)      In the event and on each occasion that any Net Proceeds are received by or on behalf of any Loan Party in connection with any Prepayment Event, the Borrower shall, promptly after such Net Proceeds are received by any Loan Party, be applied as set forth in Section 2.10(f) in an aggregate amount equal to 100% of such Net Proceeds.

(d)      The Borrower shall prepay the Revolving Loans on the first Business Day of each week in an amount equal to the Excess Cash Amount calculated as of the last Business Day of the immediately preceding week, if any.  As used herein, "Excess Cash Amount" means, for any week, an amount equal to (a) the aggregate amount of cash on deposit in all Deposit Accounts of the Loan Parties on the last Business Day of such week, minus (b) an amount equal to 115% of the Budgeted Disbursement Amount for the immediately succeeding week.

(e)      In the event and on such occasion that a Change in Control occurs, the Borrower shall, on the date of such Change in Control, Pay in Full the Secured Obligations and the Pre-Petition Obligations.

(f)      Notwithstanding anything to the contrary in this Agreement, during the period between the Effective Date and payment in full of all Pre-Petition Obligations, (i) funds credited to the Collection Account shall be applied in accordance with Section 2.09(c) and (ii) all other amounts not constituting a payment of a specific item (including all such amounts pursuant to Section 2.10(c) or (d)) shall be applied first, during the period between the Effective Date and payment in full of all Pre-Petition Obligations, to the Pre-Petition Obligations then outstanding in a manner satisfactory to the Lender, second, to prepay any Protective Advances that may be outstanding, third, to prepay the Term Loans (beginning with the first draw of the Term Loan made hereunder until repaid in full, and then each subsequent draw) in inverse order of maturing installments until such Term Loans, until repaid in full, and fourth to prepay the Revolving Loans without a corresponding reduction in the Revolving Commitment.

(g)      The order of payments required by Sections 2.10(a), 2.10(f) and 2.17(b) notwithstanding, the Borrower may first prepay any Protective Advances that may be outstanding solely in order to satisfy the requirements of Section 4.02(b) in respect of a request for a new Borrowing.

(h)      The Borrower shall notify the Lender by telephone (confirmed by facsimile) or through Electronic System, if arrangements for doing so have been approved by the Lender, of any prepayment hereunder not later than 10:00 a.m., New York time, on the date of prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that, if a notice of prepayment is given in connection with a conditional notice of termination of the Revolving Commitment as contemplated by Section 2.08, then such notice of prepayment may be revoked if such notice of termination is revoked in accordance with Section 2.08.  Prepayments shall be accompanied by accrued interest to the extent required by Section 2.12.

SECTION 2.11.  Fees.  (a) The Borrower agrees to pay to the Lender the Closing Fee.  The entire Closing Fee shall be deemed fully earned by the Lender and shall be due and payable in full on the Effective Date.

(b)        The Borrower agrees to pay to the Lender, upon the earlier of (i) payment in full of the Obligations (whether through a voluntary prepayment, mandatory prepayment, or as a result of acceleration of the Obligations) and (ii) the Maturity Date, an exit fee (the "Exit Fee") in the amount of $100,000.  Such fee shall be deemed fully earned by the Lender and shall be due and payable in full on the first of the foregoing events to occur.

(c)        The Borrower agrees to pay to the Lender the Extension Fee (i) in connection with any Extension Request that is accepted in writing by the Lender, or (ii) in the event that the Obligations are not paid in full on or before the Maturity Date.  Such fee shall be deemed fully earned and due and payable (A) in the case of clause (i), on the first Business Day after the Lender accepts in writing the Extension Request, and (B) in the case of clause (ii), on the first day after the Maturity Date.

(d)        [Reserved].

(e)        All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Lender.  Fees paid shall not be refundable under any circumstances.

SECTION 2.12.  Interest.  (a) The Loans and other Borrowings shall bear interest at the aggregate rate of 11% per annum (the "Interest Rate") as set forth in clauses (i) and (ii) below.

(i)        Cash Interest.  The Loans and other Borrowings shall bear interest at a cash rate ("Cash Interest") of six percent (6%) per annum.

(ii)        PIK Interest.  In addition to the Cash Interest in accordance with clause (i) above, the Loans and other Borrowings shall bear interest to be paid in kind ("PIK Interest") at a rate equal to 5% per annum, in each case by the automatic increase of the principal amount of the Loans on each Interest Payment Date by the applicable PIK Amount.  As used herein, "PIK Amount" shall mean with respect to the Loans and other Borrowings, as of any Interest Payment Date, an amount equal to the accrued but unpaid PIK Interest on the principal amount of such Loans and Borrowings as of such Interest Payment Date.

(b)        [Reserved].

(c)        [Reserved].

(d)        Notwithstanding the foregoing, during the occurrence and continuance of a Default or Event of Default, the Lender may, at its option, by notice to the Borrower, declare that (i) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in Section 2.12(a) or (ii) in the case of any other amount outstanding hereunder, such amount shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder.

(e)        Accrued interest on each Loan shall be payable in arrears  on each Interest Payment Date for such Loan (either as Cash Interest or PIK Interest, as provided in Section 2.12(a)) and upon termination of the Commitment (in cash, notwithstanding Section 2.12(a)); provided that (i) interest accrued pursuant to paragraph (d) of this Section shall be payable on each Interest Payment Date, and then upon demand after the Maturity Date, and (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of a Revolving Loan prior to the end of the Availability Period), accrued interest on the

principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment; and provided further, that all PIK Interest not otherwise added to the principal balance of the Loans, in accordance with Section 2.12(a)(ii), shall be payable in cash on the Maturity Date and in connection with the payment of any Loan after the Maturity Date.

(f)     All interest hereunder shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

SECTION 2.13.  [Reserved].

SECTION 2.14.  Increased Costs.  (a) If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement (including any compulsory loan requirement, insurance charge or other assessment) against assets of, deposits with or for the account of, or credit extended by, the Lender;

(ii)     impose on the Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans hereunder; or

(iii)     subject the Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clause (b) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to the Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by the Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender for such additional costs incurred or reduction suffered.

(b)     If the Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on the Lender's capital or on the capital of the Lender's holding company, if any, as a consequence of this Agreement or the Loans made by, the Commitments of the Lender to a level below that which the Lender or the Lender's holding company could have achieved but for such Change in Law (taking into consideration the Lender's policies and the policies of the Lender's holding company with respect to capital adequacy and liquidity), then from time to time the Borrower will pay to the Lender such additional amount or amounts as will compensate the Lender or the Lender's holding company for any such reduction suffered.

(c)     A certificate of the Lender setting forth the amount or amounts necessary to compensate the Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay the Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of the Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate the Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that the Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of the Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or

8

reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15.  [Reserved].

SECTION 2.16.  Taxes.  (a) Withholding of Taxes; Gross Up.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by a withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.16) the Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)  Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Lender timely reimburse it for, Other Taxes.

(c)  Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.16, such Loan Party shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(d)  Indemnification by the Loan Parties.  The Loan Parties shall jointly and severally indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Lender or required to be withheld or deducted from a payment to the Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Loan Party by the Lender shall be conclusive absent manifest error.

(e)  Treatment of Certain Refunds.  If the Lender determines, in its sole discretion, exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.16 (including by the payment of additional amounts pursuant to this Section 2.16), it shall promptly pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.16 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of the Lender, shall repay to the Lender the amount paid over pursuant to this Section 2.16(e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that the Lender is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.16(e), in no event will the Lender be required to pay any amount to an indemnifying party pursuant to this Section 2.16 the payment of which would place the Lender in a less favorable net after-Tax position than the Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid.  This

Section 2.16(e) shall not be construed to require the Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

        (f)     Survival.  Each party's obligations under this Section 2.16 shall survive the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document (including the Payment in Full of the Secured Obligations).

        (g)     Defined Terms.  For purposes of this Section 2.16, the term "applicable law" includes FATCA.

        SECTION 2.17.  Payments Generally; Allocation of Proceeds.  (a) The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees, or of amounts payable under Section 2.14, or 2.16, or otherwise) prior to 3:00 p.m., New York time, on the date when due, in immediately available funds, without setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Lender, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Lender at its offices at 16 W. 46th Street, 11th Floor, New York, New York.  Unless otherwise provided for herein, if any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in dollars.

        (b)     Any payments received by the Lender (including from proceeds of Collateral) (i) not constituting either (A) a specific payment of principal, interest, fees or other sums payable under the Loan Documents (which shall be applied as specified by the Borrower), (B) a mandatory prepayment (which shall be applied in accordance with Section 2.10), or (C) amounts to be applied from the Collection Account (which shall be applied in accordance with Section 2.09(c)), shall be applied by the Lender first, to repay the Pre-Petition Obligations in a manner satisfactory to the Lender until paid in full, and second, to the payment of the Secured Obligations in such order as the Lender may elect in its sole discretion.  Notwithstanding the foregoing, amounts received from any Loan Party shall not be applied to any Excluded Swap Obligation of such Loan Party.  The Lender shall have the continuing and exclusive right to apply and reverse and reapply any and all such proceeds and payments to any portion of the Secured Obligations.

        (c)     At the election of the Lender, all payments of principal, interest, fees, premiums, reimbursable expenses (including, without limitation, all reimbursement for fees, costs and expenses pursuant to Section 8.03), and other sums chargeable to or required to be paid by the Borrower under the Loan Documents, may be paid from the proceeds of Borrowings made hereunder whether made following a request by the Borrower pursuant to Section 2.03 or a deemed request as provided in this Section or may be deducted from any deposit account of the Borrower maintained with the Lender or a depository bank approved by the Lender.  The Borrower hereby irrevocably authorizes (i) the Lender, even if the conditions precedent set forth in Section 4.02 have not been satisfied, to make a Borrowing for the purpose of paying each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents and agrees that all such amounts charged shall constitute Revolving Loans (but such a Borrowing may only constitute a Protective Advance if it is to reimburse costs, fees and expenses as described in Section 8.03) and that all such Borrowings shall be deemed to have been requested pursuant to Sections 2.03 or 2.04, as applicable and (ii) the Lender to charge any deposit account of the Borrower maintained with the Lender or a depository bank approved by the Lender for each payment of principal, interest and fees as it becomes due hereunder or any other amount due under the Loan Documents.

        (d)     The Lender shall, on or about the first Business Day of each calendar month, provide the Borrower with account statements together with invoices with respect to any of the Secured

Obligations (the "Statements").  Statements may contain estimates of the amounts owed during the relevant billing period, whether of principal, interest, fees or other Secured Obligations.  If the Borrower pays the full amount indicated on a Statement on or before the due date indicated on such Statement, the Borrower shall not be in default of payment with respect to the billing period indicated on such Statement; provided, that acceptance by the Lender of any payment that is less than the total amount actually due at that time (including but not limited to any past due amounts) shall not constitute a waiver of the Lender's right to receive payment in full at another time.

SECTION 2.18.  Indemnity for Returned Payments.  If after receipt of any payment which is applied to the payment of all or any part of the Obligations (including a payment effected through exercise of a right of setoff), the Lender is for any reason compelled to surrender such payment or proceeds to any Person because such payment or application of proceeds is invalidated, declared fraudulent, set aside, determined to be void or voidable as a preference, impermissible setoff, or a diversion of trust funds, or for any other reason (including pursuant to any settlement entered into by the Lender in its discretion), then the Obligations or part thereof intended to be satisfied shall be revived and continued and this Agreement shall continue in full force as if such payment or proceeds had not been received by the Lender.  The provisions of this Section 2.18 shall be and remain effective notwithstanding any contrary action which may have been taken by the Lender in reliance upon such payment or application of proceeds.  The provisions of this Section 2.18 shall survive the termination of this Agreement.

SECTION 2.19.  Super-Priority.

(a)        The priority of Lender's Liens on the Collateral, claims and other interests shall be as set forth in the Interim Order and Final Order.

(b)        Upon the maturity (whether by acceleration or otherwise) of any of the Secured Obligations, the Lender shall be entitled to immediate payment of such Secured Obligations without further application to or order of the Court.

ARTICLE III
Representations and Warranties

Each Loan Party represents and warrants to the Lender that:

SECTION 3.01.  Organization; Powers.  Each Loan Party and each Subsidiary is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Interim Order (and Final Order, when applicable) and to the further approval of the Court for transactions outside the ordinary course of business, carry on its business as now conducted and is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.  Authorization.  Upon the entry of the Interim Order (and Final Order, when applicable), the Transactions will be within each Loan Party's organizational powers and have been duly authorized by all necessary organizational actions and, if required, actions by equity holders.  Each Loan Document to which each Loan Party is a party has been duly executed and delivered by such Loan Party and, upon the entry of the Interim Order (and Final Order, when applicable), will constitute a legal, valid and biding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other laws affecting creditors' rights generally and subject to general principles of equity.

11

SECTION 3.03.  <u>Governmental Approvals; No Conflicts</u>.  Except for the entry of, and pursuant to the terms of, the Interim Order (and Final Order, when applicable), the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect, (b) will not violate any Requirement of Law applicable to any Loan Party or any Subsidiary, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Loan Party or any Subsidiary or the assets of any Loan Party or any Subsidiary, or give rise to a right thereunder to require any payment to be made by any Loan Party or any Subsidiary, and (d) will not result in the creation or imposition of, or the requirement to create, any Lien on any asset of any Loan Party or any Subsidiary, except Liens created pursuant to the Loan Documents.

SECTION 3.04.  <u>Financial Condition; No Material Adverse Change</u>.  (a) The Borrower has heretofore furnished to the Lender its consolidated balance sheet and statements of income, stockholders equity and cash flows (i) as of and for the Reference Fiscal Year, reported on by the Borrower's Accountants, and (ii) as of and for the Interim Fiscal Period certified by its Financial Officer.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments (all of which, when taken as a whole, would not be materially adverse) and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)     No event, change or condition has occurred that has had, or could reasonably be expected to have, a Material Adverse Effect, since the Petition Date, other than those events or circumstances customarily resulting from the commencement of the Chapter 11 Cases.

SECTION 3.05.  <u>Properties</u>.  (a) As of the date of this Agreement, <u>Section 3.05 of the Disclosure Certificate</u> sets forth the address of each parcel of real property that is owned or leased by any Loan Party. To the actual knowledge of the Loan Parties, each of such leases and subleases is valid and enforceable in accordance with its terms and is in full force and effect, and no material default by any Loan Party to any such lease or sublease exists other than defaults arising solely as a result of the commencement of the Chapter 11 Cases.  Each of the Loan Parties and each of its Subsidiaries has good and indefeasible title to, or valid leasehold interests in, all of its real and personal property, free of all Liens other than those permitted by <u>Section 6.02</u>, including without limitation, those current and future Liens on real property securing the PAO TMK Indebtedness and any extensions, renewals, refinancings and replacements of the PAO TMK Indebtedness made in accordance with the requirements of <u>Section 6.01(f)</u> hereof.

(b)     Each Loan Party and each Subsidiary owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property used in connection with its business as currently conducted, a correct and complete list of which, as of the date of this Agreement, is set forth in <u>Section 3.05 of the Disclosure Certificate</u>, and the use thereof by each Loan Party and each Subsidiary does not infringe in any material respect upon the rights of any other Person, and each Loan Party's and each Subsidiary's rights thereto are not subject to any licensing agreement or similar arrangement.

(c)     All tangible items of Collateral, other than inventory in transit and motor vehicles that are temporarily relocated in the ordinary course of business, are and will be located at the business locations set forth on <u>Section 3.05 of the Disclosure Certificate</u>.

SECTION 3.06.  <u>Litigation and Environmental Matters</u>.  (a) Except for the Chapter 11 Cases and the foreclosure actions in respect of the PAO TMK Indebtedness, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or threatened against or affecting any Loan Party or any Subsidiary (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result

in a Material Adverse Effect (other than the Disclosed Matters) or (ii) that involve any Loan Document or the Transactions.

(b)      Except for the Disclosed Matters (i) no Loan Party nor any Subsidiary has received notice of any claim with respect to any Environmental Liability or knows of any basis for any Environmental Liability and (ii) except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, no Loan Party or any Subsidiary (A) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (B) has become subject to any Environmental Liability, (C) has received notice of any claim with respect to any Environmental Liability or (D) knows of any basis for any Environmental Liability.

(c)      Since the date of this Agreement, there has been no change in the status of the Disclosed Matters that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.07.   Compliance with Laws and Agreements; No Default.  Except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, and other than non-compliance arising solely as a result of the commencement of the Chapter 11 Cases, each Loan Party and each Subsidiary is in compliance with (i) all material Requirements of Law applicable to it or its property and (ii) all indentures, agreements and other instruments binding upon it or its property.  Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, the foreclosure actions in respect of the PAO TMK Indebtedness, and any defaults or events of default arising under the Pre-Petition Credit Agreement to the extent the Pre-Petition Obligations have not been converted to Obligations under (and in accordance with) this Agreement, no Default or Event of Default has occurred and is continuing.

SECTION 3.08.   Investment Company Status.  No Loan Party or any Subsidiary is an investment company as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.   Taxes.  Each Loan Party and each Subsidiary has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Loan Party or such Subsidiary, as applicable, has set aside on its books adequate reserves or (b) to the extent that the failure to do so could not be expected to result in a Material Adverse Effect.  No Liens have been filed and no claims are being asserted with respect to any such Taxes.

SECTION 3.10.   ERISA.  No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.  The present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87 or subsequent recodification thereof, as applicable) did not, as of the date of the most recent financial statements reflecting such amounts, exceed by more than $50,000 the fair market value of the assets of all such underfunded Plans.

SECTION 3.11.   Disclosure.  (a) The Loan Parties have disclosed to the Lender all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result

in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party or any Subsidiary to the Lender in connection with this Agreement or any other Loan Document (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date.

(b)     As of the Effective Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Effective Date to the Lender in connection with this Agreement is true and correct in all respects.

SECTION 3.12.  Material Agreements.  All Material Agreements and contracts to which any Loan Party is a party or is bound as of the date of this Agreement are listed in Section 3.12 of the Disclosure Certificate.  Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, the foreclosure actions in respect of the PAO TMK Indebtedness, and any defaults or events of default arising under the Pre-Petition Credit Agreement to the extent the Pre-Petition Obligations have not been converted to the Obligations under (and in accordance with) this Agreement, no Loan Party is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in (i) any Material Agreement to which it is a party or (ii) any agreement or instrument evidencing or governing Indebtedness.

SECTION 3.13.  Accounts, Chattel Paper and Inventory.

(a)     Accounts.

(i)     The names of the obligors, amounts owing, due dates and other information with respect to its Accounts and Chattel Paper are and will be correctly stated in all records of such Loan Party relating thereto and in all invoices and Borrowing Base Certificates and other reporting furnished to the Lender from time to time by the Borrower or any other Loan Parties from time to time. As of the time when each Account or each item of Chattel Paper arises, such Loan Party shall be deemed to have represented and warranted that such Account or Chattel Paper, as the case may be, and all records relating thereto, are genuine and in all respects what they purport to be.

(ii)     With respect to its Accounts (except as specifically disclosed on the most recent Borrowing Base Certificate), and, with respect to clauses (C) and (D) below, issues that occur in the ordinary course of business which are not material either individually or in the aggregate, (A) all Accounts are Eligible Accounts; (B) all Accounts represent bona fide sales of Inventory or rendering of services to Account Debtors in the ordinary course of such Loan Party's business and are not evidenced by a judgment, Instrument or Chattel Paper; (C) there are no setoffs, claims or disputes existing or asserted with respect thereto and such Loan Party has not made any agreement with any Account Debtor for any extension of time for the payment thereof, any compromise or settlement for less than the full amount thereof, any release of any Account Debtor from liability therefor, or any deduction therefrom except a discount or allowance allowed by such Loan Party in the ordinary course of its business for prompt payment and disclosed to the Lender; (D) to such Loan Party's knowledge, there are no facts, events or occurrences which in any way impair the validity or enforceability thereof or could reasonably be expected to reduce the amount payable thereunder as shown on such Loan Party's books and records and any invoices, statements and reports with respect thereto; (E) such Loan Party has not received any notice of proceedings or

14

actions which are threatened or pending against any Account Debtor which might result in any adverse change in such Account Debtor's financial condition; and (F) such Loan Party has no knowledge that any Account Debtor has become insolvent or is generally unable to pay its debts as they become due.  The amounts shown on all invoices, statements and Borrowing Base Certificates and other reports delivered to Lender hereunder with respect thereto are actually and absolutely owing to such Loan Party as indicated thereon and are not in any way contingent.

(b)    Inventory.  With respect to any of its Inventory scheduled or listed on the most recent Borrowing Base Certificate, (i) such Inventory (other than Inventory in transit) is located at one of such Loan Party's locations set forth in Section 3.05 of the Disclosure Certificate, (ii) no Inventory (other than Inventory in transit) is now, or shall at any time or times hereafter be stored at any other location other than as set forth in Section 3.05 of the Disclosure Certificate, (iii) such Loan Party has good, indefeasible and merchantable title to such Inventory and such Inventory is not subject to any Lien or security interest or document whatsoever except for Liens permitted hereunder, (iv) except as specifically disclosed in the most recent Borrowing Base Certificate, such Inventory is Eligible Inventory of good and merchantable quality, free from any defects, (v) such Inventory that is reflected as Eligible Inventory on the most recent Borrowing Base Certificate is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreements with any third parties which would require any consent of any third party upon sale or disposition of that Inventory or the payment of any monies to any third party upon such sale or other disposition, (vi) to such Loan Party's knowledge, such Inventory has been produced in accordance with the Federal Fair Labor Standards Act of 1938, as amended, and all rules, regulations and orders thereunder, and (vii) the completion of manufacture, sale or other disposition of such Inventory by the Lender following an Event of Default shall not require the consent of any Person and shall not constitute a breach or default under any contract or agreement to which such Loan Party is a party or to which such property is subject.

SECTION 3.14.  Insurance.  Section 3.14 of the Disclosure Certificate sets forth a description of all insurance maintained by or on behalf of the Loan Parties and their Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums then due in respect of such insurance have been paid.  The Borrower maintains, and has caused each Subsidiary to maintain, with financially sound and reputable insurance companies, insurance on all their real and personal property in such amounts, subject to such deductibles and self-insurance retentions and covering such properties and risks as are adequate and customarily maintained by companies engaged in the same or similar businesses operating in the same or similar locations.

SECTION 3.15.  Capitalization and Subsidiaries.  Section 3.15 of the Disclosure Certificate sets forth (a) a correct and complete list of the name and relationship to the Borrower of each Subsidiary, (b) a true and complete listing of each class of each of the Borrower's authorized Equity Interests, all of which issued Equity Interests are validly issued, outstanding, fully paid and non-assessable, and owned beneficially and of record by the Persons identified in Section 3.15 of the Disclosure Certificate, and (c) the type of entity of the Borrower and each Subsidiary.  All of the issued and outstanding Equity Interests owned by any Loan Party have been (to the extent such concepts are relevant with respect to such ownership interests) duly authorized and issued and are fully paid and non-assessable.  There are no outstanding commitments or other obligations of any Loan Party to issue, and no options, warrants or other rights of any Person to acquire, any shares of any class of capital stock or other equity interests of any Loan Party.

SECTION 3.16.  Security Interest in Collateral.  Subject to the entry of the Interim Order, the provisions of this Agreement and the other Loan Documents shall be effective to create legal and valid first priority liens over all other Liens on the Collateral except in the case of (a) Permitted Encumbrances, to the extent any such Permitted Encumbrances would have priority over the Liens in favor of the Lender pursuant to any applicable law or agreement or Liens permitted by the Orders, to the extent such Liens would have priority over the Liens in favor of the Lender pursuant to the terms thereof, and (b) Liens perfected only by

15

possession (including possession of any certificate of title) to the extent the Lender has not obtained or does not maintain possession of such Collateral.  Specifically, and subject to the foregoing and the terms of the Interim Order, upon entry of the Interim Order, Lender shall receive:  (i) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority senior security interest in all unencumbered property of the Loan Parties, whether now owned or hereinafter acquired, excluding causes of action under chapter 5 of the Bankruptcy Code or analogous state law ("Avoidance Actions") but including, subject to entry of the Final Order, proceeds of Avoidance Actions solely to the extent that all other Collateral is insufficient to satisfy the Secured Obligations hereunder; (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, a senior secured priming lien upon all property of the Loan Parties subject to liens held by the Pre-Petition Lender pursuant to the Pre-Petition Loan Documents, whether now existing or hereinafter acquired; and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, a junior security interest upon all other property of the Loan Parties not otherwise referenced in sections (i) or (ii) above and which is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date, or subject to valid and unavoidable liens in existence immediately prior to the Petition Date that are subsequently perfected as permitted by section 546(b) of the Bankruptcy Code, which valid, perfected, and unavoidable liens are senior in priority to the security interests and liens of the Lender.  For the avoidance of doubt, the security interests and liens granted to the Lender in this Section 3.16 shall be subject to the Carve Out in all respects and shall not apply to and shall not attach to any real property of the Loan Parties.

SECTION 3.17.  Employment Matters.  As of the Effective Date, there are no strikes, lockouts or slowdowns against any Loan Party or any Subsidiary pending or, to the knowledge of any Loan Party, threatened.  The hours worked by and payments made to employees of the Loan Parties and their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from any Loan Party or any Subsidiary, or for which any claim may be made against any Loan Party or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Loan Party or such Subsidiary.

SECTION 3.18.  Margin Regulations.  No Loan Party is engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying Margin Stock, or extending credit for the purpose of purchasing or carrying Margin Stock, and no part of the proceeds of any Borrowing hereunder will be used to buy or carry any Margin Stock.

SECTION 3.19.  Use of Proceeds.  The proceeds of the Loans have been used and will be used, whether directly or indirectly, as set forth in Section 5.08.

SECTION 3.20.  No Burdensome Restrictions.  No Loan Party is subject to any Burdensome Restriction except Burdensome Restrictions permitted under Section 6.10.

SECTION 3.21.  Anti-Corruption Laws and Sanctions.  Each Loan Party has implemented and maintains in effect policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and such Loan Party, its Subsidiaries and their respective officers and employees and, to the knowledge of such Loan Party, its directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that would reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.  None of (a) any Loan Party, any Subsidiary or any of their respective directors, officers or, to the knowledge of any such Loan Party or Subsidiary, any of their respective employees, or (b) to the knowledge of any such Loan Party or Subsidiary, any agent of such Loan Party or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No

Borrowing, use of proceeds, Transaction or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.22.  Affiliate Transactions.  Except as set forth on Section 3.22 of the Disclosure Certificate, as of the date of this Agreement, there are no existing or proposed agreements, arrangements, understandings, or transactions between any Loan Party and any of the officers, members, managers, directors, stockholders, parents, holders of other Equity Interests, employees, or Affiliates (other than Subsidiaries) of any Loan Party or any members of their respective immediate families, and none of the foregoing Persons are directly or indirectly indebted to or have any direct or indirect ownership, partnership, or voting interest in any Affiliate of any Loan Party or any Person with which any Loan Party has a business relationship or which competes with any Loan Party (except that any such Persons may own Equity Interests in (but not exceeding 2.0%) of the outstanding Equity Interests of) any publicly traded company that may compete with a Loan Party.

SECTION 3.23.  Common Enterprise.  The successful operation and condition of each of the Loan Parties is dependent on the continued successful performance of the functions of the group of the Loan Parties as a whole and the successful operation of each of the Loan Parties is dependent on the successful performance and operation of each other Loan Party.  Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lender to the Borrower hereunder, both in their separate capacities and as members of the group of companies.  Each Loan Party has determined that execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, in furtherance of its direct and/or indirect business interests, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.24.  Plan Assets; Prohibited Transactions.  No Loan Party or any of its Subsidiaries is an entity deemed to hold "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise, and neither the execution, delivery or performance of the transactions contemplated under this Agreement, including the making of any Loan hereunder, will give rise to a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code.

SECTION 3.25.  PAO TMK Indebtedness Documents.  As of the Effective Date, the PAO TMK Indebtedness Documents, copies of all of which have been delivered to the Lender, are true and correct copies thereof and together comprise full and complete copies of all agreements among the parties thereto, with respect to the transactions contemplated by such PAO TMK Indebtedness Documents.  There are no oral agreements or understandings not contained therein relating to or modifying the substance thereof as of the Effective Date.  As of the Effective Date, the PAO TMK Indebtedness Documents are in full force and effect and have not been amended, terminated, rescinded or withdrawn in any material respect, except as shown on the true and correct copies delivered to the Lender.

SECTION 3.26.  Approved Budget.  Each of the initial Approved Budget, attached hereto as Annex A, which was delivered to the Lender on or prior to the Effective Date, and the then-applicable Approved Budget, was prepared in good faith upon assumptions the Borrower believed to be reasonable assumptions on the date of delivery of the then-applicable Approved Budget or update thereto.  To the knowledge of the Borrower, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget.

SECTION 3.27.  Chapter 11 Cases.

17

(a)     The Chapter 11 Cases were commenced on the Petition Date in accordance with applicable law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.  The Loan Parties shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

(b)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve-Out, and (ii) to the extent set forth in the Interim Order or the Final Order.

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Lender's consent, modified or amended.  The Loan Parties are in compliance in all material respects with the applicable Order.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Secured Obligations, the Lender shall be entitled to immediate payment of such Secured Obligations and to enforce the remedies provided for hereunder or under applicable law.

ARTICLE IV
Conditions

SECTION 4.01.  Effective Date.  The obligations of the Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 8.02):

(a)     Credit Agreement and Loan Documents.  The Lender (or its counsel) shall have received (i) a counterpart of this Agreement signed on behalf of each party hereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page of this Agreement) that each such party has signed a counterpart of this Agreement, (ii) a counterpart of each other Loan Document (each in form and substance reasonably satisfactory to Lender) signed on behalf of each party thereto or written evidence satisfactory to the Lender (which may include facsimile or other electronic transmission of a signed signature page thereof) that each such party has signed a counterpart of such Loan Document, (iii) such other certificates, documents, instruments and agreements as the Lender shall reasonably request in connection with the Transactions, including all those documents and requirements listed in the Closing Conditions Schedule attached hereto, in each case in form and substance satisfactory to the Lender, and (iv) evidence satisfactory to the Lender as to the satisfaction of

18

each of the items and requirements set forth in such Closing Conditions Schedule in a manner satisfactory to the Lender.

(b)     Other Documents.  The Lender shall have received such other documents as the Lender or its counsel may have reasonably requested.

The Lender shall notify the Borrower of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.  Each Credit Event.  The obligation of the Lender to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)     The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct in all material respects (except that any representation and warranty that is qualified by materiality shall be true and correct in all respects) with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct only as of such specified date).

(b)     At the time of and immediately after giving effect to such Borrowing, (i) no Default or Event of Default shall have occurred and be continuing, except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases to the extent the Pre-Petition Obligations have not been converted to the Obligations under (and in accordance with) this Agreement and (ii) no Protective Advance shall be outstanding.

(c)     the Actual Net Paydown Amount for the most recently ended Cumulative Four-Week Period is not less than the Budgeted Net Paydown Amount for such Cumulative Four-Week Period.

(d)     After giving effect to any Borrowing of a Revolving Loan, Availability shall not be less than zero.

(e)     (i) The Final Order shall have been entered following the expiration of the Interim Order, (ii) the Interim Order or Final Order, as applicable, shall not have been vacated, stayed, reversed, modified or amended without the Lender's consent and shall otherwise be in full force and effect, and (iii) no motion for reconsideration of the Interim Order or Final Order, as applicable, shall have been filed by any Loan Party.

(f)     The Lender shall have received a Borrowing Request in accordance with the requirements hereof, and the Borrowing requested therein (other than a Borrowing consisting of (i) the Initial Term Loan or (ii) a Specified Term Loan which shall otherwise comply with the Specified Term Loan Draw Conditions) shall be not more than the amount set forth for the Budgeted Disbursement Amount for such week (less the amount of any other Borrowings previously made during such week).

(g)     The Lender shall have received (i) a Borrowing Request in accordance with the requirements hereof, (ii) a certificate of a Responsible Borrower of the Borrower certifying as to the matters described in clauses (a), (b) and (f) of this Section, (iii) with respect to the week in which such Loan is to be made, a Budget Compliance Certificate for such week required to be delivered to the Lender pursuant to Section 5.18(c) (attaching the Approved Budget Variance Report for the Prior Week) and (B) the 13-week cash flow forecast for such week required to be delivered to the Lender pursuant to Section 5.18(e).

Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in paragraphs (a), (b), (c), (d), (e) and (f) of this Section.

19

ARTICLE V
Affirmative Covenants

Until all of the Secured Obligations have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 5.01.  Financial Statements; Borrowing Base and Other Information.  The Borrower will furnish to the Lender the information required under the Reporting Schedule attached hereto within the applicable time periods set forth therein.

SECTION 5.02.  Notices of Material Events.  The Borrower will furnish to the Lender prompt (but in any event within any time period that may be specified below) written notice of the following:

(a)     the occurrence of any Default, Event of Default, or any "Default" or "Event of Default" under the Pre-Petition Credit Agreement;

(b)     receipt of any notice of any investigation by a Governmental Authority or any litigation or proceeding commenced or threatened against any Loan Party or any Subsidiary that (i) seeks damages in excess of $200,000, (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, its fiduciaries or its assets, (iv) alleges criminal misconduct by any Loan Party or any Subsidiary, (v) alleges the violation of, or seeks to impose remedies under, any Environmental Law or related Requirement of Law, or seeks to impose Environmental Liability, (vi) asserts liability on the part of any Loan Party or any Subsidiary in excess of $200,000, in respect of any tax, fee, assessment, or other governmental charge, or (vii) involves any product recall;

(c)     any Lien (other than Permitted Encumbrances) or claim made or asserted against any of the Collateral;

(d)     any loss, damage, or destruction to the Collateral in the amount of $200,000 or more, whether or not covered by insurance;

(e)     within two Business Days of receipt thereof, any and all default notices received under or with respect to any leased location or public warehouse where Collateral is located;

(f)     all material amendments to any Material Agreement, together with a copy of each such amendment;

(g)     any material change in accounting or financial reporting practices by the Borrower or any Subsidiary;

(h)     the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, could reasonably be expected to result in liability of the Loan Parties and their Subsidiaries in an aggregate amount exceeding $100,000;

(i)     any amendment, modification, supplementation, waiver or other change, in any manner that is less favorable to any Loan Party, to the Loan Parties as a whole, or to the Lender, (A) of the terms (including, without limitation, payment terms) of any account payable by any Loan Party to PAO TMK, any parent entity of the Borrower and/or any of their respective non-Loan Party Affiliates, (whether arising out of an Inventory purchase and sale transaction or otherwise), or (B) the terms (including, without

20

limitation, amounts and payment terms) of any intercompany receivable payable to any Loan Party by PAO TMK, any parent entity of the Borrower and/or any of their respective Affiliates;

(j)     any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect;

(k)     any change in the information provided in the Beneficial Ownership Certification delivered to the Lender that would result in (i) a change in the beneficial ownership, directly or indirectly, of a majority of the issued and outstanding Equity Interests in the Borrower, or (ii) any other change to the list of beneficial owners identified in such certification; and

(l)     (i) as soon as practicable in advance of filing with the Court or delivering to the Committee appointed in a Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to (x) the Chapter 11 Cases (all of which must be in form and substance reasonably satisfactory to the Lender) and (y) the Pre-Petition Credit Agreement, this Agreement and the credit facilities contemplated thereby, and/or any sale contemplated in accordance with any plan of reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Lender), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.  Existence; Conduct of Business.  Each Loan Party will, and will cause each Subsidiary to, (a) do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, qualifications, licenses, permits, franchises, governmental authorizations, intellectual property rights, licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.03, and (b) carry on and conduct its business in substantially the same manner and in substantially the same fields of enterprise as it is presently conducted.

SECTION 5.04.  Payment of Obligations.  Subject to the Orders, each Loan Party will, and will cause each Subsidiary to, pay or discharge all Material Indebtedness and all other material liabilities and obligations, including Taxes incurred after the Petition Date (but for the avoidance of doubt, Taxes incurred before the Petition Date which are required to be paid in accordance with the Orders or any other order of the Court shall be permitted to be paid), before the same shall become delinquent or in default, but subject to the Approved Budget (and the permitted variances provided for therein with respect to amounts included in the Actual Disbursement Amount for any period) except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) such Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (c) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect; provided, however, each Loan Party will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.

SECTION 5.05.  Maintenance of Properties.  Each Loan Party will, and will cause each Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

SECTION 5.06.  Books and Records; Inspection Rights.  Each Loan Party will, and will cause each Subsidiary to, (a) keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Lender (including employees of the Lender, or any consultants, accountants, lawyers, agents and appraisers retained by the Lender), upon reasonable prior notice (unless an Event of Default exists, in which case no prior notice shall be required), to visit and inspect its properties during normal business hours, to conduct at such Loan Party's premises field examinations of such Loan Party's assets, liabilities, books and records, including examining and making extracts from its books and records, environmental assessment reports and Phase I or Phase II studies, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.  Each Loan Party acknowledges that the Lender, after exercising its rights of inspection, may prepare certain Reports pertaining to the Loan Parties' assets for internal use by the Lender. After the occurrence and during the continuance of any Event of Default, each Loan Party shall provide the Lender with access to its suppliers for purposes of obtaining information to verify the status of each Loan Party's accounts payable owing to any applicable suppliers.

SECTION 5.07.  Compliance with Laws and Material Contractual Obligations.  Each Loan Party will, and will cause each Subsidiary to, (i) comply with (A) each Requirement of Law applicable to it or its property (including without limitation Environmental Laws), except, in each case, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect or such compliance is stayed by the Chapter 11 Cases and (B) the Bankruptcy Code, the Bankruptcy Rules, the Orders and any other order of the Court in all material respects, and (ii) subject to the foregoing clause (i)(B), perform in all material respects its obligations under Material Agreements to which it is a party.  Each Loan Party will maintain in effect and enforce policies and procedures designed to ensure compliance by such Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

SECTION 5.08.  Use of Proceeds.  (a) The proceeds of the Loans will be used by the Borrower solely on or after the Effective Date (i) to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to variances permitted under Section 5.18), and (ii) for the financing of the Borrower's and its Subsidiaries' ordinary working capital and other general corporate needs, including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve-Out, in each case to the extent permitted under this Agreement and in accordance with the Approved Budget, (iii) for certain other pre-petition and pre-filing expenses and payments that are approved by the Court and permitted by the Approved Budget, and (iv) to pay the Pre-Petition Obligations, including as provided in Section 2.01.  The Loan Parties shall not be permitted to use the proceeds of the Loans in contravention of the provisions of the applicable Order or the Bankruptcy Code, including any restrictions or limitations on the use of proceeds contained therein.  The Post-Petition payment of Pre-Petition Obligations, including principal, interest, fees, penalties or recoverable costs, due and payable in connection with the Pre-Petition Credit Agreement with the proceeds of the Collateral (as defined herein) or Collateral (as defined in the Pre-Petition Credit Agreement) shall be made in accordance herewith.  No part of the proceeds of any Loan will be used, whether directly or indirectly (i) for any purpose that entails a violation of any of the regulations of the Federal Reserve Board, including Regulations T, U and X or (ii) to make any Acquisition.

(b)     The Borrower will not request any Borrowing, and the Borrower shall not use, and shall procure that its Subsidiaries and its and their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or

authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws to the extent such activity, businesses or transactions would be prohibited by Sanctions, if conducted by a corporation incorporated in the United States or the European Union, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, except to the extent permitted for a Person required to comply with Sanctions, or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

SECTION 5.09.  Accuracy of Information.  The Loan Parties will ensure that any information, including financial statements or other documents, furnished to the Lender in connection with this Agreement or any other Loan Document contains no material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and the furnishing of such information shall be deemed to be a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 5.09; provided that, with respect to projected financial information, the Loan Parties will only ensure that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

SECTION 5.10.  Insurance.  (a) Each Loan Party will, and will cause each Subsidiary to, maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including, without limitation, loss or damage by fire and loss in transit; theft, burglary, pilferage, larceny, embezzlement and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to the Collateral Documents.  The Borrower will furnish to the Lender, upon request of the Lender, but no less frequently than annually, information in reasonable detail as to the insurance so maintained.

(b)     In the event any Collateral is located in any area that has been designated by the Federal Emergency Management Agency as a "Special Flood Hazard Area", the applicable Loan Party shall purchase and maintain flood insurance on such Collateral (including any personal property which is located on any real property leased by such Loan Party within a "Special Flood Hazard Area").  The amount of flood insurance required by this Section shall be in an amount equal to the lesser of the Commitment or the total replacement cost value of the improvements.

(c)     All insurance policies covering any Collateral and required under this Section 5.10 shall name the Lender as an additional insured or as lender loss payee, as applicable, and shall contain lender loss payable clauses, through endorsements in form and substance satisfactory to the Lender, which provide that: (i) all proceeds thereunder with respect to any Collateral shall be payable to the Lender (provided that the Lender's application of such proceeds shall be subject to the applicable Order); (ii) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy; and (iii) such policy and lender loss payable clauses may be canceled, amended, or terminated only upon at least 30 days prior written notice given to the Lender.

(d)     All premiums on such insurance shall be paid when due, and copies of the policies delivered to the Lender.  If a Loan Party fails to obtain any insurance as required by this Section, the Lender may obtain such insurance at the Borrower's expense.  By purchasing such insurance, the Lender shall not be deemed to have waived any Default or Event of Default arising from the applicable Loan Party's failure to maintain such insurance or pay any premiums therefor.

SECTION 5.11.  Casualty and Condemnation.  The Borrower will (a) furnish to the Lender prompt written notice of any casualty or other insured damage to any material portion of the Collateral or the

23

commencement of any action or proceeding for the taking of any material portion of the Collateral or interest therein under power of eminent domain or by condemnation or similar proceeding and (b) ensure that the Net Proceeds of any such event (whether in the form of insurance proceeds, condemnation awards or otherwise) are collected and applied in accordance with any applicable provisions of this Agreement and the Collateral Documents.

SECTION 5.12.  Appraisals.  At any time that the Lender requests, the Borrower and each Subsidiary that is a Loan Party will provide the Lender with appraisals or updates thereof of its Inventory from an appraiser selected and engaged by the Lender, and prepared on a basis satisfactory to the Lender, such appraisals and updates to include, without limitation, information required by any applicable Requirement of Law; provided, however, that the Borrower and any other Loan Parties shall not be obligated to reimburse the Lender for the costs of more than the number of Inventory appraisals set forth on the Terms Schedule attached hereto during any calendar year, unless a Default or Event of Default has occurred or exists at the time any additional Inventory appraisals are ordered or commissioned.

SECTION 5.13.  Collection and Application of Collateral Proceeds; Deposit Accounts.

(a)  Each Loan Party will provide (or will have provided) to the Lender a Control Agreement (in each case in form and substance satisfactory to the Lender), duly executed on behalf of each financial institution or securities intermediary holding a Deposit Account or Securities Account of such Loan Party, other than Deposit Accounts used exclusively for payroll or employee benefits.

(b)  Without limiting the generality of the foregoing, each Loan Party shall (i) execute and deliver (or shall have executed and delivered) to the Lender Control Agreements for each Deposit Account maintained by such Loan Party into which all cash, checks or other similar payments relating to or constituting payments made in respect of Receivables will be deposited (each a "Collateral Deposit Account"), which Collateral Deposit Accounts are identified on Section 5.13 of the Disclosure Certificate, and (ii) establish lock box service (the "Lock Boxes") with the bank(s) set forth on Section 5.13 of the Disclosure Certificate, which Lock Boxes shall be subject to irrevocable lockbox agreements in form and substance acceptable to the Lender and shall be accompanied by an acknowledgment by the bank where the Lock Box is located of the Lien of the Lender granted hereunder and of irrevocable instructions to wire all amounts collected therein to the Collection Account (each, a "Lock Box Agreement").  After the Effective Date, each Loan Party will comply with the terms of Section 5.13(d).

(c)  Each Loan Party shall direct all of its Account Debtors to forward payments directly to the Collateral Deposit Accounts or Lock Boxes associated therewith. The Lender shall have sole access to the Collateral Deposit Accounts and Lock Boxes at all times and each Loan Party shall take all actions necessary to grant the Lender sole access (the "Lock Boxes") with the bank(s) set forth on Section 5.13 of the access. At no time shall any Loan Party remove any item from a Lock Box or a Collateral Deposit Account without the Lender's prior written consent.  If any Loan Party should refuse or neglect to notify any Account Debtor to forward payments directly to a Collateral Deposit Account or associated Lock Box after notice from the Lender, the Lender shall be entitled to make such notification directly to such Account Debtor. If notwithstanding the foregoing instructions, any Loan Party receives any proceeds of any Receivables, such Loan Party shall receive such payments as the Lender's trustee, and shall immediately deposit all cash, checks or other similar payments related to or constituting payments made in respect of Receivables received by it to a Collateral Deposit Account.

(d)  Before opening or replacing any Collateral Deposit Account or other Deposit Account, or establishing a new Lock Box, each Loan Party shall (a) obtain the Lender's consent in writing to the opening of such Collateral Deposit Account or other Deposit Account or establishing of such Lock Box, and (b) cause each bank or financial institution in which it seeks to open (i) a Collateral Deposit Account or other Deposit Account, to enter into a Control Agreement with the Lender in order to give the

Lender Control of such Collateral Deposit Account or other Deposit Account and provide for a daily sweep into the Collection Account, or (ii) a Lock Box, to enter into a Lock Box Agreement with the Lender in order to give the Lender Control of the Lock Box and provide for a daily sweep into the Collection Account.

(e)     The Lender shall require all other cash proceeds of the Collateral, which are not required to be applied to the Secured Obligations or Pre-Petition Obligations pursuant to Section 2.09, to be deposited in a special non-interest bearing cash collateral account with the Lender or a depository bank approved by the Lender and held there as security for the Secured Obligations.  No Loan Party shall have any control whatsoever over said cash collateral account.  Any such proceeds of the Collateral shall be applied in the order set forth in Section 2.17, unless the Court or another court of competent jurisdiction shall otherwise direct.  The Loan Parties shall remain liable, jointly and severally, for any deficiency if the proceeds of any sale or disposition of the Collateral are insufficient to pay all Secured Obligations and Pre-Petition Obligations, including any attorneys' fees and other expenses incurred by the Lender to collect such deficiency.

SECTION 5.14.  Additional Collateral; Further Assurances.

(a)     [Reserved].

(b)     Borrower will cause 100% of the issued and outstanding Equity Interests of each of its Domestic Subsidiaries to be subject at all times to a first priority, perfected Lien in favor of the Lender, for the benefit of the Secured Parties, pursuant to the terms and conditions of the Loan Documents or other security documents as the Lender shall reasonably request.  Notwithstanding the terms of this Agreement or any of the other Loan Documents to the contrary, in no event shall Lender have or be granted any security interest, Lien, encumbrance, or any other interest in or right to any of the Equity Interests or ownership interests of Borrower.

(c)     Without limiting the foregoing, Borrower will, and will cause each Domestic Subsidiary to, execute and deliver, or cause to be executed and delivered, to the Lender such documents, agreements and instruments, and will take or cause to be taken such further actions (including the filing of financing statements, and such other actions or deliveries of the type required by Section 4.01, as applicable), which may be required by any Requirement of Law or which the Lender may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents, all in form and substance reasonably satisfactory to the Lender and all at the expense of the Loan Parties.  In furtherance of the foregoing, each Loan Party hereby authorizes the Lender to file, and if requested will deliver to the Lender, all financing statements and other documents and take such other actions as may from time to time be requested by the Lender in order to maintain a first perfected security interest in and, if applicable, Control of, the Collateral owned by such Loan Party. Any financing statement filed by the Lender may be filed in any filing office in any UCC jurisdiction and may (i) indicate such Loan Party's Collateral (A) as all assets of such Loan Party or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of such jurisdiction, or (B) by any other description which reasonably approximates the description contained in any Collateral Document, and (ii) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment.  Each Loan Party ratifies its authorization for the Lender to have filed in any UCC jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof.

(d)     If any material assets (but specifically excluding any real property or improvements thereto or any interest therein) are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral that become subject to the Lien in favor of the Lender or in accordance

25

with the Orders or the Security Agreement upon acquisition thereof), the Borrower will (i) notify the Lender, and, if requested by the Lender, cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, and cause each applicable Loan Party to take, such actions as shall be necessary or reasonably requested by the Lender to grant and perfect such Liens, including actions described in paragraph (c) of this Section, all at the expense of the Loan Parties. Notwithstanding any provision of this Agreement to the contrary, in no event shall Lender have any interest or Lien or interest in any of the real property of any of the Loan Parties.

SECTION 5.15.  Receivables.  (a) Certain Agreements on Receivables.  No Loan Party will make or agree to make any discount, credit, rebate or other reduction in the original amount owing on a Receivable or accept in satisfaction of a Receivable less than the original amount thereof, except that, when no Event of Default exists, the Loan Parties may reduce the amount of Accounts arising from the sale of Inventory in accordance with their present policies and in the ordinary course of business.

(b)    Collection of Receivables.  Except as otherwise provided in this Agreement or the Security Agreement, each Loan Party will collect and enforce, at the Loan Party's sole expense, all amounts due or hereafter due to such Loan Party under the Receivables.

(c)    Delivery of Invoices.  The Borrower will deliver to the Lender promptly upon its request after the occurrence and during the continuation of an Event of Default duplicate invoices with respect to each Account of the Loan Parties bearing such language of assignment as the Lender shall specify.

(d)    Disclosure of Counterclaims on Receivables.  If (i) any discount, credit or agreement to make a rebate or to otherwise reduce the amount owing on a Receivable exists or (ii) if, to the knowledge of any Loan Party, any dispute, setoff, claim, counterclaim or defense exists or has been asserted or threatened with respect to a Receivable in an amount equal to or greater than $100,000, the Borrower will promptly disclose such fact to the Lender in writing.  The Borrower shall send the Lender a copy of each credit memorandum at Lender's request, and the Borrower shall promptly report each credit memo and each of the facts required to be disclosed to the Lender in accordance with this Section 5.15(d) on the Borrowing Base Certificates submitted by it.

SECTION 5.16.  Inventory and Equipment.  (a) Maintenance of Goods.  Each Loan Party will do all things necessary to maintain, preserve, protect and keep its Inventory and Equipment in good repair and working and saleable condition, except for damaged or defective goods arising in the ordinary course of the Loan Party's business and except for ordinary wear and tear in respect of its Equipment.

(b)    Returned Inventory.  If an Account Debtor returns any Inventory to a Loan Party when no Event of Default exists, then such Loan Party shall promptly determine the reason for such return and shall issue a credit memorandum to the Account Debtor in the appropriate amount.  The Borrower shall immediately report to the Lender any return involving an amount in excess of the $100,000.  Each such report shall indicate the reasons for the returns and the locations and condition of the returned Inventory. In the event any Account Debtor returns Inventory to a Loan Party when an Event of Default exists, such Loan Party, upon the request of the Lender, shall: (i) hold the returned Inventory in trust for the Lender; (ii) segregate all returned Inventory from all of its other property; (iii) dispose of the returned Inventory solely according to the Lender's written instructions; and (iv) not issue any credits or allowances with respect thereto without the Lender's prior written consent.  All returned Inventory shall be subject to the Lender's Liens thereon.  Whenever any Inventory is returned, the related Account shall be deemed ineligible to the extent of the amount owing by the Account Debtor with respect to such returned Inventory and such returned Inventory shall not be Eligible Inventory.

(c)      Inventory Count; Perpetual Inventory System.  Each Loan Party will conduct a physical count of the Inventory at least once per fiscal year, and after and during the continuation of an Event of Default, at such other times as the Lender requests.  Each Loan Party, at its own expense, shall deliver to the Lender the results of each physical verification, which such Loan Party has made, or has caused any other Person to make on its behalf, of all or any portion of its Inventory.  Unless waived by the Lender, each Loan Party will maintain a perpetual Inventory reporting system at all times.

SECTION 5.17.  Amendments of PAO TMK Indebtedness Documents.  The Borrower will provide the Lender with fully executed copies of any and all amendments or modifications of any of the PAO TMK Indebtedness Documents promptly after the same become effective.

SECTION 5.18.  Approved Budget.  (a) The use of Loans and other extensions of credit by the Loan Parties under this Loan Agreement and the other Loan Documents shall be limited in accordance with the Approved Budget (subject to variances permitted under this Section 5.18) and the terms hereof.  The initial Approved Budget shall depict, on a weekly basis, cash receipts, expenses, and disbursements, net cash flows, inventory receipts, Budgeted 503(b)(9) Payments, the projected Borrowing Base, Availability and the other items set forth therein, for the first thirteen (13) week period from the Effective Date and such initial Approved Budget shall be approved by, and in form and substance satisfactory to, the Lender in its discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as Annex A is approved by and satisfactory to the Lender).  The Approved Budget shall be updated, modified or supplemented by the Borrower with the written consent of the Lender, and upon the request of the Lender from time to time, but in any event the Approved Budget shall be updated by the Borrower not less than one time in each four (4) consecutive week period, and each such updated, modified or supplemented budget shall be approved in writing (including by email) by, and shall be in form and substance satisfactory to, the Lender in its sole discretion and no such updated, modified or supplemented budget shall be effective until so approved and once so approved shall be deemed an Approved Budget; provided, however, that in the event the Lender, on the one hand, and the Borrower, on the other hand, cannot agree acting reasonably as to an updated, modified or supplemented budget, such disagreement shall give rise to an Event of Default once the period covered by the prior Approved Budget has terminated.  Each Approved Budget delivered to the Lender shall be accompanied by such supporting documentation as reasonably requested by the Lender.  Each Approved Budget shall be prepared in good faith based upon assumptions which the Borrower believes to be reasonable.

(b)      Commencing following the third full calendar week following the Petition Date and for each calendar week thereafter, the Borrower shall not permit:

(i)      Actual Cash Receipts for any Cumulative Four-Week Period to be less than 85% of Budgeted Cash Receipts for any such Cumulative Four-Week Period;

(ii)      the Actual Disbursement Amount for any Cumulative Four-Week Period to be greater than 115% of Budgeted Disbursement Amount for any such Cumulative Four-Week Period;

(iii)      Actual Net Cash Flow for any Cumulative Four-Week Period to be less than 85% of Budgeted Net Cash Flow for any such Cumulative Four-Week Period; or

(iv)      the Actual Net Paydown Amount for any Cumulative Four-Week Period to be less than 85% of the Budgeted Net Paydown Amount for any such Cumulative Four-Week Period.

In addition, the Borrower shall not permit the sum of the Actual 503(b)(9) Payments and other critical vendor payments to exceed $325,000 in the aggregate during the term of this Agreement.

(c)     The Borrower shall deliver to the Lender on or before 5:00 p.m., New York time on Wednesday of each week a certificate of the Financial Officer of the Borrower (each, a "Budget Compliance Certificate") in form and detail acceptable to the Lender, (i) certifying that the Borrower is in compliance with the covenants contained in Section 5.18(b), (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) attaching an Approved Budget Variance Report.

(d)     The Lender (i) may assume that the Loan Parties will comply with the Approved Budget, (ii) shall have no duty to monitor such compliance and (iii) shall not be obligated to pay (directly or indirectly from the Collateral) any unpaid expenses incurred or authorized to be incurred pursuant to any Approved Budget.  The line items in the Approved Budget for payment of interest, expenses and other amounts to the Lender are estimates only, and the Loan Parties remain obligated to pay any and all Obligations in accordance with the terms of the Loan Documents and the applicable Order regardless of whether such amounts exceed such estimates.  Nothing in any Approved Budget (including any estimates of a loan balance in excess of borrowing base restrictions) shall constitute an amendment or other modification of any Loan Document or any of the borrowing base restrictions or other lending limits set forth therein.

(e)     The Borrower shall deliver by no later than Wednesday after the end of each calendar week (commencing on the Wednesday following the Petition Date), a rolling 13-week cash flow forecast for the Borrower and its consolidated Subsidiaries, commencing with such week, all in form and substance satisfactory to the Lender.

(f)     For all purposes of this Section 5.18, for any periods after those reflected in the Approved Budget, all amounts shall be based on the monthly DIP forecast delivered pursuant to item (b) of the Closing Conditions Schedule attached hereto, modified in a manner reasonably satisfactory to Lender on a weekly basis.

SECTION 5.19.  Loan Party Advisors.  The Loan Parties shall continue to engage a Restructuring Advisor to provide operation advice, perform cash flow modeling and otherwise provide advisory services pursuant to such terms of engagement (including such other duties and responsibilities) and at a rate for services as are acceptable to the Lender.  The Loan Parties and their representatives will fully cooperate with any such advisors and consultants (including the Restructuring Advisor) and grant them full and complete access to the books and records of the Loan Parties.  The Loan Parties hereby (i) authorize the Lender (or its agents or advisors) to communicate directly with the Restructuring Advisor regarding any and all matters related to the Loan Parties and their Affiliates, including, without limitation, all financial reports and projections developed, reviewed or verified by the Restructuring Advisor and all additional information, reports and statements reasonably requested by the Lender, and (ii) authorize and direct the Restructuring Advisor to provide the Lender (or its agents or advisors) with copies of reports and other information or materials prepared or reviewed by the Restructuring Advisor as the Lender may reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege).

SECTION 5.20.  Lender Advisors.  The Lender shall be entitled to retain or to continue to retain (either directly or through counsel) any Lender's Advisors to provide advice, analysis and reporting for the benefit of the Lender, including, among other items, the monitoring of the Collateral.  The Loan Parties shall pay all fees and expenses of each Lender's Advisor and all such fees and expenses shall constitute Obligations and be secured by the Collateral.  The Loan Parties and their advisors shall grant access to, and

cooperate in all respects with, the Lender, the Lender's Advisors, and any other representatives of the foregoing, including access to each premises of the Loan Parties during normal business hours, and provide all information that such parties may request in a timely manner.

SECTION 5.21.  Debtor-In-Possession Obligations.  The Loan Parties will comply in a timely manner with its obligations and responsibilities as a debtor-in-possession under the Bankruptcy Code, the Bankruptcy Rules, and any other order of the Court.

SECTION 5.22.  Required Milestone.  The Loan Parties shall have filed a plan of reorganization or liquidation in form and substance acceptable to the Lender on or before 90 days after the Petition Date.

SECTION 5.23.  Additional Covenants.  The Loan Parties shall comply with the following covenants:

(a)    On or before the entry by the Court of the Final Order, the Loan Parties shall use best efforts to deliver to the Lender a Collateral Access Agreement with respect to each location of any Loan Party leased by a Loan Party and at which any material Collateral is located (including, for the avoidance of doubt, the location at 555 Cannelton Rd, Darlington, Pennsylvania), in form and substance acceptable to the Lender.  In the event the Loan Parties do not provide the Lender a Collateral Access Agreement with respect to any such location, the Loan Parties acknowledge that the Lender may, (i) not include Inventory or Equipment at such location as Eligible Inventory or Eligible Equipment, as applicable, or (ii) establish a Reserve for such location.

(b)    On or before the entry by the Court of the Final Order, the Loan Parties shall have delivered to the Lender an amendment to that certain letter agreement dated as of November 20, 2020, among the Lender, the Borrower, and Fermata, regarding "Forbearance under Fermata Licenses and Manufacture or Sale of Fermata Branded Inventory", in form and substance acceptable to the Lender.

(c)    On or before the entry by the Court of the Final Order, the Loan Parties shall have delivered to the Lender a collateral assignment of rights under business interruption insurance policy, in form and substance acceptable to the Lender.

ARTICLE VI
Negative Covenants

Until all Secured Obligations shall have been Paid in Full, each Loan Party executing this Agreement covenants and agrees, jointly and severally with all of the other Loan Parties, with the Lender that:

SECTION 6.01.  Indebtedness.  No Loan Party will, nor will it permit any Subsidiary to, create, incur or suffer to exist any Indebtedness, except:

(a)    the Secured Obligations and the Pre-Petition Obligations;

(b)    the PAO TMK Indebtedness and other Indebtedness existing on the date hereof and set forth in Section 6.01 of the Disclosure Certificate and any extensions, renewals, refinancings and replacements of any such other Indebtedness in accordance with clause (f) hereof;

(c)    Indebtedness of the Borrower to any Subsidiary and of any Subsidiary to the Borrower or any other Subsidiary, provided that (i) Indebtedness of any Subsidiary that is not a Loan Party to the Borrower or any other Loan Party shall be subject to Section 6.04 and shall be permitted to the extent

consistent with the Approved Budget, and (ii) Indebtedness of any Loan Party to any Subsidiary that is not a Loan Party shall be subordinated to the Secured Obligations and the Pre-Petition Obligations on terms reasonably satisfactory to the Lender;

(d)     Guarantees by the Borrower of Indebtedness of any Subsidiary and by any Subsidiary of Indebtedness of the Borrower or any other Subsidiary, provided that (i) the Indebtedness so Guaranteed is permitted by this Section 6.01, (ii) Guarantees by the Borrower or other Loan Party of Indebtedness of any Subsidiary that is not a Loan Party shall be subject to Section 6.04 and shall be permitted to the extent consistent with the Approved Budget, and (iii) Guarantees permitted under this clause (d) shall be subordinated to the Secured Obligations and Pre-Petition Obligations on the same terms as the Indebtedness so Guaranteed is subordinated to the Secured Obligations;

(e)     Indebtedness of the Borrower or any Subsidiary incurred to finance the acquisition, construction or improvement of any fixed or capital assets (whether or not constituting purchase money Indebtedness), including Capital Lease Obligations, in each case in existence on the Effective Date;

(f)     Indebtedness which represents extensions, renewals, refinancing or replacements (such Indebtedness being so extended, renewed, refinanced or replaced being referred to herein as the "Refinance Indebtedness") of any of the Indebtedness described in clauses (b) and (e) hereof (such Indebtedness being referred to herein as the "Original Indebtedness"); provided that (i) such Refinance Indebtedness does not increase the principal amount or interest rate of the Original Indebtedness, (ii) any Liens securing such Refinance Indebtedness are not extended to any additional property of any Loan Party or any Subsidiary, (iii) no Loan Party or any Subsidiary that is not originally obligated with respect to repayment of such Original Indebtedness is required to become obligated with respect to such Refinance Indebtedness, (iv) such Refinance Indebtedness does not result in a shortening of the average weighted maturity of such Original Indebtedness, (v) the terms of such Refinance Indebtedness are not less favorable to the obligor thereunder than the original terms of such Original Indebtedness, (vi) if such Original Indebtedness is the PAO TMK Indebtedness, (A) in the reasonable judgment of the Lender, the representations and warranties, covenants, events of default, and other provisions of such Refinance Indebtedness (including any guarantees thereof, scheduled payments and mandatory prepayment provisions thereof) shall be, in the aggregate, not materially less favorable to the Lender than those contained in the PAO TMK Indebtedness Documents as in effect on the date hereof, and (B) such Refinance Indebtedness shall in all respects be subject to the terms and conditions of the PAO TMK Intercreditor Agreement, and (vii) if such Original Indebtedness was subordinated in right of payment to the Secured Obligations, then the terms and conditions of such Refinance Indebtedness must include subordination terms and conditions that are at least as favorable to the Lender as those that were applicable to such Original Indebtedness;

(g)     Indebtedness owed to any Person providing workers' compensation, health, disability or other employee benefits or property, casualty or liability insurance, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business; and

(h)     Indebtedness of any Loan Party (other than Parent) in respect of performance bonds, bid bonds, appeal bonds, surety bonds and similar obligations, in each case provided in the ordinary course of business.

Notwithstanding any of the foregoing, no Indebtedness permitted under this Section 6.01 shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or *pari passu* with the superpriority administrative expense claims of (i) the Lender and (ii) the Pre-Petition Lender, in each case, as set forth herein and in the applicable Order and subject to the Carve Out.

SECTION 6.02. Liens. No Loan Party will, nor will it permit any Subsidiary to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, or assign or sell any income or revenues (including Accounts) or rights in respect of any thereof, except:

(a) Liens of the Lender and the Pre-Petition Lender granted by the Orders or created pursuant to any Loan Document or Pre-Petition Loan Document;

(b) Permitted Encumbrances;

(c) any Lien on any property or asset of the Borrower or any Subsidiary existing on the date hereof and set forth in Section 6.02 of the Disclosure Certificate; provided that (i) such Lien shall not apply to any other property or asset of the Borrower or Subsidiary and (ii) such Lien shall secure only those obligations which it secures on the date hereof and extensions, renewals and replacements thereof that do not increase the outstanding principal amount thereof;

(d) Liens on fixed or capital assets acquired, constructed or improved by the Borrower or any Subsidiary; provided that (i) such Liens secure Indebtedness permitted by clause (e) of Section 6.01, (ii) such Liens and the Indebtedness secured thereby are incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement, (iii) the Indebtedness secured thereby does not exceed 80% of the cost of acquiring, constructing or improving such fixed or capital assets and (iv) such Liens shall not apply to any other property or assets of the Borrower or Subsidiary;

(e) Liens of a collecting bank arising in the ordinary course of business under Section 4-208 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon;

(f) Liens arising out of Sale and Leaseback Transactions permitted by Section 6.06;

(g) Liens granted by a Subsidiary that is not a Loan Party in favor of the Borrower or another Loan Party in respect of Indebtedness owed by such Subsidiary;

(h) Liens on any real property and/or Equipment now or hereafter acquired by the Borrower or any Subsidiary which secure the PAO TMK Indebtedness and are expressly permitted under the terms of the PAO TMK Intercreditor Agreement and subject to the Orders; and

(i) such other Liens as may be permitted under the terms of any Rider attached hereto;

(j) Liens securing the Pre-Petition Obligations; and

(k) the Adequate Protection Liens and Adequate Protection Superpriority Claims.

Notwithstanding the foregoing, (A) none of the Liens permitted pursuant to this Section 6.02 may at any time attach to any Loan Party's (1) Accounts, other than those permitted under clause (a) of the definition of Permitted Encumbrances and clause (a) above, or (2) Inventory, other than those permitted under clauses (a) and (b) of the definition of Permitted Encumbrances and clause (a) above, and (B) Liens permitted under this Section 6.02 shall at all times be junior and subordinate to the Liens under the Loan Documents and the applicable Order securing the Obligations (other than Liens on real property in favor of PAO TMK). The prohibition provided for in this Section 6.02 specifically includes any effort by any Loan Party, as debtor, any official committee in any Chapter 11 Case or any other party in interest in the Chapter 11 Cases, as applicable, to prime or create pari passu to any claims, Liens or interests of (x) the Lender or (y) for so long as the Pre-Petition Obligations have not been Paid in Full, the Pre-Petition Lender, any Lien,

in each case, other than as set forth in the applicable Orders and irrespective of whether such claims, Liens or interests may be "adequately protected."

SECTION 6.03.  Fundamental Changes.  (a) No Loan Party will, nor will it permit any Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate, dissolve, or divide, except that, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing (i) any Subsidiary of the Borrower may merge into the Borrower in a transaction in which the Borrower is the surviving entity, (ii) any Loan Party (other than the Borrower or Parent) may merge into any other Loan Party in a transaction in which the surviving entity is a Loan Party and (iii) any Subsidiary that is not a Loan Party may liquidate or dissolve if the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lender; provided that any such merger involving a Person that is not a wholly owned Subsidiary immediately prior to such merger shall not be permitted unless also permitted by Section 6.04.

(b)     No Loan Party will, nor will it permit any Subsidiary to, engage to any material extent in any business other than businesses of the type conducted by the Borrower and its Subsidiaries on the date of hereof and businesses reasonably related thereto.

(c)     No Loan Party will, nor will it permit any Subsidiary to, change its fiscal year from the basis in effect on the Effective Date.

(d)     No Loan Party will change the accounting basis upon which its financial statements are prepared.

(e)     No Loan Party will change the tax filing elections it has made under the Code.

(f)     No Loan Party will change the type of entity that it is.

(g)     No Loan Party will change its organization identification number, if any, issued by its state of incorporation or other organization

(h)     No Loan Party will change its state of incorporation or organization, in each case, unless the Lender shall have received at least 30 days prior written notice of such change and the Lender shall have acknowledged in writing that either (1) such change will not adversely affect the validity, perfection or priority of the Lender's security interest in the Collateral, or (2) any reasonable action requested by the Lender in connection therewith has been completed or taken (including any action to continue the perfection of any Liens in favor of the Lender in any Collateral), provided that, any new location of incorporation or organization shall be in the continental U.S.

SECTION 6.04.  Investments, Loans, Advances, Guarantees and Acquisitions.  No Loan Party will, nor will it permit any Subsidiary to, form any subsidiary after the Effective Date, or purchase, hold or acquire (including pursuant to any merger with any Person that was not a Loan Party and a wholly owned Subsidiary prior to such merger) any evidences of Indebtedness or Equity Interests or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, Guarantee any obligations of, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise), except:

(a)    Permitted Investments in accordance with the Approved Budget, subject to Control Agreements in favor of the Lender or otherwise subject to a perfected security interest in favor of the Lender;

(b)    investments in existence on the date hereof and described in Section 6.04 of the Disclosure Certificate;

(c)    investments by the Borrower and the Subsidiaries in Equity Interests in their respective Subsidiaries;

(d)    loans or advances made by any Loan Party (other than Parent) to another Loan Party;

(e)    Guarantees constituting Indebtedness permitted by Section 6.01;

(f)    [reserved];

(g)    notes payable, or stock or other securities, issued by Account Debtors to a Loan Party pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business, consistent with past practices in accordance with the Approved Budget;

(h)    investments in the form of Swap Agreements permitted by Section 6.07;

(i)    [reserved];

(j)    [reserved];

(k)    investments constituting deposits described in clauses (c) and (d) of the definition of the term "Permitted Encumbrances;" and

(l)    investments, purchases or acquisitions as may be permitted by the terms of any Rider attached hereto.

SECTION 6.05.  Asset Sales.  No Loan Party will, nor will it permit any Subsidiary to, sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Borrower permit any Subsidiary to issue any additional Equity Interest in such Subsidiary (other than to the Borrower or another Subsidiary in compliance with Section 6.04), except for the following, and in each case subject to the Loan Parties obtaining Court approval, as applicable:

(a)    sales, transfers and dispositions of (i) Inventory in the ordinary course of business and (ii) used, obsolete, worn out or surplus Equipment or property in the ordinary course of business; provided, that no Inventory may be sold, transferred or disposed of below the lower of the Borrower's cost or market value without the prior written consent of the Lender;

(b)    sales, transfers and dispositions of assets to the Borrower or any Subsidiary, provided that any such sales, transfers or dispositions involving a Subsidiary that is not a Loan Party shall be made in compliance with Section 6.09;

(c)    sales, transfers and dispositions of Accounts in connection with the compromise, settlement or collection thereof;

(d)    [reserved];

33

(e)     Sale and Leaseback Transactions permitted by Section 6.06;

(f)     dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of the Borrower or any Subsidiary; and

(g)     sales, transfers and other dispositions of assets (other than Equity Interests in a Subsidiary unless all Equity Interests in such Subsidiary are sold) that are not permitted by any other paragraph of this Section, provided that the aggregate fair market value of all assets sold, transferred or otherwise disposed of in reliance upon this paragraph (g) shall not exceed $200,000 during any fiscal year of the Borrower;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by paragraphs (b) and (f) above) shall be made for fair value and for 100% cash consideration.

SECTION 6.06.  Sale and Leaseback Transactions.  No Loan Party will, nor will it permit any Subsidiary to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred (a "Sale and Leaseback Transaction"), except for any such sale of any fixed or capital assets by the Borrower or any Subsidiary that is (a) made for cash consideration in an amount not less than the fair value of such fixed or capital asset and is consummated within 90 days after the Borrower or such Subsidiary acquires or completes the construction of such fixed or capital asset and (b) is otherwise in accordance with the Approved Budget or for which the Loan Parties have obtained Court approval.

SECTION 6.07.  Swap Agreements.  No Loan Party will, nor will it permit any Subsidiary to, enter into any Swap Agreement, except (a) Swap Agreements entered into to hedge or mitigate risks to which the Borrower or any Subsidiary has actual exposure (other than those in respect of Equity Interests of the Borrower or any Subsidiary), and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates (from floating to fixed rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investment of the Borrower or any Subsidiary.

SECTION 6.08.  Restricted Payments; Certain Payments of Indebtedness.  (a) No Loan Party will, nor will it permit any Subsidiary to, declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except (i) the Borrower may declare and pay dividends or other distributions with respect to its existing Equity Interests payable solely in additional Equity Interests of Borrower that are comparable in class and priority to the applicable existing Equity Interests, and (ii) Subsidiaries may declare and pay dividends or other distributions ratably with respect to their Equity Interests.

(b)     No Loan Party will, nor will it permit any Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Indebtedness, except (i) payment in respect of the Secured Obligations and Pre-Petition Obligations, (ii) payment of accrued and unpaid interest and payment, of outstanding principal under the applicable terms of the PAO TMK Indebtedness Documents, in each case made in accordance with the Approved Budget, (iii) payment of regularly scheduled interest and principal payments as and when due in respect of any other Indebtedness permitted under Section 6.01, other than payments in respect of the Subordinated Indebtedness prohibited

34

by the subordination provisions thereof, to the extent permitted by <u>Sections 6.16</u> and <u>6.17</u> and made in accordance with the Approved Budget, (iv) refinancings of Indebtedness to the extent permitted by <u>Section 6.01(f)</u>, (v) payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by the terms of <u>Section 6.05</u> and in accordance with the Approved Budget, and (vi) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases made in accordance with the Approved Budget.

SECTION 6.09.  <u>Transactions with Affiliates</u>.  No Loan Party will, nor will it permit any Subsidiary to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of such Loan Parties' Affiliates, PAO TMK or any Affiliates of PAO TMK, except (a) transactions that (i) are in the ordinary course of business and (ii) are at prices and on terms and conditions not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and any Subsidiary that is a Loan Party not involving any other Affiliate, (c) any investment permitted by <u>Sections 6.04(c)</u> or <u>6.04(d)</u>, (d) any Indebtedness permitted under <u>Section 6.01(c)</u>, (e) any Restricted Payment permitted by <u>Section 6.08</u>, (f) [reserved], (g) the payment of reasonable fees to directors of the Borrower or any Subsidiary who are not employees of the Borrower or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, partners, managing members, directors, officers or employees of the Borrower or its Subsidiaries in the ordinary course of business, in each case in accordance with the Approved Budget, and (h) any issuances of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of, employment agreements, stock options and stock ownership plans approved by the Borrower's partners, managing members or directors; <u>provided</u>, that in addition to the foregoing, and for purposes of clarity, in no event shall any Loan Party amend, modify, supplement, waive, or otherwise change, or permit the amendment, modification, supplementation, waiver, or other change of, in any manner that is less favorable to such Loan Party, to the Loan Parties as a whole, or to the Lender, (A) the terms (including, without limitation, payment terms) of any account payable by such Loan Party to PAO TMK, any parent entity of the Borrower and/or any of their respective non-Loan Party Affiliates, (whether arising out of an Inventory purchase and sale transaction (to the extent permitted under clause (a) above), or otherwise), or (B) the terms (including, without limitation, amounts and payment terms) of any intercompany receivable payable to such Loan Party by PAO TMK, any parent entity of the Borrower and/or any of their respective Affiliates; and <u>provided</u>, <u>further</u>, that each of the parties hereto acknowledge and agree that, as of the Effective Date, payment terms with respect to accounts payable by any Loan Party which arise out of inventory purchase and sale transactions with PAO TMK and/or its non-Loan Party Affiliates, are net 90 days, without payment of interest or other premium or penalty.

SECTION 6.10.  <u>Restrictive Agreements</u>.  No Loan Party will, nor will it permit any Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; <u>provided</u> that (i) the foregoing shall not apply to restrictions and conditions imposed by any Requirement of Law, by any Loan Document, by any Pre-Petition Loan Document or by any PAO TMK Indebtedness Document, (ii) the foregoing shall not apply to restrictions and conditions existing on the date hereof identified on <u>Section 6.10 of the Disclosure Certificate</u> (but shall apply to any extension or renewal of, or any amendment or modification expanding the scope of, any such restriction or condition), (iii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iv) clause (a) of the foregoing shall

not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness and (v) clause (a) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

SECTION 6.11.  Amendment of Material Documents.  No Loan Party will, nor will it permit any Subsidiary to, amend, modify or waive any of its rights under (a) any agreement relating to any Subordinated Indebtedness, (b) its charter, articles or certificate of incorporation or organization, by-laws, operating, management or partnership agreement or other organizational or governing documents or (c) any Material Agreement, to the extent any such amendment, modification or waiver would be adverse to the Lender.

SECTION 6.12.  Amendments to Fermata License; Payments to Fermata. The Borrower will not (a) make any royalty payments to Fermata under the Fermata License, notwithstanding that such payment is reflected on the Approved Budget, if the Actual Net Paydown Amounts for the most recently ending Cumulative Four-Week Period are less than the Budgeted Net Paydown Amount for such Cumulative Four-Week Period for four consecutive weeks, (b) make any other payments to Fermata (whether arising from the sale of goods or provision of services by Fermata, or otherwise), unless such payment is reflected on the Approved Budget, or (c) amend or modify, or permit any amendment or modification of, the Fermata License without the prior written consent of the Lender

SECTION 6.13.  Amendment of PAO TMK Indebtedness Documents.  The Borrower will not amend or modify, or permit any amendment or modification of, any of the PAO TMK Indebtedness Documents without the prior written consent of the Lender, if and to the extent the applicable amendment or modification is not permitted to be made under the terms of the PAO TMK Intercreditor Agreement without the written consent of the Lender.

SECTION 6.14.  Subsidiaries.  No Loan Party will form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Effective Date.

SECTION 6.15.  Orders.  Notwithstanding anything to the contrary herein, no Loan Party shall use any portion or proceeds of the Loans or the Collateral, or disbursements set forth in the Approved Budget, for payments or purposes that would violate the terms of the Paragraph entitled "Limitations on Use of DIP Proceeds, Cash Collateral and Carve Out" of the Interim Order, and the corresponding paragraph of the Final Order.

SECTION 6.16.  Prepayments of Other Debt.  Other than pursuant to an order of the Court and in accordance with the Approved Budget, no Loan Party will directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity, other than (i) the Obligations and the Pre-Petition Obligations or (ii) any payments in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases in accordance with the Approved Budget.

SECTION 6.17.  Repayment of Indebtedness.  Without limiting any other provision hereof, except pursuant to the Approved Budget, without express prior written consent of the Lender and pursuant to an order of the Court (including any Order) after notice and a hearing, no Loan Party shall make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the Petition Date that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

SECTION 6.18.  Reclamation Claims.  No Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise.

SECTION 6.19.  Chapter 11 Claims.  No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of the Lender against Borrower or any other Loan Party, except for the Carve-Out and as otherwise set forth in the Interim Order or the Final Order, as applicable.

ARTICLE VII
Events of Default

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, if any of the following events ("Events of Default") shall occur:

(a)    the Borrower shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)    the Borrower shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement or any other Loan Document, when and as the same shall become due and payable;

(c)    any representation or warranty made or deemed made by or on behalf of any Loan Party or any Subsidiary in, or in connection with, this Agreement or any other Loan Document, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document, shall prove to have been materially incorrect when made or deemed made;

(d)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 (with respect to a Loan Party's existence), 5.06 (with respect to inspection rights), 5.08, 5.10, 5.12, 5.13, 5.18, 5.19, 5.20, 5.21, or Article VI;

(e)    any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement (other than those which constitute a default under another Section of this Article), and such failure shall continue unremedied for a period of (i) five (5) days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of Section 5.01, 5.02 (except as provided in clause (d) above), 5.03 (except as provided in clause (d) above), 5.04, 5.05, 5.06 (except as provided in clause (d) above), 5.07, 5.11, 5.15, or 5.16 or (ii) fifteen (15) days after the earlier of any Loan Party's knowledge of such breach or notice thereof from the Lender if such breach relates to terms or provisions of any other Section of this Agreement;

(f)    any Loan Party or Subsidiary shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Material Indebtedness, when and as the same shall become due and payable;

(g)    except for defaults arising solely due to the filing of the Chapter 11 Cases and the defaults in existence on the Petition Date under the PAO TMK Indebtedness Documents, any event or

37

condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness to the extent such sale or transfer is permitted by Section 6.05;

       (h)     [reserved];

       (i)     [reserved];

       (j)     [reserved];

       (k)     (1) one or more judgments for the payment of money in an aggregate amount in excess of the Judgment Amount shall be rendered against any Loan Party, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Loan Party or Subsidiary to enforce any such judgment; or (2) any Loan Party or Subsidiary shall fail within 30 days to discharge one or more non-monetary judgments or orders which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect, which judgments or orders, in any such case, are not stayed on appeal or otherwise being appropriately contested in good faith by proper proceedings diligently pursued;

       (l)     (i) an ERISA Event shall have occurred that, in the opinion of the Lender, when taken together with all other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect, (ii) any Loan Party or ERISA Affiliate fails to pay when due, after the expiration of any grace period, any installment payment with respect to its Withdrawal Liability to a Multiemployer Plan under Section 4201 of ERISA and such failure would reasonably be expected to result in a Material Adverse Effect or (iii) the PBGC or other appropriate Governmental Authority or any Multiemployer Plan imposes any Lien with respect to a Plan or a Multiemployer Plan on the Collateral having a priority senior to or *pari passu* with the Liens and the security interests granted under the Loan Documents or the Pre-Petition Loan Documents;

       (m)     a Change in Control shall occur;

       (n)     the occurrence of any "default", as defined in any Loan Document (other than this Agreement) or the breach of any of the terms or provisions of any Loan Document (other than this Agreement), which default or breach continues beyond any notice and cure periods or any period of grace therein provided;

       (o)     the Loan Guaranty or any Obligation Guaranty (each term as defined herein and in the Pre-Petition Credit Agreement) shall fail to remain in full force or effect or any action shall be taken to discontinue or to assert the invalidity or unenforceability of the Loan Guaranty or any Obligation Guaranty (each term as defined herein and in the Pre-Petition Credit Agreement) or a Loan Guarantor shall fail to comply with any of the terms or provisions of the Loan Guaranty or any Obligation Guaranty (each as defined herein and in the Pre-Petition Credit Agreement) to which it is a party, or any Loan Guarantor shall deny that it has any further liability under the Loan Guaranty or any Obligation Guaranty (each term as defined herein and in the Pre-Petition Credit Agreement) to which it is a party, or shall give notice to such effect, including, but not limited to notice of termination delivered pursuant to Section 9.08 or any notice

of termination delivered pursuant to the terms of any Obligation Guaranty (as defined herein and in the Pre-Petition Credit Agreement);

(p)        except as permitted by the terms of any Collateral Document (as defined herein and in the Pre-Petition Credit Agreement), (i) any Collateral Document (as defined herein and in the Pre-Petition Credit Agreement), shall for any reason fail to create a valid security interest in any material portion of the Collateral purported to be covered thereby, or (ii) the Orders, any Collateral Document (as defined herein and in the Pre-Petition Credit Agreement), shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected or recorded Lien on and security interest in any portion of the Collateral (as defined herein and in the Pre-Petition Credit Agreement) purported to be covered thereby, or such Lien or other security interest shall cease to have the status and priority provided in the Orders;

(q)        [reserved];

(r)        any material provision of any Loan Document (as defined herein and in the Pre-Petition Credit Agreement) for any reason ceases to be valid, binding and enforceable in accordance with its terms, or any Loan Party shall challenge the enforceability of any Loan Document (as defined herein and in the Pre-Petition Credit Agreement) or shall assert in writing, or engage in any action or inaction that evidences its assertion, that any provision of any of the Loan Documents (as defined herein and in the Pre-Petition Credit Agreement) has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms;

(s)        any Loan Party is criminally indicted or convicted under any law that may reasonably be expected to lead to a forfeiture of any property of such Loan Party having a fair market value in excess of the $200,000;

(t)        if there occurs any uninsured loss of any portion of the Collateral with a market or book value in excess of $200,000;

(u)        the occurrence of any of the following in the Chapter 11 Cases:

(i)        the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan Parties or any Subsidiary, or any Person claiming by or through any Loan Party or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Liens permitted pursuant to Section 6.02 upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Lender or Pre-Petition Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender; or (D) any other action or actions materially adverse to (x) the Lender or Pre-Petition Lender, or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral or (y) Pre-Petition Lender or their rights under the Pre-Petition Credit Agreement or the other Pre-Petition Loan Documents or its interest in the Collateral (as defined in the Pre-Petition Credit Agreement); or

(ii)        (A) the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by a Loan Party that does not propose to indefeasibly repay in full in cash the Obligations under this Agreement and the Pre-Petition Obligations or by any other Person to which the Lender does not consent, or any of the Loan Parties or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order, (B) the entry of any order terminating any Loan Party's exclusive

right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization; or

(iii)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization that (A) is not reasonably acceptable to the Lender, or (B) does not contain a provision for termination of the Commitments and indefeasible repayment in full in cash of all of the Obligations under this Agreement and the Pre-Petition Obligations on or before the effective date of such plan or plans; or

(iv)     (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of the Lender or the filing of a motion by the Loan Parties or its Affiliates for reconsideration with respect to the Interim Order or the Final Order, or the Interim Order or the Final Order shall otherwise not be in full force and effect without the prior written consent of the Lender in its sole discretion or (B) any Loan Party or any Subsidiary shall fail to comply with the Orders in any material respect; or

(v)     the payment of, or application for authority to pay, any pre-petition claim without the Lender's prior written consent unless in accordance with the Approved Budget or pursuant to an Order of the Court; or

(vi)     the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender or any of the Collateral or against the Pre-Petition Lender or any Collateral (as defined in the Pre-Petition Credit Agreement); or

(vii)     (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee, receiver or an examiner in the Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without the Lender's consent of all or substantially all of the Loan Parties' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and all Pre-Petition Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

(viii)     the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to Chapter 7 of the Bankruptcy Code; or

(ix)     any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Lender) to execute upon or enforce a Lien on any Collateral not approved by the Lender, (B) approving any settlement or other stipulation not approved by the Lender with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral not approved by the Lender to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim that would have a Material Adverse Effect on the Loan Parties or their estates or more or (D) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates; or

(x)     any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the automatic stay of Section 362 of the Bankruptcy to permit PAO TMK to exercise any remedies (by foreclosure or otherwise) with respect to any Lien granted by any Loan Party

on any real property securing the PAO TMK Indebtedness, or any Loan Party fails to timely oppose a motion seeking such relief filed by PAO TMK or any other Person (other than a Loan Party); or

(xi)    the commencement of a suit or an action (but not including a motion for standing to commence a suit or an action) against either the Lender or Pre-Petition Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without dismissal for thirty (30) days after service thereof on either the Lender or Pre-Petition Lender, that asserts or seeks by or on behalf of a Loan Party, any state or federal environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Cases, a claim or any legal or equitable remedy that would (x) have the effect of invalidating, subordinating or challenging any or all of the Obligations or Liens of the Lender under the Loan Documents or the Pre-Petition Obligations or Liens of the Pre-Petition Lender under the Pre-Petition Loan Documents to any other claim, or (y) have a material adverse effect on the rights and remedies of the Lender or Pre-Petition Lender under any Loan Document or the Pre-Petition Lender under the Pre-Petition Loan Documents or the collectability of all or any portion of the Obligations or the Pre-Petition Obligations; or

(xii)   the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Pre-Petition Obligations owing under the Pre-Petition Loan Documents; or

(xiii)  the failure of any Loan Party to perform any of its material obligations under the Interim Order, the Final Order or any order of the Court approving any plan of reorganization, sale of all or substantially all assets under Section 363 of the Bankruptcy Code, or to perform in any material respect its material obligations under any order of the Court approving bidding procedures; or

(xiv)   the existence of any claims or charges, or the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Lender under this Agreement and the other Loan Documents, or there shall arise or be granted by the Court (A) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code or (B) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Orders then in effect (but only in the event specifically consented to by the Lender), whichever is in effect; or

(xv)    the Orders shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of Lender; or

(xvi)   an order in the Chapter 11 Cases shall be entered (A) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lender or (B) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Lender on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date, or the commencement of other actions that is materially adverse to Lender or its respective rights and remedies under the Loan Documents in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(xvii)    if the Final Order does not include a waiver, in form and substance satisfactory to the Lender, of (A) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Lender on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; or

(xviii)    without the Lender's consent, an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xix)    an order materially adversely impacting the rights and interests of the Lender, as determined by the Lender in its Permitted Discretion, shall have been entered by the Court; or

(xx)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Lender with respect to the Obligations or the Pre-Petition Lender with respect to the Pre-Petition Obligations, or without the consent of the Lender, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any Pre-Petition Lender that is inconsistent with the Order; or

(xxi)    without the Lender's consent, the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Lender's consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents without the Lender's consent; or

(xxii)    any Loan Party or any person on behalf of any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral to the extent having a value in excess of $100,000 outside the ordinary course of business and not otherwise permitted hereunder and without the Lender's consent; or

(xxiii)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments (A) in respect of accrued payroll and related expenses as of the commencement of the Chapter 11 Cases, (B) in respect of certain creditors as may be reasonably acceptable to the Lender and (C) permitted under this Agreement, in each case, to the extent authorized or required by one or more "first day" or "second day" orders or any of the Orders (or other orders with the consent of the Lender) and consistent with the Approved Budget; or

(xxiv)    if, unless otherwise approved by the Lender, an order of the Court shall be entered providing for a change of venue with respect to any of the Chapter 11 Cases and such order shall not be reversed or vacated within ten (10) days; or

(xxv)    without the Lender's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior, equal or subordinate to the Lender's liens and security interests; or (B) to modify or affect any of the rights of the Lender under the Orders, the Loan Documents, and related documents by any plan of reorganization confirmed in the Chapter 11 Cases or subsequent order entered in the Chapter 11 Cases;

then, and in every such event, and at any time thereafter during the continuance of such event, subject to the Orders and notwithstanding Section 362 of the Bankruptcy Code, the Lender may deliver a written notice of its intention to declare a termination of the Borrower's and the other Loan Parties' ability and rights to access or use of proceeds of any Loans (any such declaration, a "Termination Declaration").  The Termination Declaration shall be given by written notice (including electronic mail) to the Loan Parties, the U.S. Trustee and counsel to the Committee (as defined in the Orders), if any.  If a Termination Declaration is delivered as provided above, the Loan Parties consent to a hearing being held before the Court on an expedited basis and the Lender will file a motion with the Court on at least five (5) Business Days' notice (subject to the Court's availability) to cause the Automatic Stay to be lifted to enable the Lender to exercise its rights and remedies against the Loan Parties under the Loan Documents, the Orders, or applicable law.  The Loan Parties hereby waive their right to and shall not be entitled to seek relief, including under Section 105 of the Bankruptcy Code or otherwise, to the extent that such relief would in any way impair or restrict the express rights and remedies granted to the Lender under this paragraph.

<div align="center">

ARTICLE VIII
Miscellaneous

</div>

SECTION 8.01.  Notices.  (a) Except in the case of notices and other communications expressly permitted to be given by telephone or Electronic Systems (and subject in each case to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, to the addresses set forth on the Terms Schedule attached hereto.  All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received, (ii) sent by facsimile shall be deemed to have been given when sent, provided that if not given during normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient or (iii) delivered through Electronic Systems to the extent provided in paragraph (b) below shall be effective as provided in such paragraph.

(b)        Notices and other communications to the Lender hereunder may be delivered or furnished by Electronic Systems pursuant to procedures approved by the Lender; provided that the foregoing shall not apply to notices pursuant to Article II or to compliance and no Default certificates delivered pursuant to item (c) of the Reporting Schedule attached hereto unless otherwise agreed by the Lender.  Each of the Lender and the Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.  Unless the Lender otherwise proscribes, all such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii) above, if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day of the recipient.

(c)        Any party hereto may change its address, facsimile number or e-mail address for notices and other communications hereunder by notice to the other parties hereto.

<div align="center">43</div>

SECTION 8.02.  Waivers; Amendments.  (a) No failure or delay by the Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Lender hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that it would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)      Neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrower and the Lender, or (ii) in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Lender and the Loan Party or Loan Parties that are parties thereto.

SECTION 8.03.  Expenses; Indemnity; Damage Waiver.  (a) The Loan Parties, jointly and severally, shall pay all (i) reasonable out-of-pocket expenses incurred by the Lender and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Lender, in connection with the credit facilities provided for herein, the preparation and administration of the Loan Documents and any amendments, modifications or waivers of the provisions of the Loan Documents, the Interim Order, the Final Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Lender's Liens in the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral, and (iii) out-of-pocket expenses incurred by the Lender, including the fees, charges and disbursements of any counsel for the Lender, in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.  Expenses being reimbursed by the Loan Parties under this Section include, without limiting the generality of the foregoing, fees, costs and expenses incurred in connection with: (A) appraisals and insurance reviews; (B) field examinations and the preparation of Reports based on the fees charged by a third party retained by the Lender or the internally allocated fees for each Person employed by the Lender with respect to each field examination; provided, however, that the Borrower and any other Loan Parties shall not be obligated to reimburse the Lender for the costs of more than the number of field examinations set forth in the Terms Schedule attached hereto during any calendar year, unless a Default or Event of Default has occurred and exists at the time any additional field examinations are ordered or commissioned; (C) background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of the Lender; (D) Taxes, fees and other charges for (1) lien and title searches and title insurance and (2) filing financing statements and continuations, and other actions to perfect, protect, and continue the Lender's Liens; (E) sums paid or incurred to take any action required of any Loan Party under the Loan Documents that such Loan Party fails to pay or take; and (F) forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lock boxes, and costs and expenses of preserving and protecting the Collateral.  All of the foregoing

44

fees, costs and expenses may be charged to the Borrower as Revolving Loans or to another deposit account, all as described in Section 2.17(c).

(b)     The Loan Parties, jointly and severally, shall indemnify the Lender, and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, incremental taxes, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, and any refinancing of the obligations hereunder or any "exit financing" requested by Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by a Loan Party or a Subsidiary, or any Environmental Liability related in any way to a Loan Party or a Subsidiary, (iv) the failure of a Loan Party to deliver to the Lender the required receipts or other required documentary evidence with respect to a payment made by a Loan Party for Taxes pursuant to Section 2.16, or (v) any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing, whether or not such claim, litigation, investigation, arbitration or proceeding is brought by any Loan Party or their respective equity holders, Affiliates, creditors or any other third Person and whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  **WITHOUT LIMITATION OF THE FOREGOING, IT IS THE INTENTION OF THE LOAN PARTIES AND THE LOAN PARTIES AGREE THAT THE FOREGOING INDEMNITIES SHALL APPLY TO EACH INDEMNITEE WITH RESPECT TO LOSSES, CLAIMS, DAMAGES, PENALTIES, LIABILITIES AND RELATED EXPENSES (INCLUDING, WITHOUT LIMITATION, ALL EXPENSES OF LITIGATION OR PREPARATION THEREFOR), WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF THE NEGLIGENCE, BUT NOT GROSS NEGLIGENCE, OF SUCH (AND/OR ANY OTHER) INDEMNITEE.**  This Section 8.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)     To the extent permitted by applicable law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee (i) for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the Internet) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof; provided that, nothing in this paragraph (c) shall relieve any Loan Party of any obligation it may have to indemnify an Indemnitee against special, indirect, consequential or punitive damages asserted against such Indemnitee by a third party.

(d)     All amounts due under this Section shall be payable promptly after written demand therefor.

SECTION 8.04.  Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations

45

hereunder without the prior written consent of the Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of the Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     The Lender may assign to one or more Persons (other than an Ineligible Institution) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that, except in the case of an assignment to an Affiliate of the Lender or an Approved Fund, the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld; provided that the Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Lender within five Business Days after having received notice thereof); and provided further that no consent of the Borrower shall be required if an Event of Default has occurred and is continuing.  Subject to notification of an assignment, the assignee shall be a party hereto and, to the extent of the interest assigned, have the rights and obligations of the Lender under this Agreement, and the Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement (and, in the case of an assignment covering all of the Lender's rights and obligations under this Agreement, the Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16 and 8.03).  The Borrower and each other Loan Party hereto hereby agrees to execute any amendment and/or any other document that may be necessary to effectuate such an assignment, including an amendment to this Agreement to provide for multiple lenders and an administrative agent to act on behalf of such lenders.  Any assignment or transfer by the Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by the Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

For the purposes of this Section 8.04(b), the terms "Approved Fund" and "Ineligible Institution" have the following meanings:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) the Lender, (b) an Affiliate of the Lender or (c) an entity or an Affiliate of an entity that administers or manages the Lender.

"Ineligible Institution" means a (a) natural person, (b) holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person or relative(s) thereof; provided that, with respect to clause (b), such holding company, investment vehicle or trust shall not constitute an Ineligible Institution if it (x) has not been established for the primary purpose of acquiring any Loans or Commitments, (y) is managed by a professional advisor, who is not such natural person or a relative thereof, having significant experience in the business of making or purchasing commercial loans, and (z) has assets greater than $25,000,000 and a significant part of its activities consist of making or purchasing commercial loans and similar extensions of credit in the ordinary course of its business, or (c) a Loan Party or a Subsidiary or other Affiliate of a Loan Party.

(c)     The Lender may, without the consent of, or notice to, the Borrower, sell participations to one or more banks or other entities other than an Ineligible Institution (a "Participant") in all or a portion of the Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) the Lender's obligations under this Agreement shall remain unchanged, (ii) the Lender shall remain solely responsible to the other parties hereto for the

46

performance of such obligations and (iii) the Borrower shall continue to deal solely and directly with the Lender in connection with the Lender's rights and obligations under this Agreement.  Subject to paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.14 and 2.16 (subject to the requirements and limitations therein) to the same extent as if it were the Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant shall not be entitled to receive any greater payment under Section 2.14 or 2.16, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 8.08 as though it were a Lender.  If the Lender shall sell a participation, it shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that the Lender shall have no obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitment, Loans, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, or other obligation is in registered form under Section 5f.103-1(c) of the U.S. Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and the Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(d)      The Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of the Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release the Lender from any of its obligations hereunder or substitute any such pledgee or assignee for the Lender as a party hereto.

SECTION 8.05.  Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitment has not expired or terminated.  The provisions of Sections 2.14, 2.16 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitment or the termination of this Agreement or any other Loan Document or any provision hereof or thereof.

SECTION 8.06.  Counterparts; Integration; Effectiveness; Electronic Execution.   (a)  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Lender constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter

hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Delivery of an executed counterpart of a signature page of this Agreement by telecopy, emailed pdf. or any other electronic means that reproduces an image of the actual executed signature page shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

SECTION 8.07.  Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.08.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, the Lender and each of its Affiliates is hereby authorized (subject to the Termination Declaration requirements for seeking relief from the Automatic Stay) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by the Lender or such Affiliate to or for the credit or the account of the Borrower or any Loan Guarantor against any and all of the Secured Obligations held by the Lender or such Affiliate, irrespective of whether or not the Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch office or Affiliate of the Lender different from the branch office or Affiliate holding such deposit or obligated on such indebtedness.  The rights of the Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) which the Lender and its Affiliates may have.

SECTION 8.09.  Governing Law; Jurisdiction; Consent to Service of Process.  (a) The Loan Documents (other than those containing a contrary express choice of law provision) shall be governed by and construed in accordance with the internal laws of the Governing State, but giving effect to federal laws applicable to national banks.

(b)     Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of any U.S. Federal or Governing State court sitting in the Primary City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Documents, the transactions relating hereto or thereto, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in

respect of any such action or proceeding may (and any such claims, cross-claims or third party claims brought against the Lender or any of its Related Parties may only) be heard and determined in the Governing State or, to the extent permitted by law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)     Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 8.01</u>.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 8.10.  <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE OR OTHER AGENT (INCLUDING ANY ATTORNEY) OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 8.11.  <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 8.12.  <u>Confidentiality</u>.  The Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by any Requirement of Law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Loan Parties and their obligations, (g) with the consent of the Borrower,

(h) to holders of Equity Interests in the Borrower, (i) to any Person providing a Guarantee of all or any portion of the Secured Obligations or (j) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Lender on a non-confidential basis from a source other than the Borrower.  For the purposes of this Section, "Information" means all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Lender on a non-confidential basis prior to disclosure by the Borrower; provided that, in the case of information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential.   Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 8.13.  <u>Nonreliance; Violation of Law</u>.  The Lender hereby represents that it is not relying on or looking to any margin stock for the repayment of the Borrowings provided for herein.  Anything contained in this Agreement to the contrary notwithstanding, the Lender shall not be obligated to extend credit to the Borrower in violation of any Requirement of Law.

SECTION 8.14.  <u>USA PATRIOT Act</u>.  The Lender is subject to the requirements of the USA PATRIOT Act and hereby notifies each Loan Party that, pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party and other information that will allow the Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

SECTION 8.15.  <u>Disclosure</u>.  Each Loan Party hereby acknowledges and agrees that the Lender and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

SECTION 8.16.  <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the NYFRB Rate to the date of repayment, shall have been received by the Lender.

SECTION 8.17.  <u>Marketing Consent</u>.  The Borrower hereby authorizes the Lender, at its sole expense, but without any prior approval by the Borrower, to publish such tombstones and give such other publicity to this Agreement as it may from time to time determine in its sole discretion.  The foregoing authorization shall remain in effect unless and until the Borrower notifies the Lender in writing that such authorization is revoked.

SECTION 8.18.  <u>No Fiduciary Duty, etc</u>.   The Borrower acknowledges and agrees, and acknowledges its Subsidiaries' understanding, that Lender will not have any obligations except those obligations expressly set forth herein and in the other Loan Documents and Lender is acting solely in the capacity of an arm's length contractual counterparty to the Borrower with respect to the Loan Documents and the transaction contemplated therein and not as a financial advisor or a fiduciary to, or an agent of, the Borrower or any other person.  The Borrower agrees that it will not assert any claim against the Lender

based on an alleged breach of fiduciary duty by the Lender in connection with this Agreement and the transactions contemplated hereby.  Additionally, the Borrower acknowledges and agrees that the Lender is not advising the Borrower as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction.  The Borrower shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Lender shall have no responsibility or liability to the Borrower with respect thereto.  In addition, the Borrower acknowledges and agrees, and acknowledges its subsidiaries' understanding, that the Lender and its affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  The Lender will not use confidential information obtained from the Borrower by virtue of the transactions contemplated by the Loan Documents or its other relationships with the Borrower in connection with the performance by the Lender of services for other companies, and the Lender will not furnish any such information to other companies.  The Borrower also acknowledges that the Lender has no obligation to use in connection with the transactions contemplated by the Loan Documents, or to furnish to the Borrower, confidential information obtained from other companies.

ARTICLE IX
Loan Guaranty

SECTION 9.01.  <u>Guaranty</u>.  Each Loan Guarantor (other than those that have delivered a separate Guaranty) hereby agrees that it is jointly and severally liable for, and, as a primary obligor and not merely as surety, absolutely, unconditionally and irrevocably guarantees to the Secured Parties, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of the Secured Obligations and all costs and expenses including, without limitation, all court costs and attorneys' and paralegals' fees (excluding allocated costs of in-house counsel and paralegals) and expenses paid or incurred by the Lender in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, the Borrower, any Loan Guarantor or any other guarantor of all or any part of the Secured Obligations (such costs and expenses, together with the Secured Obligations, collectively the "<u>Guaranteed Obligations</u>"); <u>provided</u>, <u>however</u>, that the definition of "Guaranteed Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor.  Each Loan Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal.  All terms of this Loan Guaranty apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of the Lender that extended any portion of the Guaranteed Obligations.

SECTION 9.02.  <u>Guaranty of Payment</u>.  This Loan Guaranty is a guaranty of payment and not of collection.  Each Loan Guarantor waives any right to require the Lender to sue the Borrower, any Loan Guarantor, any other guarantor of, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or otherwise to enforce its payment against any collateral securing all or any part of the Guaranteed Obligations.

SECTION 9.03.  <u>No Discharge or Diminishment of Loan Guaranty</u>.  (a) Except as otherwise provided for herein, the obligations of each Loan Guarantor hereunder are unconditional and absolute and not subject to any reduction, limitation, impairment or termination for any reason (other than the Payment in Full of the Guaranteed Obligations), including: (i) any claim of waiver, release, extension, renewal, settlement, surrender, alteration, or compromise of any of the Guaranteed Obligations, by operation of law or otherwise; (ii) any change in the corporate existence, structure or ownership of the Borrower or any other Obligated Party liable for any of the Guaranteed Obligations; (iii) any insolvency, bankruptcy,

reorganization or other similar proceeding affecting any Obligated Party, or their assets or any resulting release or discharge of any obligation of any Obligated Party; or (iv) the existence of any claim, setoff or other rights which any Loan Guarantor may have at any time against any Obligated Party, the Lender, or any other Person, whether in connection herewith or in any unrelated transactions.

(b)     The obligations of each Loan Guarantor hereunder are not subject to any defense or setoff, counterclaim, recoupment, or termination whatsoever by reason of the invalidity, illegality, or unenforceability of any of the Guaranteed Obligations or otherwise, or any provision of applicable law or regulation purporting to prohibit payment by any Obligated Party, of the Guaranteed Obligations or any part thereof.

(c)     Further, the obligations of any Loan Guarantor hereunder are not discharged or impaired or otherwise affected by: (i) the failure of the Lender to assert any claim or demand or to enforce any remedy with respect to all or any part of the Guaranteed Obligations; (ii) any waiver or modification of or supplement to any provision of any agreement relating to the Guaranteed Obligations; (iii) any release, non-perfection, or invalidity of any indirect or direct security for the obligations of the Borrower for all or any part of the Guaranteed Obligations or any obligations of any other Obligated Party liable for any of the Guaranteed Obligations; (iv) any action or failure to act by the Lender with respect to any collateral securing any part of the Guaranteed Obligations; or (v) any default, failure or delay, willful or otherwise, in the payment or performance of any of the Guaranteed Obligations, or any other circumstance, act, omission or delay that might in any manner or to any extent vary the risk of such Loan Guarantor or that would otherwise operate as a discharge of any Loan Guarantor as a matter of law or equity (other than the Payment in Full of the Guaranteed Obligations).

SECTION 9.04.  Defenses Waived.  To the fullest extent permitted by applicable law, each Loan Guarantor hereby waives any defense based on or arising out of any defense of the Borrower or any Loan Guarantor or the unenforceability of all or any part of the Guaranteed Obligations from any cause, or the cessation from any cause of the liability of the Borrower, any Loan Guarantor, or any other Obligated Party other than the Payment in Full of the Guaranteed Obligations.  Without limiting the generality of the foregoing, each Loan Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against any Obligated Party, or any other Person.  Each Loan Guarantor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  The Lender may, at its election, foreclose on any Collateral held by it by one or more judicial or nonjudicial sales, accept an assignment of any such Collateral in lieu of foreclosure or otherwise act or fail to act with respect to any collateral securing all or a part of the Guaranteed Obligations, compromise or adjust any part of the Guaranteed Obligations, make any other accommodation with any Obligated Party or exercise any other right or remedy available to it against any Obligated Party, without affecting or impairing in any way the liability of such Loan Guarantor under this Loan Guaranty except to the extent the Guaranteed Obligations have been Paid in Full.  To the fullest extent permitted by applicable law, each Loan Guarantor waives any defense arising out of any such election even though that election may operate, pursuant to applicable law, to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Loan Guarantor against any Obligated Party or any security.

SECTION 9.05.  Rights of Subrogation.  No Loan Guarantor will assert any right, claim or cause of action, including, without limitation, a claim of subrogation, contribution or indemnification that it has against any Obligated Party, or any collateral, until the Loan Parties and the Loan Guarantors have fully performed all their obligations to the Lender.

SECTION 9.06.  Reinstatement; Stay of Acceleration.  If at any time any payment of any portion of the Guaranteed Obligations (including a payment effected through exercise of a right of setoff) is

rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, or reorganization of any Obligated Party or otherwise (including pursuant to any settlement entered into by a Secured Party in its discretion), each Loan Guarantor's obligations under this Loan Guaranty with respect to that payment shall be reinstated at such time as though the payment had not been made and whether or not the Lender is in possession of this Loan Guaranty.  If acceleration of the time for payment of any of the Guaranteed Obligations is stayed upon the insolvency, bankruptcy or reorganization of any Obligated Party, all such amounts otherwise subject to acceleration under the terms of any agreement relating to the Guaranteed Obligations shall nonetheless be payable by the Loan Guarantors forthwith on demand by the Lender.

SECTION 9.07.  <u>Information</u>.  Each Loan Guarantor assumes all responsibility for being and keeping itself informed of each Obligated Party's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Loan Guarantor assumes and incurs under this Loan Guaranty, and agrees that the Lender shall not have any duty to advise any Loan Guarantor of information known to it regarding those circumstances or risks.

SECTION 9.08.  <u>Termination</u>.  The Lender may continue to make loans or extend credit to the Borrower based on this Loan Guaranty until five days after it receives written notice of termination from any Loan Guarantor.  Notwithstanding receipt of any such notice, each Loan Guarantor will continue to be liable to the Lender for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of such Guaranteed Obligations.  Nothing in this <u>Section 9.08</u> shall be deemed to constitute a waiver of, or eliminate, limit, reduce or otherwise impair any rights or remedies the Lender may have in respect of, any Default or Event of Default that shall exist under clause (o) of <u>Article VII</u> hereof as a result of any such notice of termination.

SECTION 9.09.  <u>Taxes</u>.  Each payment of the Guaranteed Obligations will be made by each Loan Guarantor without withholding for any Taxes, unless such withholding is required by law.  If any Loan Guarantor determines, in its sole discretion exercised in good faith, that it is so required to withhold Taxes, then such Loan Guarantor may so withhold and shall timely pay the full amount of withheld Taxes to the relevant Governmental Authority in accordance with applicable law.  If such Taxes are Indemnified Taxes, then the amount payable by such Loan Guarantor shall be increased as necessary so that, net of such withholding (including such withholding applicable to additional amounts payable under this Section), the Lender receives the amount it would have received had no such withholding been made.

SECTION 9.10.  <u>Maximum Liability</u>.  Notwithstanding any other provision of this Loan Guaranty, the amount guaranteed by each Loan Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law.  In determining the limitations, if any, on the amount of any Loan Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which such Loan Guarantor may have under this Loan Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 9.11.  <u>Contribution</u>.

(a)     To the extent that any Loan Guarantor shall make a payment under this Loan Guaranty (a "<u>Guarantor Payment</u>") which, taking into account all other Guarantor Payments then previously or concurrently made by any other Loan Guarantor, exceeds the amount which otherwise would have been paid by or attributable to such Loan Guarantor if each Loan Guarantor had paid the aggregate Guaranteed

Obligations satisfied by such Guarantor Payment in the same proportion as such Loan Guarantor's "Allocable Amount" (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Loan Guarantors as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Guarantor Payment and the Payment in Full of the Guaranteed Obligations and the termination of this Agreement, such Loan Guarantor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Loan Guarantor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment.

(b)     As of any date of determination, the "Allocable Amount" of any Loan Guarantor shall be equal to the excess of the fair saleable value of the property of such Loan Guarantor over the total liabilities of such Loan Guarantor (including the maximum amount reasonably expected to become due in respect of contingent liabilities, calculated, without duplication, assuming each other Loan Guarantor that is also liable for such contingent liability pays its ratable share thereof), giving effect to all payments made by other Loan Guarantors as of such date in a manner to maximize the amount of such contributions.

(c)     This Section 9.11 is intended only to define the relative rights of the Loan Guarantors, and nothing set forth in this Section 9.11 is intended to or shall impair the obligations of the Loan Guarantors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Loan Guaranty.

(d)     The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the Loan Guarantor or Loan Guarantors to which such contribution and indemnification are owing.

(e)     The rights of the indemnifying Loan Guarantors against other Loan Guarantors under this Section 9.11 shall be exercisable upon the Payment in Full of the Guaranteed Obligations and the termination of this Agreement.

SECTION 9.12.  Liability Joint and Several.  The liability of each Loan Party as a Loan Guarantor under this Article IX is in addition to and shall be joint and several with all liabilities of each Loan Party to the Lender under this Agreement and the other Loan Documents to which such Loan Party is a party or in respect of any obligations or liabilities of the other Loan Parties, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary.

SECTION 9.13.  Keepwell.  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under this Guarantee in respect of a Swap Obligation (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section 9.13 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 9.13 or otherwise under this Loan Guaranty voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  Except as otherwise provided herein, the obligations of each Qualified ECP Guarantor under this Section 9.13 shall remain in full force and effect until the termination of all Swap Obligations.  Each Qualified ECP Guarantor intends that this Section 9.13 constitute, and this Section 9.13 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section la(18)(A)(v)(II) of the Commodity Exchange Act.

[*Remainder of page left intentionally blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective authorized officers as of the day and year first above written.

BORROWER:

OFS INTERNATIONAL LLC,
a Delaware limited liability company

By: _____
Name: _____
Title: _____

LOAN GUARANTOR AND OTHER LOAN PARTIES:

OFSI HOLDING LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

THREADING AND PRECISION MANUFACTURING LLC, a Delaware limited liability company

By: _____
Name: _____
Title: _____

LENDER:

SANDTON CAPITAL SOLUTIONS MASTER
FUND V, LP

By:  Sandton Capital Solutions V GP LLC, its General
      Partner

    By:  Sandton Fund Advisors, LLC, its Sole Member


        By: _____
        Name: _____
        Title: _____

## DEFINITIONS SCHEDULE

The following terms shall have the meanings given to them in the Terms Schedule attached hereto: "Borrower's Accountants", "Closing Fee", "Governing State", "Investment Limit", "Judgment Amount", "Maturity Date", "Primary City", and "Reference Fiscal Year".

The following terms shall have the meanings assigned to them in the Borrowing Base Schedule attached hereto.  "Borrowing Base", "Eligible Accounts", "Eligible Equipment", and "Eligible Inventory".

The following terms shall have the meaning given to them in the UCC: "Account", "Chattel Paper", "Deposit Account", "Document", "Equipment", "General Intangible", "Inventory" and "Securities Account".

"Account Debtor" means any Person obligated on an Account.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Effective Date, by which any Loan Party (a) acquires any going business or all or substantially all of the assets of any Person, whether through purchase of assets, merger or otherwise or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which has ordinary voting power for the election of directors or other similar management personnel of a Person (other than Equity Interests having such power only by reason of the happening of a contingency) or a majority of the outstanding Equity Interests of a Person.

"Actual 503(b)(9) Payments" means the sum of all cash expenditures made by the Loan Parties during the relevant period of determination which corresponds to each of the budgeted cash expenditures described in the line item contained in the Approved Budget across from the heading "Critical Vendor - 503(b)(9)" as determined in a manner consistent with the Approved Budget.

"Actual Cash Receipts" means the sum of all cash receipts received by the Loan Parties (excluding any borrowings under this Agreement) during the relevant period of determination which corresponds to the budgeted cash receipts described in the line item contained in the Approved Budget across from the heading "Total Collections", as determined in a manner consistent with the Approved Budget.

"Actual Disbursement Amount" means the sum of all cash expenditures made by the Loan Parties during the relevant period of determination which corresponds to each of the budgeted cash expenditures described in the line item contained in the Approved Budget across from the headings "Total Disbursements" determined in a manner consistent with the Approved Budget.

"Actual Net Cash Flow" means the net cash flow of the Loan Parties during the relevant period of determination which corresponds to the budgeted net cash flow described in the line item contained in the Approved Budget across from the heading "Net Cash Flow", as determined in a manner consistent with the Approved Budget.

"Actual Net Paydown Amount" means the sum of all repayments of the Pre-Petition Obligations and the Secured Obligations (net of any borrowings under this Agreement) during the relevant period of determination which corresponds to the budgeted amount of borrowings and paydowns described in the line item contained in the Approved Budget across from the heading "Draw/(Paydown)", as determined in a manner consistent with the Approved Budget.

"Adequate Protection Liens" has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"Adequate Protection Superpriority Claims" has the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the specified Person.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries from time to time concerning or relating to bribery or corruption.

"Approved Budget" means the budget prepared by the Borrower in the form of Annex A and initially furnished to the Lender on the Effective Date and which is approved by, and in form and substance satisfactory to, the Lender in its sole discretion, as the same may be updated, modified or supplemented from time to time as provided in Section 5.18.

"Approved Budget Variance Report" means a weekly report provided by the Borrower to the Lender (i) showing, in each case, by line item the Actual Cash Receipts, the Actual Disbursement Amount, Actual 503(b)(9) Payments, Availability and total available liquidity for the last day of the Prior Week, the Cumulative Four-Week Period and the Cumulative Period, noting therein all variances required by Section 5.18, on a line-item and cumulative basis, from the amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, and (ii) certified by a Responsible Officer of the Borrower.  The Approved Budget Variance Report shall be in a form, and shall contain supporting information, reasonably satisfactory to the Lender in its sole discretion.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability" means, at any time, an amount equal to (a) the lesser of (i) the Revolving Commitment and (ii) the Borrowing Base, minus (b) the Revolving Exposure, minus (c) the Availability Block, minus (d) Reserves established against Availability by the Lender in its Permitted Discretion.

"Availability Block"  means, at any time, the outstanding principal amount of the Term Loans at such time.

"Availability Period" means the period from and including the Effective Date to but excluding the earlier of the Maturity Date and the date of termination of the Revolving Commitment.

"Banking Services" means each and any of the following bank services provided to any Loan Party by the Lender or any of its Affiliates: (a) credit cards for commercial customers (including, without limitation, "commercial credit cards" and purchasing cards), (b) stored value cards, (c) merchant processing services, and (d) treasury management services (including, without limitation, controlled disbursement, automated clearinghouse transactions, return items, overdrafts, cash pooling services and interstate depository network services).

"Banking Services Obligations" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) in connection with Banking Services.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Event</u>" means, with respect to any Person, when such Person becomes the subject of a voluntary or involuntary bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, administrator, custodian, assignee for the benefit of creditors or similar Person charged with the reorganization or liquidation of its business, appointed for it, or, in the good faith determination of the Lender, has taken any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any such proceeding or appointment or has had any order for relief in such proceeding entered in respect thereof, provided that a Bankruptcy Event shall not result solely by virtue of any ownership interest, or the acquisition of any ownership interest, in such Person by a Governmental Authority or instrumentality thereof, unless such ownership interest results in or provides such Person with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority or instrumentality) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Person.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as now and hereafter in effect and applicable to the Chapter 11 Cases.

"<u>Beneficial Ownership Certification</u>" means a certification regarding the beneficial ownership as required by the Beneficial Ownership Regulation.

"<u>Beneficial Ownership Regulation</u>" means 31 C.F.R. § 1010.230.

"<u>Borrowing</u>" means (a) Revolving Loans, (b) a Protective Advance, (c) a Term Loan, and (d) in the case of any other Loan made pursuant to a Rider attached hereto, any such Loan made on the same date.

"<u>Borrowing Base Certificate</u>" means a certificate, signed and certified as accurate and complete by a Financial Officer of the Borrower, in form which is acceptable to the Lender in its sole discretion.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing of (a) a Revolving Loan in accordance with <u>Section 2.03</u>,  (b) a Term Loan in accordance with <u>Section 2.02</u>, or (c) for another Loan made pursuant to a Rider attached hereto, in accordance with such Rider.

"<u>Budget Compliance Certificate</u>" has the meaning assigned to such term in <u>Section 5.18(c)</u>.

"<u>Budgeted 503(b)(9) Payments</u>" means the sum of the expenditures described in the line item contained in the Approved Budget across from the heading "Critical Vendor - 503(b)(9)" during the relevant period of determination.

"<u>Budgeted Cash Receipts</u>" means the line item contained in the Approved Budget across from the heading "Total Collections" during the relevant period of determination.

"<u>Budgeted Disbursement Amount</u>" means the sum of the expenditures described in the line item contained in the Approved Budget across from the heading "Total Disbursements", in each case, during the relevant period of determination.

"<u>Budgeted Net Cash Flow</u>" means the line item contained in the Approved Budget across from the heading "Net Cash Flow" during the relevant period of determination.

"Budgeted Net Paydown Amount" means the line item contained in the Approved Budget across from the heading "Draw/(Paydown)" during the relevant period of determination.

"Burdensome Restriction" means any consensual encumbrance or restriction of the type described in Section 6.10.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital or financing leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve-Out" has the meaning assigned to the term "Carve Out" in the Interim Order (or Final Order, when applicable).

"Cash Management Order" means the order of the Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, which among other matters authorizes the Loan Parties to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Lender in all material respects.

"Change in Control" means (a) Konstantin Semerikov shall cease to own and Control, directly or indirectly, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of Parent on a fully diluted basis, (b) Parent shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of the Borrower on a fully diluted basis, or (c) the Borrower shall cease to own, free and clear of all Liens or other encumbrances, 100% of the outstanding voting Equity Interests of each other Loan Party on a fully diluted basis.

"Change in Law" means the occurrence after the date of this Agreement of any of the following: (a) the adoption of or taking effect of any law, rule, regulation or treaty; (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority; or (c) compliance by the Lender (or, for purposes of Section 2.14(b), by any lending office of the Lender or by the Lender's holding company, if any) with any request, guideline, requirement or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements or directives thereunder or issued in connection therewith or in the implementation thereof, and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the Recitals.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means any and all property owned, leased or operated by a Person covered by the Collateral Documents and any and all other property of any Loan Party, now existing or hereafter acquired, that may at any time be, become or intended to be, subject to a security interest or Lien in favor of the Lender, on behalf of the Secured Parties, to secure the Secured Obligations; provided, however, that notwithstanding any provision to the contrary contained in this Agreement, any Security Agreement and/or any other Loan Document, none of the real property of any Loan Party shall be required to serve as Collateral for any Secured Obligations, it being understood that such real property may be pledged by the Loan Parties as collateral for the PAO TMK Indebtedness and any extensions, renewals, refinancings and replacements of the PAO TMK Indebtedness made in accordance with the requirements of Section 6.01(f) hereof, but not any other Indebtedness of any Loan Party.

"Collateral Access Agreement" means any landlord waiver or other agreement, in form and substance satisfactory to the Lender, between the Lender and any third party (including any bailee, consignee, customs broker, or other similar Person) in possession of any Collateral or any landlord of any Loan Party for any real property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, or otherwise modified from time to time.

"Collateral Deposit Account" shall have the meaning assigned to such term in Section 5.13(b).

"Collateral Documents" means, collectively, the Orders, the Security Agreement, and any other agreements, instruments and documents executed in connection with this Agreement that are intended to create, perfect or evidence Liens to secure the Secured Obligations, including, without limitation, all other security agreements, pledge agreements, loan agreements, notes, guarantees, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, fee letters, notices, leases, financing statements and all other written matter whether theretofore, now or hereafter executed by any Loan Party and delivered to the Lender.

"Collection Account" shall have the meaning assigned to such term in Section 2.09(b).

"Commitment" means each of (a) the Revolving Commitment, (b) the Term Loan Commitment, and (c) any other commitment, if any, to make Loans pursuant to a Rider attached hereto.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means an agreement, in form and substance satisfactory to the Lender, among any Loan Party, a bank, financial institution, securities intermediary or other Person holding such Loan Party's funds or maintaining a Deposit Account or Securities Account for such Loan Party, and the Lender, with respect to collection and control of all deposits, balances, securities and other assets held in a Deposit Account or Securities Account maintained by such Loan Party with such bank, financial institution, securities intermediary or other Person.

"Court" has the meaning assigned to such term in the Recitals.

"<u>Cumulative Four-Week Period</u>" means the four-week period up to and through the Saturday of the most recent week then ended, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"<u>Cumulative Period</u>" means the period from the Petition Date through the most recent week ended.

"<u>Default</u>" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"<u>Disclosed Matters</u>" means the actions, suits and proceedings and the environmental matters disclosed in <u>Section 3.06 of the Disclosure Certificate</u>.

"<u>Disclosure Certificate</u>" means the disclosure certificate prepared, executed and delivered by the Loan Parties to the Lender.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means a Subsidiary organized under the laws of a jurisdiction located in the U.S.

"<u>ECP</u>" means an "eligible contract participant" as defined in Section 1(a)(18) of the Commodity Exchange Act or any regulations promulgated thereunder and the applicable rules issued by the Commodity Futures Trading Commission and/or the SEC.

"<u>Effective Date</u>" means the date on which the conditions specified in <u>Section 4.01</u> are satisfied (or waived in accordance with <u>Section 8.02</u>).

"<u>Electronic Signature</u>" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"<u>Electronic System</u>" means any electronic system, including e-mail, e-fax, web portal access for the Borrower, Intralinks®, ClearPar®, Debt Domain, Syndtrak and any other Internet or extranet-based site, whether such electronic system is owned, operated or hosted by the Lender or any of its respective Related Parties or any other Person, providing for access to data protected by passcodes or other security system.

"<u>Environmental Laws</u>" means all laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to (i) the environment, (ii) the preservation or reclamation of natural resources, (iii) the management, Release or threatened Release of any Hazardous Material or (iv) to health and safety matters.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) any exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

6

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or Section 4001(14) of ERISA or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the failure to satisfy the "minimum funding standard" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal of the Borrower or any ERISA Affiliate from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition upon the Borrower or any ERISA Affiliate of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, in critical status or in reorganization, within the meaning of Title IV of ERISA.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an ECP at the time the Guarantee of such Guarantor or the grant of such security interest becomes or would become effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Lender or required to be withheld or deducted from a payment to the Lender: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the Lender being organized under the laws of, or having its principal office or its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, and (b) any withholding Taxes imposed under FATCA.

"Exit Fee" has the meaning assigned to such term in Section 2.11(b).

"Extension Conditions" means each of the following conditions, as determined by the Lender in its sole discretion (a) the Borrower shall have delivered a written request to the Lender, no later than 30 days prior to the Maturity Date in effect on the Effective Date requesting that the term of the Commitment be extended by six months (an "Extension Request"), (b) no Default or Event of Default exists at the time of such Extension Request, (c) the Lender shall have indicated in writing to the Borrower that it has accepted the Extension Request, and (d) the Lender shall have received payment of the Extension Fee.

"Extension Fee" means, on any date of determination, an amount equal to (a) the sum of the principal amount (including any PIK Interest) of Pre-Petition Loans and Loans outstanding on such date (or, if such date is after the Maturity Date, the sum of the principal amount (including any PIK Interest) of Pre-Petition Loans and Loans outstanding immediately prior to the Maturity Date), multiplied by (b) 2.5%.

"Extension Request" has the meaning assigned to such term in the definition of "Extension Conditions".

"Extenuating Circumstance" means any period during which the Lender has determined in its sole discretion (i) that due to unforeseen and/or nonrecurring circumstances, it is impractical and/or not feasible to submit or receive a Borrowing Request by email or fax or through Electronic System, and (ii) to accept a Borrowing Request telephonically.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" means, for any day, the rate calculated by the NYFRB based on such day's federal funds transactions by depositary institutions (as determined in such manner as the NYFRB shall set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as the effective federal funds rate, provided that if the Federal Funds Effective Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Fermata" means, Fermata Technologies, LLC, a Texas limited liability company.

"Fermata License" means, collectively, the following agreements: (a) License Agreement – Sales and Marketing, dated as of April 1, 2019, between Fermata and the Borrower, (b) License Agreement – Manufacturing, dated as of April 1, 2019, between Fermata and the Borrower, and (c) Field Service Agreement, dated as of June 14, 2019, between Fermata and the Borrower, in each case as in effect on the Effective Date or amended thereafter with the Lender's prior written consent.

"Final Order" means, collectively, the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Lender in all respects and in the Lender's sole discretion, and which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Lender in its sole discretion, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty)

Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Lender's claims.

"Financial Officer" means the chief financial officer, chief accounting officer, treasurer or controller of the Borrower.

"Funding Account" means the deposit account of the Borrower to which the Lender is authorized by the Borrower to transfer the proceeds of any Borrowings requested or authorized pursuant to this Agreement.

"GAAP" means generally accepted accounting principles in the U.S.

"Governmental Authority" means the government of the U.S., any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Guaranteed Obligations" has the meaning assigned to such term in Section 9.01.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations of such Person under any liquidated earn-out, (l) any other Off-Balance Sheet Liability of such Person, and (m) all obligations of such Person, whether absolute or contingent and

howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (i) any and all Swap Agreements, and (ii) any and all cancellations, buy backs, reversals, terminations or assignments of any Swap Agreement transaction. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in the foregoing clause (a) hereof, Other Taxes.

"Initial Term Loan" has the meaning assigned to such term in Section 2.02(a)(i).

"Interest Payment Date" means (a) with respect to any Loan and any interest accruing under the terms of Section 2.12(d), the first Business Day of each calendar month and the Maturity Date, and (b) with respect to all Loans, the Maturity Date.

"Interim Order" means, collectively, the order of the Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standard prescribed in Section 324 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents.

"Lender's Advisors" means any financial advisor, attorney, accountant, appraiser, auditor, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts retained by the Lender or the attorneys or other advisors of the Lender.

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" means, collectively, this Agreement, any promissory notes issued pursuant to this Agreement, the Collateral Documents, the Loan Guaranty, any Obligation Guaranty, each Budget Compliance Certificate, and all other agreements, instruments, documents and certificates identified in or contemplated by Section 4.01 executed and delivered to, or in favor of, the Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of any Loan Party, or any employee of any Loan Party, and delivered to the Lender in connection with this Agreement or the transactions contemplated hereby.  Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits, riders or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, all waivers thereunder, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan Guarantor" means each Loan Party other than the Borrower.

"Loan Guaranty" means Article IX of this Agreement and each separate Guarantee (if any), in form and substance satisfactory to the Lender, delivered by each Loan Guarantor.

10

"<u>Loan Parties</u>" means the Borrower, the Borrower's Domestic Subsidiaries (if any), and any other Person who becomes a party to this Agreement pursuant to a joinder agreement and their respective successors and assigns, and the term "<u>Loan Party</u>" shall mean any one of them or all of them individually, as the context may require.

"<u>Loans</u>" means the loans and advances made by the Lender pursuant to this Agreement, including Protective Advances and any loans made pursuant to a Rider hereto.

"<u>Lock Box</u>" shall have the meaning assigned to such term in <u>Section 5.13(b)</u>.

"<u>Lock Box Agreement</u>" shall have the meaning assigned to such term in <u>Section 5.13(b)</u>.

"<u>Margin Stock</u>" means margin stock within the meaning of Regulations T, U and X, as applicable.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, operations, prospects or condition, financial or otherwise, of the Loan Parties taken as a whole, (b) the ability of any Loan Party to perform any of its Obligations, (c) the Collateral, or the Lender's Liens on the Collateral or the priority of such Liens, or (d) the rights of or benefits available to the Lender under any of the Loan Documents.

"<u>Material Agreements</u>" means all material agreements and contracts identified in <u>Section 3.12 of the Disclosure Certificate</u>, which in no event shall include any agreements or contract whose contract value or amount is less than $200,000.

"<u>Material Indebtedness</u>" means (a) the PAO TMK Indebtedness and (b) any other Indebtedness (other than the Loans), or obligations in respect of one or more Swap Agreements, of any one or more of the Loan Parties or any Subsidiary in an aggregate principal amount exceeding the $200,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Loan Parties or any Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party or Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Multiemployer Plan</u>" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Proceeds</u>" means, with respect to any event, (a) the cash proceeds received in respect of such event including (i) any cash received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but excluding any interest payments), but only as and when received, (ii) in the case of a casualty, insurance proceeds and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, <u>minus</u> (b) the sum of (i) all reasonable fees and out-of-pocket expenses paid to third parties (other than Affiliates) in connection with such event, (ii) in the case of a sale, transfer or other disposition of an asset (including pursuant to a sale and leaseback transaction or a casualty or a condemnation or similar proceeding), the amount of all payments required to be made as a result of such event to repay Indebtedness (other than Loans) secured by such asset or otherwise subject to mandatory prepayment as a result of such event and (iii) the amount of all taxes paid (or reasonably estimated to be payable) and the amount of any reserves established to fund contingent liabilities reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to such event (as determined reasonably and in good faith by a Financial Officer).

"NYFRB" means the Federal Reserve Bank of New York.

"NYFRB Rate" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day(or for any day that is not a Business Day, for the immediately preceding Business Day); provided that if none of such rates are published for any day that is a Business Day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Lender from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Obligated Party" has the meaning assigned to such term in Section 9.02.

"Obligation Guaranty" means any Guarantee of all or any portion of the Secured Obligations executed and delivered to the Lender by a guarantor who is not a Loan Party.

"Obligations" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees and all expenses, reimbursements, indemnities and other obligations and indebtedness (including interest and fees accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), obligations and liabilities of any of the Loan Parties to the Lender or any indemnified party individually or collectively, existing on the Effective Date or arising thereafter, direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any of the other Loan Documents or in respect of any of the Loans made or other instruments at any time evidencing any thereof.

"Off-Balance Sheet Liability" of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheet of such Person (other than operating leases).

"Orders" means, collectively, the Interim Order and the Final Order.

"Other Connection Taxes" means, with respect to the Lender, Taxes imposed as a result of a present or former connection between the Lender and the jurisdiction imposing such Taxes (other than a connection arising from the Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to, or enforced, any Loan Document, or sold or assigned an interest in any Loan or any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Overnight Bank Funding Rate" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions (as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time) and published on the next succeeding Business Day by the NYFRB as an overnight bank funding rate.

"Paid in Full", "Pay in Full" or "Payment in Full" means, (i) the indefeasible payment in full in cash of all outstanding Loans, together with accrued and unpaid interest thereon, (ii) [reserved], (iii) the indefeasible payment in full in cash of the accrued and unpaid fees, including the applicable Exit Fee and Extension Fee, if any, (iv) the indefeasible payment in full in cash of all reimbursable expenses and other Secured Obligations (other than Unliquidated Obligations for which no claim has been made and other obligations expressly stated to survive such payment and termination of this Agreement), together with accrued and unpaid interest thereon, (vi) the indefeasible payment in full in cash of all Pre-Petition Obligations, (vii) the termination of all Commitments, and (viii) the termination of the Swap Agreement Obligations and the Banking Services Obligations or entering into other arrangements satisfactory to the Secured Parties counterparties thereto.

"PAO TMK" means, collectively, PAO TMK, a public joint-stock company incorporated and acting under the laws of the Russian Federation, and its successors and assigns as "Lender" under the PAO TMK Loan Agreement.

"PAO TMK Indebtedness" means, collectively, (a) that certain advancing line of credit in the principal amount of up to, but not exceeding, $25,000,000.00 and (b) all other Indebtedness now or hereafter outstanding and evidenced by the PAO TMK Indebtedness Documents. As of the Petition Date, the aggregate amount of the PAO TMK Indebtedness is $14,363,296.29.

"PAO TMK Intercreditor Agreement" means that certain Intercreditor Agreement dated as of July 13, 2018, by and between PAO TMK and the Lender, as said Intercreditor Agreement may hereafter be amended, modified, restated and/or replaced from time to time in accordance with the terms thereof.

"PAO TMK Indebtedness Documents" means (a) the PAO TMK Loan Agreement, and (b) all other loan documents, if any, now or hereafter evidencing, securing or otherwise executed in connection with the PAO TMK Loan Agreement, in each case as in effect on the Effective Date, and as each of the same may be hereafter amended, modified, refinanced, supplemented, renewed, restated or replaced in accordance with the terms of the PAO TMK Intercreditor Agreement.

"PAO TMK Loan Agreement" means that certain Loan Agreement dated as of September 19, 2017, by and between the Borrower and PAO TMK, as said Loan Agreement may hereafter be amended, modified, refinanced, restated and/or replaced from time to time in accordance with the terms of the PAO TMK Intercreditor Agreement.

"Parent" means OFSI Holding LLC, a Delaware limited liability company.

"Participant" has the meaning assigned to such term in Section 8.04(c).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Discretion" means a determination made in good faith and in the exercise of reasonable (from the perspective of a secured lender) business judgment.

"Permitted Encumbrances" means:

    (a)    Liens imposed by law for Taxes that are not yet due or are being contested in compliance with Section 5.04;

(b)      carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.04;

(c)      subject to the Orders, pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)      deposits to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business, in each case, in accordance with the Approved Budget;

(e)      judgment Liens in respect of judgments arising after the Petition Date that do not constitute an Event of Default under clause (k) of Article VII; and

(f)      easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of the Borrower or any Subsidiary;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, except with respect to clause (e) above.

"Permitted Investments" means:

(a)      direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the U.S. (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the U.S.), in each case maturing within one year from the date of acquisition thereof;

(b)      investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)      investments in certificates of deposit, bankers' acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the U.S. or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e)      money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"<u>Petition Date</u>" has the meaning assigned to such term in the Recitals.

"<u>PIK Interest</u>" has the meaning assigned to such term in <u>Section 2.12(a)(ii)</u>.

"<u>Plan</u>" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"<u>Post-Petition</u>" means the time period commencing immediately upon the filing of the applicable Chapter 11 Case.

"<u>Prepayment Event</u>" means:

      (a)     any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any property or asset of any Loan Party, other than dispositions described in <u>Section 6.05(a)</u>; or

      (b)     any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of any Loan Party with a fair value immediately prior to such event equal to or greater than the $100,000; or

      (c)     the issuance by the Borrower of any Equity Interests, or the receipt by the Borrower of any capital contribution; or

      (d)     the incurrence by any Loan Party of any Indebtedness, other than Indebtedness permitted under <u>Section 6.01</u>.

"<u>Pre-Petition Credit Agreement</u>" has the meaning assigned to such term in the Recitals.

"<u>Pre-Petition Lender</u>" means Sandton Capital Solutions Master Fund V, LP, in its capacity as lender under any of the Pre-Petition Loan Documents.

"<u>Pre-Petition Loan Documents</u>" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Loans</u>" means the "Loans" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Obligations</u>" means "Secured Obligations" as defined in the Pre-Petition Credit Agreement.

"<u>Prior Week</u>" means, as of any date of determination, the immediately preceding week ended on a Saturday and commencing on the prior Sunday.

"<u>Qualified ECP Guarantor</u>" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Loan Guaranty or grant of the relevant security interest becomes or would become effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Receivables</u>" means the Accounts, Chattel Paper, Documents, Investment Property, Instruments and any other rights or claims to receive money which are General Intangibles or which are otherwise included as Collateral.

"<u>Regulation T</u>" means Regulation T of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" means Regulation X of the Federal Reserve Board, as in effect from time to time and all official rulings and interpretations thereunder or thereof.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and such Person's Affiliates.

"<u>Release</u>" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping of any substance into the environment.

"<u>Report</u>" means reports prepared by the Lender or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Loan Parties from information furnished by or on behalf of the Borrower, after the Lender has exercised its rights of inspection pursuant to this Agreement.

"<u>Requirement of Law</u>" means, with respect to any Person, (a) the charter, articles or certificate of organization or incorporation and bylaws or operating, management or partnership agreement, or other organizational or governing documents of such Persons and (b) any statute, law (including common law), treaty, rule regulation, code, ordinance, order, decree, writ, judgment, injunction or determination of any arbitrator or court or other Governmental Authority (including Environmental Laws), in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Reserves</u>" means any and all reserves which the Lender deems necessary, in its Permitted Discretion, to maintain (including, without limitation, an availability reserve, reserves for accrued and unpaid interest on the Secured Obligations, Banking Services Reserves, volatility reserves, reserves for rent at locations leased by any Loan Party and for consignee's, warehousemen's and bailee's charges, reserves for dilution of Accounts, reserves for Inventory shrinkage, reserves for customs charges and shipping charges related to any Inventory in transit, reserves for Swap Agreement Obligations, reserves for contingent liabilities of any Loan Party, reserves for uninsured losses of any Loan Party, reserves for uninsured, underinsured, unindemnified or under indemnified liabilities or potential liabilities with respect to any litigation and reserves for taxes, fees, assessments, and other governmental charges) with respect to the Collateral or any Loan Party.

"<u>Responsible Officer</u>" means the president, Financial Officer or other executive officer of the Borrower.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in any Loan Party or Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase,

redemption, retirement, acquisition, cancellation or termination of any such Equity Interests or any option, warrant or other right to acquire any such Equity Interests.

"Restructuring Advisor" means a financial advisor reasonably acceptable to the Lender.

"Revolving Commitment" means the commitment of the Lender to make Revolving Loans hereunder up to the amount set forth in the Term Schedule.

"Revolving Exposure" means, at any time, the sum of (a) the outstanding principal amount of Revolving Loans at such time, plus (b) the aggregate principal amount of Protective Advances outstanding at such time.

"Revolving Loan" means a Loan made pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a Standard & Poor's Financial Services LLC business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Crimea, Cuba, Iran, North Korea and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State or by the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"SEC" means the Securities and Exchange Commission of the U.S.

"Secured Obligations" means all Obligations, together with all (i) Banking Services Obligations and (ii) Swap Agreement Obligations owing to the Lender or its Affiliates; provided, however, that the definition of "Secured Obligations" shall not create any guarantee by any Loan Guarantor of (or grant of security interest by any Loan Guarantor to support, as applicable) any Excluded Swap Obligations of such Loan Guarantor for purposes of determining any obligations of any Loan Guarantor.

"Secured Parties" means (a) the Lender, (b) each Affiliate of the Lender that provides Banking Services, (c) each Affiliate of the Lender that is a counterparty to any Swap Agreement, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (e) the successors and assigns of each of the foregoing.

"Security Agreement" means, collectively, each pledge or security agreement entered into by any Loan Party (as required by this Agreement or any other Loan Document or requested by the Lender pursuant to Section 5.14(c)), or any other Person, for the benefit of the Secured Parties.

"<u>Specified Term Loan</u>" has the meaning assigned to such term in <u>Section 2.02(a)(iii)</u>.

"<u>Specified Term Loan Draw Conditions</u>" means, with respect to each Specified Term Loan, the following conditions:

        (a)      no more than one request for a Specified Term Loan is made in any calendar week;

        (b)      the proceeds of such Term Loan are to be used exclusively for the purchase of Inventory in connection with the Borrower's business;

        (c)      the purchase of such Inventory is consistent with the Approved Budget;

        (d)      at least three (3) Business Days before the date such Term Loan is to be made, the Borrower shall have delivered to the Lender copies of the proposed purchase order demonstrating that the aggregate amount of such Term Loan shall not exceed 100% of the purchase price of such Inventory;

        (e)      Lender has agreed, in its sole discretion, to approve the making of such Term Loan for the purchase of such Inventory; and

        (f)      the amount of such Term Loan when added to the initial principal amount of all other Specified Term Loans will not exceed the $2,500,000.

"<u>Subordinated Indebtedness</u>" of a Person means any Indebtedness of such Person the payment of which is subordinated to payment of the Secured Obligations to the written satisfaction of the Lender.

"<u>subsidiary</u>" means, with respect to any Person (the "<u>parent</u>") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"<u>Subsidiary</u>" means any direct or indirect subsidiary of the Borrower or any other Loan Party, as applicable.

"<u>Swap Agreement</u>" means any agreement with respect to any swap, forward, spot, future, credit default or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Borrower or the Subsidiaries shall be a Swap Agreement.

"<u>Swap Agreement Obligations</u>" means any and all obligations of the Loan Parties, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under (a) any and all Swap Agreements permitted hereunder with the Lender or an Affiliate of the Lender, and (b) any and all

cancellations, buy backs, reversals, terminations or assignments of any such Swap Agreement transaction permitted hereunder with the Lender or an Affiliate of the Lender.

"Swap Obligation" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1 a(47) of the Commodity Exchange Act or any rules or regulations promulgated thereunder.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), value added taxes, or any other goods and services, use or sales taxes, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Termination Declaration" has the meaning assigned to such term in the last paragraph of Article VII.

"Term Loan" has the meaning assigned to such term in Section 2.02(a).

"Term Loan Commitment" has the meaning assigned to such term in Section 2.02(a).

"Transactions" means the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions, the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code as in effect from time to time in the Governing State or any other state the laws of which are required to be applied in connection with the issue of perfection of security interests.

"Unliquidated Obligations" means, at any time, any Secured Obligations (or portion thereof) that are contingent in nature or unliquidated at such time, including any Secured Obligation that is: (i) an obligation to reimburse a bank for drawings not yet made under a letter of credit issued by it; (ii) any other obligation (including any guarantee) that is contingent in nature at such time; or (iii) an obligation to provide collateral to secure any of the foregoing types of obligations.

"U.S." means the United States of America.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

## BORROWING BASE SCHEDULE

"Borrowing Base" means, at any time, the following amount:

(a)     (i) for the period beginning on the Effective Date through June 30, 2021, 85% of Eligible Accounts at such time and (ii) at all times thereafter, 80% of Eligible Accounts at such time; plus

(b)      (i) for the period beginning on the Effective Date through July 15, 2021, 40% of Eligible Inventory, (ii) for the period beginning July 16, 2021 through August 31, 2021, 35% of Eligible Inventory, and (iii) at all times thereafter, 30% of Eligible Inventory, in each case valued at the lower of cost or market value, determined on a first-in-first-out basis, at such time; plus

(c)     50% multiplied by the NOLV Percentage for the applicable type of Eligible Equipment identified in the most recent Equipment appraisal ordered by the Lender multiplied by the applicable type of Eligible Equipment; minus

(c)     Reserves established against the Borrowing Base by the Lender in its Permitted Discretion.

The Lender may, in its Permitted Discretion, reduce the advance rates set forth above or reduce one or more of the other elements used in computing the Borrowing Base.

"Eligible Accounts" means, at any time, the Accounts of the Borrower or any other Loan Party which the Lender determines in its Permitted Discretion are eligible as the basis for the extension of Revolving Loans.  Without limiting the Lender's discretion provided herein, Eligible Accounts shall not include any Account:

(a)     which do not constitute an Account or "payment intangible" (as defined in the UCC);

(b)     which is not subject to a first priority perfected security interest in favor of the Lender;

(c)     which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(d)     (i) which is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date therefor, or (ii) which has been written off the books of the applicable Loan Party or otherwise designated as uncollectible;

(e)     which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(f)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Loan Parties exceeds (the "Concentration Threshold") (i) with respect to Pyramid Tubular Products-GP L.L.C., 60% of the aggregate Eligible Accounts, (ii) with respect to CTAP LLC, 50% of the aggregate Eligible Accounts, (iii) with respect to Tex-Isle Supply, Inc, 35% of the aggregate Eligible Accounts and (iv) with respect to each other Account Debtor, 25% of the aggregate Eligible Accounts (it being agreed that for purposes of this subparagraph, only the aggregate amount of such Accounts owing from the applicable Account Debtor and its Affiliates in excess of the Concentration Threshold applicable to such Account Debtor shall be excluded from Eligible Accounts); provided, that the Lender may reduce the Concentration Threshold for one or more of the

Account Debtors referenced in clauses (i), (ii) and (iii) of this paragraph (f), if the Lender determines, in its Permitted Discretion, that such Account Debtor has materially extended the timing of its payment of Accounts from its historical practice as exists on the Effective Date;

(g)     with respect to which any covenant, representation, or warranty contained in this Agreement or in the Security Agreement has been breached or is not true;

(h)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Lender which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon any Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis, or (vi) relates to payments of interest;

(i)     for which the goods giving rise to such Account have not been shipped to the Account Debtor (other than Rack Transfer Inventory, for which the Accounts arising from the sale thereof may be included in Eligible Accounts subject to compliance with all other applicable Eligible Accounts criteria) or for which the services giving rise to such Account have not been performed by any Loan Party or if such Account was invoiced more than once;

(j)     with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(k)     which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(l)     which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(m)     which is owed by an Account Debtor which does not maintain its chief executive office in the U.S. (including any territory thereof) or Canada;

(n)     which is owed in any currency other than dollars;

(o)     which is owed by (i) any Governmental Authority of any country other than the U.S. unless such Account is backed by a letter of credit acceptable to the Lender which is in the possession of, and is directly drawable by, the Lender, or (ii) any Governmental Authority of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940 (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect or protect the Lien of the Lender in such Account, have been complied with to the Lender's satisfaction;

(p)     which is owed by any Affiliate of any Loan Party or any employee, officer, director, agent or stockholder of any Loan Party or any of its Affiliates;

(q)     which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness, or is subject to any security deposit,

progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)    which is subject to any counterclaim, deduction, defense, setoff or dispute but only to the extent thereof;

(s)    which is evidenced by any promissory note, chattel paper, or instrument;

(t)    which is owed by an Account Debtor (i) located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit the applicable Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless the applicable Loan Party has filed such report or qualified to do business in such jurisdiction or (ii) which is a Sanctioned Person;

(u)    with respect to which the applicable Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and the applicable Loan Party created a new receivable for the unpaid portion of such Account;

(v)    which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Federal Reserve Board;

(w)    which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than any Loan Party has or has had an ownership interest in such goods, or which indicates any party other than a Loan Party as payee or remittance party;

(x)    which was created on cash on delivery terms;

(y)    which is owing by Schlumberger Technology Corporation or any of its subsidiaries or other Affiliates, so long as the UCC Financing Statement filed by Citibank Europe PLC covering the Accounts owing by Schlumberger Technology Corporation or any of its subsidiaries or other Affiliates remains in effect; or

(z)    which the Lender determines in its Permitted Discretion may not be paid by reason of the Account Debtor's inability to pay or which the Lender otherwise determines in its Permitted Discretion is unacceptable for any reason whatsoever.

In the event that an Account which was previously an Eligible Account ceases to be an Eligible Account hereunder, the Borrower shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.  In determining the amount of an Eligible Account, the face amount of an Account may, in the Lender's Permitted Discretion, be reduced by, without duplication, to the extent not reflected in such face amount, (i) the amount of all accrued and actual discounts, claims, credits or credits pending, promotional program allowances, price adjustments, finance charges or other allowances (including any amount that any Loan Party may be obligated to rebate to an Account Debtor pursuant to the terms of any agreement or understanding (written or oral)) and (ii) the aggregate amount of all cash received in respect of such Account but not yet applied by the applicable Loan Party to reduce the amount of such Account.

"Eligible Equipment" means the equipment listed on Annex B attached hereto that is owned by the Borrower on the Effective Date and for which Lender determines in its Permitted Discretion is eligible as a basis for the extension of Revolving Loans hereunder.  Without limiting the Lender's discretion provided herein, in no event shall any Equipment be Eligible Equipment unless:

(a)     it is in good working and saleable condition;

(b)     the Lender has a perfected security interest in such Equipment subject to no other Liens other than a Permitted Encumbrance which does not have priority over the Liens in favor of the Lender;

(c)     it is located at all times at a location owned or leased by the Borrower and (i) the Lender has received a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Lender in its Permitted Discretion;

(d)     it is covered by insurance in an amount and type required by the Lender and the Lender is named the sole lender's loss payee with respect thereto;

(e)     it is not leased and is not on consignment; and

(f)     it does not constitute a fixture under applicable law.

"Eligible Inventory" means, at any time, the Inventory of the Borrower or any other Loan Party which the Lender determines in its Permitted Discretion is eligible as the basis for the extension of Revolving Loans.  Without limiting the Lender's discretion provided herein, Eligible Inventory shall not include any Inventory:

(a)     which is not subject to a first priority perfected Lien in favor of the Lender;

(b)     which is subject to any Lien other than (i) a Lien in favor of the Lender and (ii) a Permitted Encumbrance which does not have priority over the Lien in favor of the Lender;

(c)     which is, in the Lender's opinion, slow moving, obsolete, unmerchantable, defective, used, unfit for sale, not salable at prices approximating at least the cost of such Inventory in the ordinary course of business, or unacceptable due to age, type, category and/or quantity;

(d)     with respect to which any covenant, representation, or warranty contained in this Agreement or the Security Agreement has been breached or is not true, or which does not conform to all standards imposed by any Governmental Authority;

(e)     in which any Person, other than the Borrower or any other Loan Party, shall (i) have any direct or indirect ownership, interest or title or (ii) be indicated on any purchase order or invoice with respect to such Inventory as having or purporting to have an interest therein;

(f)     which is unfinished goods or which constitutes work-in-process, spare or replacement parts, subassemblies, packaging and shipping material, manufacturing supplies, samples, prototypes, displays or display items, bill-and-hold or ship-in-place goods (including Rack Transfer Inventory), goods that are returned or marked for return, repossessed goods, defective or damaged goods, goods held on consignment, or goods which are not of a type held for sale in the ordinary course of business;

(g)     which is not located in the U.S. or is in transit with a common carrier from vendors and suppliers;

4

(h)      which is located in any location leased by any Loan Party unless (i) the lessor has delivered to the Lender a Collateral Access Agreement or (ii) a Reserve for rent, charges, and other amounts due or to become due with respect to such facility has been established by the Lender in its Permitted Discretion;

(i)      which is located in any third party warehouse or is in the possession of a bailee (other than a third party processor) and is not evidenced by a Document, unless (i) such warehouseman or bailee has delivered to the Lender a Collateral Access Agreement and such other documentation as the Lender may require or (ii) if and to the extent allowed by the Lender, an appropriate Reserve has been established by the Lender in its Permitted Discretion;

(j)      which is being processed offsite at a third party location or outside processor, or is in transit to or from such third party location or outside processor;

(k)      which does not meets all applicable laws and standards imposed by any Governmental Authority having regulatory authority over it;

(l)      which is a discontinued product or component thereof;

(m)      which is the subject of a consignment by any Loan Party as consignor;

(n)      which is perishable;

(o)      which contains or bears any intellectual property rights licensed to any Loan Party unless the Lender is satisfied that it may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(p)      which is not reflected in a current perpetual inventory report of the Borrower;

(q)      for which reclamation rights have been asserted by the seller;

(r)      which has been acquired from a Sanctioned Person; or

(s)      which the Lender otherwise determines in its Permitted Discretion is unacceptable for any reason whatsoever.

In the event that any Inventory which was previously Eligible Inventory ceases to be Eligible Inventory hereunder, the Borrower shall notify the Lender thereof on and at the time of submission to the Lender of the next Borrowing Base Certificate.

"NOLV Percentage" means, as of any date of determination, the percentage of the book value of the Loan Parties' applicable type of Equipment that is estimated to be recoverable in an orderly liquidation thereof net of all associated costs of such liquidation, as such percentage is specified in the most recent appraisal received by Lender from an appraiser selected by Lender.

"Rack Transfer Inventory" means bill-and-hold Inventory of any Loan Party which satisfies all of the following criteria: (i) the applicable purchasing customer has accepted and acknowledged that title and ownership of such Inventory has been transferred by the applicable Loan Party to such customer; (ii) the applicable purchasing customer bears the insurance risk and other risk of loss for such Inventory; and (iii)

such Inventory is clearly identified as third-party owned Inventory and effectively segregated and separated from other Inventory of the applicable Loan Parties at the applicable premises.

## TERMS SCHEDULE

1.     **Revolving Commitment** (**Definitions Schedule**):

$12,500,000

2.     **Maturity Date** (**Definitions Schedule**):

December 31, 2021, or any earlier date on which the Revolving Commitment is reduced to zero or otherwise terminated pursuant to the terms hereof; <u>provided</u> that such date shall be extended by six months upon satisfaction of the Extension Conditions.

3.     **[Reserved]**

4.     **[Reserved]**

5.     **[Reserved]**

6.     **Closing Fee** (**Section 2.11**):

Closing Fee - $100,000

7.     **Fiscal Periods and Accountants** (**Section 3.04**):

Reference Fiscal Year - the fiscal year ended December 31, 2019.
Borrower's Accountants – Briggs & Veselka Co., independent public accountants.
Interim Fiscal Period - the portion of the fiscal year ended April 30, 2021.

8.     **[Reserved]**

9.     **Investment Limit** (**Section 6.04**):

$-0-.

10.     **Judgment Amount** (**Article VII**):

$200,000

11.     **Notice Addresses** (**Section 8.01**):

if to any Loan Party, to the Borrower at:

OFS International LLC
7735 Miller Road #3
Houston, Texas 77049
Attention: Alexei Ratnikov, Chief Financial Officer
Email: aratnikov@ofsint.com

With a copy to:

Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, TX 77002
Attn:  Aaron Power
Facsimile: (713) 226-6248
Email: apower@porterhedges.com

if to Lender, at:

Sandton Capital Solutions Master Fund V, LP
c/o Sandton Capital Partners
16 W. 46th Street, 11th Floor
New York, NY 10036
Attention: OSF International Loan Administration

with a copy to:

McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
Attention: Mark Freedlander
Facsimile No: (412) 667-7967

**12.** **[Reserved]**

**13.** **Governing State and Primary City (Section 8.09):**

Governing State – New York
Primary City – New York, New York

## REPORTING SCHEDULE

The Borrower will furnish to the Lender:

(a)     within ninety (90) days after the end of each fiscal year of the Borrower, its audited consolidated and, if applicable, consolidating balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants acceptable to the Lender to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, accompanied by any management letter prepared by said accountants;

(b)     within thirty (30) days after the end of each fiscal month of the Borrower, its consolidated and, if applicable, consolidating balance sheet and related statements of operations, stockholders' equity, cash flows and sales reports by tonnage as of the end of and for such fiscal month and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by its Financial Officer as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)     concurrently with any delivery of financial statements under clause (a) or (b) above (including the monthly financial statements of the Borrower to be delivered as of the last calendar month of any fiscal year), a certificate of the Financial Officer of the Borrower in form and detail acceptable to the Lender, (i) certifying, in the case of the financial statements delivered under clause (b), as presenting fairly in all material respects the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, (ii) certifying that no Default or Event of Default has occurred or, if such a Default or Event of Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, and (iii) stating whether any change in GAAP or in the application thereof has occurred since the date of the audited financial statements of the Borrower referred to in Section 3.04 and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(d)     during the thirty (30) day period prior to the beginning of each fiscal year of the Borrower, a copy of the plan and forecast (including a projected consolidated and consolidating balance sheet, income statement and funds flow statement) of the Borrower for each month of such fiscal year in form and detail reasonably satisfactory to the Lender;

(e)     within three (3) Business Days after the end of each calendar week, and twenty (20) days of the end of each calendar month, a Borrowing Base Certificate and supporting information in connection therewith, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request; provided, that each weekly Borrowing Base Certificates to shall be updated to only include weekly sales and collections information and Inventory summary information only for such calendar week then ended, together with any additional reports with respect to the Borrowing Base as the Lender may reasonably request;

(f)     within twenty (20) days of the end of each calendar month, and at such other times as may be requested by the Lender, as of the period then ended, all delivered electronically in a file format acceptable to the Lender; provided, however, that during any Weekly Reporting Period, such information

shall be furnished weekly within three (3) Business Days after the end of each week, as the calendar week then ended:

  (i) a detailed aging of the Borrower's Accounts including all invoices (1) aged by invoice date and due date (with an explanation of the terms offered), and (2) reconciled to the Borrowing Base Certificate delivered by the Borrower as of such date, all prepared in a manner reasonably acceptable to the Lender, together with a summary specifying the name, address, and balance due for each Account Debtor; and

  (ii) a summary of the Borrower's Inventory, in form satisfactory to the Lender;

  (g) as soon as available but in any event within twenty (20) days of the end of each calendar month, and at such other times as may be necessary to re-determine Availability or as may be reasonably requested by the Lender, as of the calendar month then ended, all of the following delivered electronically in a text formatted file acceptable to the Lender:

  (i) a schedule detailing the Borrower's Inventory, in form satisfactory to the Lender, (1) by location (showing Inventory in transit and any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Reserves as the Lender has previously indicated to the Borrower are deemed by the Lender to be appropriate and, in the event of any material decrease in the market value of any Inventory, a calculation of the impact of such decrease on the valuation of the Borrower's inventory for Borrowing Base purposes, and (2) including a report of any variances or other results of Inventory counts performed by the Borrower since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by the Borrower and complaints and claims made against the Borrower);

  (ii) a worksheet of calculations prepared by the Borrower to determine Eligible Accounts and Eligible Inventory, such worksheets detailing the Accounts and Inventory excluded from Eligible Accounts and Eligible Inventory and the reason for such exclusion;

  (iii) a reconciliation of the Borrower's Accounts and Inventory between (A) the amounts shown in the Borrower's general ledger and financial statements and the reports delivered pursuant to clauses (i) and (ii) above, and (B) the amounts and dates shown in the reports delivered pursuant to clauses (i) and (ii) above and the Borrowing Base Certificate delivered pursuant to clause (e) above as of such date; and

  (iv) a reconciliation of the loan balance per the Borrower's general ledger to the loan balance under this Agreement;

  (v) a schedule and aging of the Borrower's accounts payable, delivered electronically in a text formatted file acceptable to the Lender;

  (h) at the request of the Lender, no later than three (3) days prior to the entry of the Final Order and three (3) days prior to confirmation of a plan of reorganization, a budget of the Borrower and its Subsidiaries for the remaining months of the then current fiscal year, containing, among other things, a pro forma balance sheet, statement of income and projected borrowing base and statement of cash flows for each such remaining month of such fiscal year, which budget shall be based on reasonable estimates,

information and assumptions that are reasonable at the time in light of the circumstances then existing, with detail and calculations supporting such assumptions, in form and substance acceptable to the Lender;

(i)     promptly upon the Lender's request:

(i)     copies of invoices issued by the Borrower in connection with any Accounts, credit memos, shipping and delivery documents, and other information related thereto;

(ii)     copies of purchase orders, invoices, and shipping and delivery documents in connection with any Inventory purchased by any Loan Party; and

(iii)     a schedule detailing the balance of all intercompany accounts of the Loan Parties;

(iv)     an updated customer list for the Borrower and its Subsidiaries, which list shall state the customer's name, mailing address and phone number, delivered electronically in a text formatted file acceptable to the Lender and certified as true and correct by a Financial Officer;

(v)     the Borrower's sales journal, cash receipts journal (identifying trade and non-trade cash receipts) and debit memo/credit memo journal;

(vi)     copies of all tax returns filed by any Loan Party with the U.S. Internal Revenue Service;

(vii)     a certificate of good standing or the substantive equivalent available in the jurisdiction of incorporation, formation or organization for each Loan Party from the appropriate governmental officer in such jurisdiction;

(j)     promptly after any request therefor by the Lender, copies of (i) any documents described in Section 101(k)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(1)(1) of ERISA that the Borrower or any ERISA Affiliate may request with respect to any Multiemployer Plan; provided that if the Borrower or any ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable ERISA Affiliate shall promptly make a request for such documents and notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(k)     promptly following any request therefor, (x) such other information regarding the operations, assets, liabilities, changes in ownership of Equity Interests, business affairs and financial condition of any Loan Party or any Subsidiary, or compliance with the terms of the Loan Documents, as the Lender may reasonably request, and (y) information and documentation reasonably requested by the Lender tor purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation.

3

## CLOSING CONDITIONS SCHEDULE

(a)     <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>. The Lender shall have received (i) a certificate of each Loan Party, dated the Effective Date and executed by its respective manager, managing member, general partner or other authorized officer acceptable to the Lender, as applicable, which shall (A) certify the resolutions or consents of its respective partners, members, board of directors or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of each Financial Officer and any other officers or representatives of such Loan Party authorized to sign the Loan Documents to which it is a party, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Loan Party certified by the relevant authority of the jurisdiction of organization of such Loan Party, and a true and correct copy of its by-laws or operating, management or partnership agreement, and (ii) a long form good standing certificate for each Loan Party from its jurisdiction of organization.

(b)     <u>Financial Statements and Projections</u>.   The Lender shall have received (i) audited consolidated financial statements of the Borrower for its 2019 fiscal year, (ii) unaudited interim consolidated financial statements of the Borrower for each fiscal month and quarter ended after the date of the latest applicable financial statements delivered pursuant to clause (i) of this paragraph as to which such financial statements are available, and such financial statements shall not, in the reasonable judgment of the Lender, reflect any material adverse change in the consolidated financial condition of the Borrower, as reflected in the financial statements, other than those events or circumstances customarily resulting from the commencement of the Chapter 11 Cases, and (iii) satisfactory projections for the Borrower (including Borrowing Base and Availability forecasts) of the Borrower's 13-week DIP budget and monthly DIP forecast, in each case of this clause (iii), from the Petition Date through the Maturity Date, all in form and substance satisfactory to the Lender.

(c)     <u>Fees</u>.  The Lender shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Effective Date.  All such amounts will be paid with proceeds of Revolving Loans made on the Effective Date and will be reflected in the funding instructions given by the Borrower to the Lender on or before the Effective Date.  Without limiting the foregoing, the Borrower authorizes the Lender to make a Revolving Loan on the Effective Date in the amount of the Closing Fee, the proceeds of which shall be retained by the Lender.

(d)     [Reserved].

(e)     <u>Filings, Registrations and Recordings</u>.   Each document (including any Uniform Commercial Code financing statement) required by the Collateral Documents or under law or reasonably requested by the Lender to be filed, registered or recorded in order to create in favor of the Lender, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by <u>Section 6.02</u>), shall be in proper form for filing, registration or recordation.

(f)     <u>Closing Certificate</u>.  The Lender shall have received a certificate, signed by the Financial Officer of the Borrower, certifying that (i) the conditions specified in this Schedule and in <u>Sections 4.01</u> and <u>4.02</u> have been satisfied and (ii) on the initial Borrowing date that no Default or Event of Default has occurred and is continuing, (ii) all documents delivered pursuant to this Schedule and <u>Section 4.01</u> are in full force and effect.

(g)     [Reserved].

(h)     Lien Searches.  The Lender shall have received the results of a recent lien search in such jurisdictions as the Lender shall deem appropriate, and such search shall reveal no liens on any of the assets of any of the Loan Parties except for liens permitted by Section 6.02 or discharged on or prior to the Effective Date pursuant to a pay-off letter or other documentation satisfactory to the Lender.

(i)     Funding Account.  The Lender shall have received a notice designating the Funding Account.

(j)     Collateral Access and Control Agreements.  The Lender shall have received each Collateral Access Agreement and Control Agreement required by the Lender to be provided as of the Effective Date.

(k)     Security Interest.  Subject to the Initial Order, the Lender shall be satisfied that the Loan Documents and the Initial Order shall be effective to create in favor of the Lender a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Initial Order and the terms thereof.

(l)     Borrowing Base Certificate.  The Lender shall have received a Borrowing Base Certificate which calculates the Borrowing Base as of a recent date determined by the Lender.

(m)     Money Transfer Authorizations.  The Borrower shall have delivered money transfer authorizations as the Lender may have reasonably requested.

(n)     Audits, Appraisals, etc.  The Loan Parties shall have delivered (i) Collateral audits, satisfactory to the Lender, prepared by an independent firm engaged directly by the Lender, and (ii) appraisals, prepared by an independent appraiser engaged directly by the Lender, of the Borrower's Inventory, prepared by an independent appraiser engaged directly by the Lender, all of which audits and appraisals shall be satisfactory to the Lender, together with evidence of compliance with applicable federal regulations governing loans in areas having special flood hazards.

(o)     Insurance.  The Lender shall have received evidence of insurance coverage in form, scope, and substance reasonably satisfactory to the Lender and otherwise in compliance with the terms of Section 5.10.

(p)     ERISA.  If the Borrower has any Plans, the Borrower shall have delivered to the Lender its most recent statement of the unfunded liabilities of each such Plan, certified as correct by an actuary enrolled under ERISA.

(q)     USA PATRIOT Act.  The Lender shall have received (i) all documentation and other information regarding the Borrower requested in connection with applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act, and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, a Beneficial Ownership Certification in relation to the Borrower.

(r)     PAO TMK Indebtedness Documents.  The Lender shall have received copies of each of the fully executed PAO TMK Indebtedness Documents, including all amendments and schedules thereto, certified as true and correct copies in all material respects by an authorized officer of Borrower.

(s)     Other Closing Deliverables.  The Loan Parties shall have delivered to the Lender, in each case in form and substance reasonably satisfactory to the Lender, each of the other agreements, instruments, certificates and items set forth in the closing checklist or schedule of closing documents most recently provided by the Lender (or its counsel) to the Borrower (or its counsel).

(t)  <u>No Material Adverse Effect</u>.

(i)  Since the Petition Date, other than those events or circumstances arising from the commencement of the Chapter 11 Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(ii)  Except for actions, suits, investigations, proceedings, claims or disputes stayed by Section 362 of the Bankruptcy Code, no orders, injunctions or pending litigation exists which could reasonably be expected to have a Material Adverse Effect or which challenges this Agreement, the Loan Documents or the credit facilities contemplated hereunder.

(iii)  Since the Petition Date, there has been no material increase in the liabilities, liquidated or contingent, of the Borrower and the Loan Guarantors taken as a whole, or material decrease in the assets of the Borrower and the Loan Guarantors taken as a whole.

(iv)  Except for any defaults or events of default arising solely as a result of the commencement of the Chapter 11 Cases, any defaults or events of default under the Pre-Petition Credit Agreement to the extent the Pre-Petition Obligations have not been converted to the Obligations under (and in accordance with) this Agreement, no Default or Event of Default shall have occurred and be continuing or shall arise hereunder immediately after giving effect to this Agreement and the transactions contemplated hereby.

(v)  Other than those resulting from the commencement of the Chapter 11 Cases, since the Petition Date there shall have been no adverse change in the ability of the Lender to enforce the Loan Documents and the Obligations of the Borrower and the Loan Guarantors hereunder.

(u)  <u>Approved Budget</u>.  The Lender shall have received the Approved Budget.

(v)  <u>Insolvency Matters – Chapter 11 Cases</u>.  (i) The Court shall have entered the Interim Order; (ii) the Lender shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Lender not later than a reasonable time in advance of the Petition Date for Lender's counsel to review and analyze the same; and (iii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Lender, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

## **ANNEX A**

APPROVED BUDGET

See attached.

## **ANNEX B**

ELIGIBLE EQUIPMENT


See attached.

# EXHIBIT B

## INTERCREDITOR AGREEMENT

July 13, 2018

JPMorgan Chase Bank, N.A.
2200 Ross Street, 9th Floor
Dallas, Texas 75201

      Re:    Indebtedness of OFS International LLC, a Delaware limited liability company ("Borrower"); Credit Agreement of even date herewith, by and among Borrower, certain of the Borrower's subsidiaries that are parties thereto (together with the Borrower, collectively the "Loan Parties"), and JPMorgan Chase Bank, N.A. ("Senior Lender"), said Credit Agreement, as the same may be amended, restated, replaced or otherwise modified from time to time, being herein called the "Credit Agreement".

Ladies and Gentlemen:

Reference is hereby made to the Credit Agreement for all purposes. Capitalized terms utilized, but not otherwise defined, herein shall have the meaning given to such terms in the Credit Agreement.

In order to induce Senior Lender to enter into the Credit Agreement and advance the Loans, issue the Letters of Credit and extend other financial accommodations to the Borrower in accordance with the terms of the Credit Agreement from time to time, PAO TMK, a Public Joint-Stock Company incorporated and acting under the laws of the Russian Federation ("PAO TMK"), agrees with Senior Lender as follows:

1.      Reference is hereby made to (a) that certain advancing line of credit in the amount of up to $25,000,000 established by PAO TMK, as evidenced by and pursuant to the terms of that certain Loan Agreement dated September 19, 2017, executed by the Borrower and PAO TMK, a true copy of which is attached hereto as Exhibit A (said Loan Agreement, as amended by that certain Amendment to Loan Agreement executed by the Borrower and PAO TMK on July 13, 2018, and as hereafter modified or amended in accordance with the terms of this letter agreement, being the "PAO TMK Loan Agreement"), and (b) the liens and security interests (i) held, or to be held, if any, by PAO TMK against the real properties owned in fee simple by any Loan Parties which are more particularly described in Exhibit B attached hereto (collectively the "Real Property Collateral"), and (ii) to be held, if any, by PAO TMK against the Equipment. All right, title or interest of the Borrower and any and all other Loan Parties (if any) in and to any and all personal property of any kind now or hereafter owned or held by the Borrower or any other Loan Party, including without limitation, all "Accounts," "Chattel Paper," "Deposit Accounts," "Equipment," "General Intangibles" and "Inventory" (as each of such terms in defined in Article 9 of the Uniform Commercial Code), is herein collectively referred to as the "Senior Lender Collateral", regardless of whether any Senior Lender Collateral is at any time located upon any of the Real Property Collateral.

2.      The payment of any and all PAO TMK Debt (as defined below) is expressly subordinated to the Senior Debt (as defined below) to the extent and in the manner set forth in the following paragraphs hereof.  As used herein, the following terms shall have the following meanings:

(a)      "Insolvency Event" means any liquidation, dissolution, conservatorship, bankruptcy, reorganization, rearrangement, debtor's relief, assignment for the benefit of creditors, receivership or other insolvency or other similar proceedings involving any Loan Party;

(b)      "PAO TMK Debt" means all indebtedness, liabilities, and obligations of the Borrower to PAO TMK arising under the PAO TMK Loan Agreement

(c)      "Senior Debt" means (i) all Secured Obligations now or hereafter outstanding, including without limitation, (x) interest, fees, expenses and other amounts accruing or incurred and owing after the occurrence of any Insolvency Event, at the rate provided in the Credit Agreement or any other applicable Loan Documents, irrespective of whether such interest, fees, expenses and other amounts are allowed as a claim in any such Insolvency Event proceeding, (y) obligations arising under guarantees of any of the Secured Obligations now or hereafter executed by any Loan Party, and (z) renewals, extensions, increases, refundings, refinancings, deferrals, restructurings, amendments (including amendments which increase the principal amount thereof and interest and fees thereon) and modifications of any of the Secured Obligations (including the items described in clauses (x) and/or (y) above); and

(d)      "Termination Date" means the date upon which all Senior Debt is paid in full in cash and any commitment by Senior Lender to make any Loans, issue any Letters of Credit and extend other financial accommodations to the Borrower or any other Loan Party under the Credit Agreement has been terminated, *provided*, that this letter agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Debt is rescinded or otherwise must be returned by Senior Lender and/or any of its Affiliates (as defined in the Credit Agreement), as though such payment has not been made.

3.      Notwithstanding any provision to the contrary contained in the PAO TMK Loan Agreement, until the Termination Date, PAO TMK shall not receive or collect, directly or indirectly, any amount upon any PAO TMK Debt after the date hereof; provided, however, that the foregoing shall not prohibit payment of the following amounts:

(a)      Regularly scheduled payments of accrued and unpaid interest only as and when due under the terms of the PAO TMK Loan Agreement, so long as no Default or Event of Default exists prior to and is continuing as of the date of, or would exist immediately after, the payment of the applicable regularly scheduled accrued interest payment;

(b)      Payments or prepayments of all or any portion of the outstanding principal balance under the PAO TMK Loan Agreement , so long as (i) no Default or Event of Default exists prior to and is continuing as of the date of, or would exist immediately after, the payment of the applicable regularly scheduled accrued interest payment, (ii) Borrower's

Fixed Charge Coverage Ratio is greater than or equal to 1.25 to 1.0 after giving effect to such payment (on a pro forma basis, tested as if such payment was paid at the beginning of the most recent twelve calendar months ending on or prior to such payment date), and (iii) Availability, after giving effect to such payment, is greater than or equal to the greater of (A) $8,000,000.00 or (B) forty percent (40%) of the Revolving Commitment. As a condition precedent to any such payment or prepayment of principal, PAO TMK shall deliver to Senior Lender (or cause the Borrower to deliver to Senior Lender) such pro forma financial statements as Senior Lender may reasonably require to evidence continued expectations of compliance with the foregoing Fixed Charge Coverage Ratio requirement after giving effect to such payment, and no such payment may be made until Senior Lender shall have acknowledged in writing that such pro forma financial statements are reasonably satisfactory to Senior Lender, provided, however, that if Senior Lender has not acknowledged to PAO TMK in writing Senior Lender's satisfaction or dissatisfaction regarding such pro forma financial statements within thirty (30) days after Senior Lender's receipt thereof, Senior Lender shall be deemed to be satisfied with such pro forma financial statements and Borrower shall be authorized to make the contemplated payment or prepayment of principal; and

(c)     Any payment of the PAO TMK Debt to the extent, but only to the extent, resulting from the application of any proceeds from a foreclosure (or acceptance of a deed-in-lieu of foreclosure) covering any of the Real Property Collateral and/or Equipment, as permitted under Section 6(a) hereof.

4.     PAO TMK acknowledges and agrees that except for liens now or hereafter held by PAO TMK against any Real Property Collateral and hereafter held by PAO TMK against the Equipment, PAO TMK has no other liens, security interests, charges, mortgages, chattel mortgages, pledges, encumbrances, or other interests in any Senior Lender Collateral or any other assets of any Loan Party securing the repayment of any of the PAO TMK Debt (collectively, referred to herein as a "Lien"). Except for any Liens now or hereafter acquired by PAO TMK against any Real Property Collateral and the Equipment, PAO TMK agrees not to acquire, by subrogation, contract or otherwise, any Lien or other right, title or interest in any of the assets of any Loan Party (including but not limited to any Liens which may arise in respect to taxes, assessments or other governmental charges) to secure any of the PAO TMK Debt. Senior Lender hereby consents to execution, recording and filing by PAO TMK, Borrower and any other necessary party of all deeds of trust, security agreements and financing statements required to establish and perfect Liens against the Real Property Collateral and the Equipment, provided that any Liens established by PAO TMK against the Equipment shall be junior and inferior to Senior Lender's Liens against the Equipment as set forth below. Any Lien granted in violation hereof shall be null and void, and PAO TMK shall release the same upon request by Senior Lender.

Notwithstanding the date, time, method, manner, or order of grant, attachment, or perfection of any Liens securing payment of the Senior Debt granted with respect to the Senior Lender Collateral or of any Liens securing the payment of the PAO TMK Debt granted with respect to the Real Property Collateral and the Equipment, and notwithstanding any contrary provision of any applicable law, the Loan Documents or the documents establishing and governing the PAO TMK

Debt (the "PAO TMK Loan Documents"), or any defect or deficiencies in, the Liens securing the Senior Debt and the PAO TMK Debt, or any other circumstance whatsoever, Senior Lender and PAO TMK hereby agree that (a) any Lien with respect to the Equipment securing the Senior Debt now or hereafter held by or on behalf of, or created for the benefit of, Senior Lender shall be senior in all respects and prior to any Lien with respect to the Equipment securing the PAO TMK Debt; (b) any Lien with respect to the Equipment securing any PAO TMK Debt now or hereafter held by or on behalf of, or created for the benefit of, PAO TMK shall be junior and subordinate in all respects to all Liens with respect to the Equipment securing the Senior Debt; and (c) except for its junior and subordinate Liens with respect to the Equipment, PAO TMK shall have no other Liens with respect to to with respect to any of the Senior Lender Collateral.

5.     Any payments, property, or realization on collateral received by PAO TMK in violation of the terms hereof shall be held by PAO TMK in trust for Senior Lender, and PAO TMK shall forthwith turn over such payments to Senior Lender, in the form received, to be applied on the Senior Debt.

6.     Until the Termination Date, PAO TMK shall not (a) commence any action or proceeding of any kind whatsoever against any Loan Party or any assets of any Loan Party to recover all or any part of the PAO TMK Debt, other than any foreclosure of its Liens against any or all of the Real Property Collateral, or acceptance of a deed-in-lieu of foreclosure covering any of the Real Property Collateral, or (b) join with any creditor in bringing any proceedings against any Loan Party under any Insolvency Event.  Notwithstanding anything herein to the contrary, PAO TMK agrees to give not less than fifteen (15) days prior written notice to Senior Lender prior to the consummation of any foreclosure of its Liens against any or all of the Real Property Collateral or acceptance of a deed-in-lieu of foreclosure covering any of the Real Property Collateral.  In the event that PAO TMK shall acquire control or possession of any of the Real Property Collateral or shall, through the exercise of remedies with respect to any of its Liens against any Real Property Collateral or otherwise, sell any of the Real Property Collateral to any third party (a "Third Party Purchaser") (and such occurrence shall, in either event, be herein referred to as a "PAO TMK Possession Event"), the following terms and conditions shall apply to the applicable affected Real Property Collateral:

(a)     Upon the occurrence and during the continuance of an Event of Default under the Credit Agreement and upon prior written notice to PAO TMK, Senior Lender may enter upon any such Real Property Collateral, without obligation to pay rent or compensation to PAO TMK or to any Third Party Purchaser, solely to complete any manufacture of and/or processing any Inventory, collect Accounts and remove, sell or otherwise dispose of any of the Senior Lender Collateral until the earlier to occur of the following (the "Real Property Access Period"):  (i) the day on which all or substantially all of the Senior Lender Collateral (other than any Senior Lender Collateral abandoned by Senior Lender) has been removed, sold, collected or liquidated from such Real Property Collateral; (ii) the date that is one hundred fifty (150) days after the date of receipt by Senior Lender of a written notice from PAO TMK that a PAO TMK Possession Event shall have occurred; and (iii) the Termination Date.  In the event that the Senior Lender is unable to exercise its rights as a secured creditor as a result of any stay in any Insolvency Event proceeding or of any temporary restraining order or preliminary injunction with respect to Borrower or Senior Lender, the Real Property

Access Period shall be extended by the number of days that the Senior Lender or its designees' access to the applicable Real Property Collateral has been prevented.

(b)     PAO TMK shall promptly notify Senior Lender in writing of a PAO TMK Possession Event, and Senior Lender shall, within fifteen (15) days thereafter, notify PAO TMK in writing as to whether Senior Lender desires to exercise access rights hereunder with respect to any affected Real Property Collateral.

(c)     Consistent with the definition of Real Property Access Period, following a PAO TMK Possession Event, access rights will apply to differing parcels or items of Real Property Collateral at differing times, in which case, a differing Real Property Access Period will apply to each such parcel or items.  Senior Lender shall take reasonable care under the circumstances of any Real Property Collateral that is used by Senior Lender or any of its representatives, agents or designees during the Real Property Access Period and repair and replace any damage (ordinary wear-and-tear excepted) caused by Senior Lender or any of its representatives, agents or designees and Senior Lender shall comply with all applicable laws in all material respects in connection with its and/or any of its representatives', agents' or designees' use or occupancy or possession of any Real Property Collateral. Senior Lender shall (i) promptly repair and restore, at Senior Lender's sole cost and expense, any damage to any Real Property Collateral caused by the acts or omissions of persons under its control, and (ii) indemnify and hold harmless PAO TMK for any injury or damage to any third-parties or their respective property (ordinary wear-and-tear excepted) caused by the acts or omissions of persons under Senior Lender's control; provided, however, that Senior Lender will not be liable for any diminution in the value of any Real Property Collateral caused by the absence of any Senior Lender Collateral therefrom.

(d)     Senior Lender and PAO TMK shall cooperate and use reasonable efforts to ensure that their respective activities during the Real Property Access Period as described above do not interfere materially with the activities of the other as described above, including (i) the rights of Senior Lender to use any Real Property Collateral in accordance with the above terms and conditions for purposes of completing manufacturing or process of any Inventory and removal, sale, collection and/or liquidation of any Senior Lender Collateral from the applicable Real Property Collateral, and (ii) the right of PAO TMK or any Third Party Purchaser to show any Real Property Collateral to prospective purchasers and to ready any Real Property for resale.

(e)     In the event that PAO TMK shall, in the exercise of its rights  with respect to its Liens against any Real Property Collateral and the Equipment or otherwise, receives and retains possession or control of any books and records of any Loan Parties which contain information identifying or pertaining to any Senior Lender Collateral, PAO TMK shall, upon request from Senior Lender and as promptly as practicable thereafter, either turn over to Senior Lender such books and records or provide Senior Lender with true and complete copies thereof (provided that PAO TMK does not warrant the accuracy or correctness of any of the information contained therein), and the Loan Parties agree to PAO TMK providing Senior Lender access to such books and records and duplications thereof.

(f)     The provisions of this Section 6 are agreed to solely as among Senior Lender and PAO TMK and are consented to by the Loan Parties.

7.     With respect to any Insolvency Event covering any Loan Party, the following terms and conditions shall apply to Senior Lender and PAO TMK at all time until the Termination Date:

(a)     PAO TMK agrees that PAO TMK shall not, in or in connection with any Insolvency Event proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case in respect of any of the Senior Lender Collateral (except for the Equipment as a junior lienholder), including, without limitation, with respect to the determination of any Liens or claims held by Senior Lender (including the validity and enforceability thereof) or the value of any claims of Senior Lender under Section 506(a) of the United States Bankruptcy Code (11 U.S.C. §101 et seq.), as amended from time to time (the "Bankruptcy Code") or otherwise; provided, however, that PAO TMK may (i) file a proof of claim in an Insolvency Event proceeding, subject to the limitations contained in this letter agreement and only if consistent with the terms and the limitations on PAO TMK imposed hereby, and (ii) seek relief from the automatic stay or from any other stay in any Insolvency Event proceeding, but only with respect to PAO TMK's Liens against any Real Property Collateral and/or the Equipment, and thereafter enforce such Liens to the extent permitted under any relief received from such automatic stay or other applicable stay.  Senior Lender agrees that Senior Lender shall not, in or in connection with any Insolvency Event proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever challenging (A) the amount of the PAO TMK Debt, so long as the amount of the PAO TMK Debt set forth in any proof of claim filed by PAO TMK is consistent with the terms and the limitations imposed hereby on the amount of the on PAO TMK, and (B) the validity and enforceability of the Liens against any of the Real Property Collateral and/or any Equipment which secure the PAO TMK Debt, provided that the foregoing shall not prevent Senior Lender from asserting the priority of its Liens against the Equipment over the junior and subordinate status of PAO TMK's Liens against the Equipment and/or seeking relief from the automatic stay (or from any other stay in any Insolvency Event proceeding) to permit foreclosure by Senior Lender of its Liens against any Equipment.

(b)     PAO TMK will hold in trust for Senior Lender and pay over to Senior Lender, in the form received, to be applied on the Senior Debt, any and all moneys, dividends, or other assets which shall be payable or deliverable upon or with respect to any or all of the PAO TMK Debt in any Insolvency Event proceedings, except and only to the extent the same is readily identifiable as proceeds of any Real Property Collateral.  PAO TMK agrees not to initiate or prosecute or encourage any other person to initiate or prosecute any claim, action or other proceeding challenging the enforceability of the Senior Debt or any liens and security interests securing the Senior Debt in any Insolvency Event proceeding. Senior Lender will hold in trust for PAO TMK and pay over to PAO TMK, in the form received, to be applied on the PAO TMK Debt, any and all moneys, dividends, or other assets received by Senior Lender in any Insolvency Event proceedings to the extent, and only to the extent the same is readily identifiable as proceeds of any Real Property Collateral. Senior Lender agrees

not to initiate or prosecute or encourage any other person to initiate or prosecute any claim, action or other proceeding challenging the enforceability of the PAO TMK Debt or any liens and security interests securing the PAO TMK Debt in any Insolvency Event proceeding, so long as PAO TMK's actions with respect to any such Insolvency Event proceeding are not inconsistent with the applicable terms and conditions of this letter agreement.

(c)      If any Loan Party becomes subject to any Insolvency Event, and if Senior Lender desires to (i) consent (or not object) to the use of cash collateral under the Bankruptcy Code or (ii) provide financing to any Loan Party under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Loan Party by any third party (any such financing, "DIP Financing"), then PAO TMK agrees that it (A) will be deemed to have consented to, will raise no objection to, nor support any other person or entity objecting to, the use of such cash collateral or to such DIP Financing, provided that the terms of such DIP Financing do not materially impair PAO TMK's rights and interests in the Real Property Collateral, (B) will not request or accept adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing, provided that the terms of such DIP Financing do not materially impair PAO TMK's rights and interests in the Real Property Collateral, and (C) agrees that notice received two (2) calendar days prior to the entry of an order approving such usage of cash collateral or approving such financing shall be adequate notice.

(d)      PAO TMK agrees that it shall not object, contest, or support any other person or entity objecting to or contesting, (i) any request by Senior Lender for adequate protection or any adequate protection provided to Senior Lender or (ii) any objection by Senior Lender to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (iii) the payment of interest, fees, expenses or other amounts to Senior Lender under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise.  PAO TMK further agrees that it shall not seek or accept adequate protection without the prior written consent of Senior Lender.

(e)      If either party is required in any Insolvency Event proceeding or otherwise to disgorge, turn over or otherwise pay to the estate of any Loan Party, because such amount was avoided or ordered to be paid or disgorged for any reason, including without limitation because it was found to be a fraudulent or preferential transfer, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of set-off or otherwise, then such party shall be reinstated to the extent of such Recovery and deemed to be outstanding as if such payment had not occurred and the Termination Date shall be deemed not to have occurred.  If this letter agreement shall have been terminated prior to such Recovery, this letter agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.  Senior Lender and PAO TMK each agree that it shall not be entitled to benefit from any avoidance action affecting or otherwise relating to any distribution or allocation made in accordance with this letter agreement, whether by preference or otherwise, it being understood and agreed that the benefit of such avoidance action otherwise allocable

to them shall instead be allocated and turned over for application in accordance with the priorities set forth in this letter agreement.

(f)     PAO TMK shall not, in an Insolvency Event proceeding or otherwise, oppose any sale or disposition of any assets of any Loan Party (other than any Real Property Collateral that is supported by Senior Lender, and PAO TMK will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any such sale (other than any sale of any Real Property Collateral) supported by Senior Lender.  Senior Lender shall not, in an Insolvency Event proceeding or otherwise, oppose any sale or disposition of any Real Property Collateral that is supported by PAO TMK, but only so long as (i) such sale or disposition does not include the sale or disposition of any Senior Lender Collateral, and (ii) Senior Lender is granted the same access and use rights with respect to the Real Property Collateral set forth in Section 6 of this letter agreement after the consummation of such sale or disposition unless such access and use rights are expressly waived in writing by Senior Lender, and Senior Lender will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any such sale supported by PAO TMK.

(g)     Nothing contained herein shall prohibit or in any way limit Senior Lender from objecting in any Insolvency Event proceeding or otherwise to any action taken by PAO TMK or the asserting by PAO TMK of any of its rights and remedies with respect to the PAO TMK Debt, other than as expressly permitted by PAO TMK to be taken under any Insolvency Provision in accordance with the terms of this Section 7.  Nothing contained herein shall prohibit or in any way limit PAO TMK from objecting in any Insolvency Event proceeding or otherwise to any action taken by Senior Lender or the asserting by Senior Lender of any of its rights and remedies with respect to the Senior Debt to the extent, but only to the extent, that such action taken or rights and remedies asserted by Senior Lender are inconsistent in any material respect with any of the rights expressly granted to PAO TMK under the terms of this Section 7.

(h)     PAO TMK shall not support or vote in favor of any plan of reorganization (and shall be deemed to have voted to reject any plan of reorganization) unless such plan (i) pays off, in cash in full, all Senior Debt or (ii) is accepted or otherwise supported by Senior Lender.  Senior Lender shall not support or vote in favor of any plan of reorganization (and shall be deemed to have voted to reject any plan of reorganization) if such plan is inconsistent in any material respect with any of the rights expressly granted to PAO TMK under the terms of this Section 7, unless such plan is accepted or otherwise supported by PAO TMK.

(i)     To the extent that PAO TMK has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Senior Lender Collateral, PAO TMK agrees not to assert any of such rights without the prior written consent of Senior Lender; provided that if requested by Senior Lender, PAO TMK shall timely exercise such rights in the manner requested by Senior Lender, including any rights to payments in respect of such rights.  To the extent that Senior Lender has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Real Property Collateral,

Senior Lender agrees not to assert any of such rights without the prior written consent of PAO TMK; provided that if requested by PAO TMK, Senior Lender shall timely exercise such rights in the manner requested by PAO TMK, including any rights to payments in respect of such rights.

(j)    This letter agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under section 510(a) of the Bankruptcy Code, shall be effective before, during and after the commencement of an Insolvency Event proceeding; provided, however, that none of the rights of PAO TMK regarding enforcement of its Liens held, or to be held, against any Real Property Collateral and its rights to receive and retain the readily identifiable proceeds of any Real Property Collateral in accordance with the other applicable terms of this letter agreement are subordinated in any respect.  The Senior Debt shall continue to be treated as Senior Debt and the provisions of this letter agreement shall continue to cover the relative rights and priorities of the Senior Lender and PAO TMK even if all or part of the Senior Debt or the Liens securing the Senior Debt are subordinated, set aside, avoided or disallowed in connection with any Insolvency Event proceeding.

8.    Until the Termination Date, PAO TMK will not (a) establish a sinking fund for the payment or prepayment of or otherwise arrange for the defeasance of any PAO TMK Debt; (b) amend, modify or alter in any way the terms of the PAO TMK Debt or any document, agreement, instrument or certificate relating thereto if such amendment, modification or alteration (i) would increase the maximum principal amount of the PAO TMK Debt (other than (A) the amount of any advances made by PAO TMK pursuant to the PAO TMK to pay taxes or insurance premiums, to satisfy liens, to prevent waste or to otherwise preserve the physical condition of the Real Property Collateral and/or the Equipment or to maintain the validity, perfection or priority of the PAO TMK Loan Documents, and (B) any other reasonable costs, expenses or fees incurred by PAO TMK to administer, service, document, secure and/or enforce the PAO TMK, (ii) increase the stated rate of interest accruing on the PAO TMK Debt under the terms of the PAO TMK Loan Documents in effect as of the date of this letter agreement (other than the institution of a default rate of interest in accordance with the terms of the PAO TMK Loan Documents in effect as of the date of this letter agreement during the existence of any event of default under the PAO TMK Loan Documents), or (iii) otherwise could reasonably be expected to (A) materially impair Senior Lender's rights in the Senior Lender Collateral, or (B) have a material adverse effect upon Borrower's ability to discharge its obligations under the Loan Documents and the PAO TMK Loan Documents; or (c) accelerate, make any demand or sue for payment of all or any part of the PAO TMK Debt or exercise any other remedies with respect to any of the PAO TMK Debt or any collateral at any time securing payment or performance thereof; provided, however, that the foregoing shall not limit the rights of PAO TMK to take action to the extent, but only to the extent, legally required to foreclose its Liens against any or all of the Real Property Collateral or the Equipment, or accept a deed-in-lieu of foreclosure covering any of the Real Property Collateral, as permitted under Section 6(a) hereof. PAO TMK agrees that it will not challenge, object to or in any respect inhibit or otherwise interfere with Senior Lender's enforcement of any of its rights or remedies in respect of the Senior Debt or this letter agreement.

9.      Neither Senior Lender nor any of its Affiliates shall have any liability to PAO TMK with respect to, and PAO TMK waives any claim or defense which PAO TMK may now or hereafter have against Senior Lender or any of its Affiliates arising from (a) any and all actions which Senior Lender or any of its Affiliates takes or omits to take (including, without limitation, actions with respect to the creation, perfection or continuation of Liens in any collateral securing any of the Senior Debt, actions with respect to the occurrence of any default under any Senior Debt, actions with respect to the foreclosure upon, sale, release of, depreciation of or failure to realize upon any of such collateral, and actions with respect to the collection of any claim for all or any part of the Senior Debt from any account debtor, guarantor or any other Person, as defined in the PAO TMK Loan Agreement ) with respect to the Senior Debt or the valuation, use, protection or release of any collateral now or hereafter securing same; (b) any right, now or hereafter existing, to require Senior Lender or any of its Affiliates to proceed against or exhaust any collateral at any time securing the Senior Debt or to marshal any assets in favor of PAO TMK; (c) any notice of the incurrence or increase of Senior Debt, it being understood that Senior Lender may make advances now or hereafter relating to the Senior Debt, without notice to or authorization of PAO TMK, in reliance upon these subordination provisions; (d) any defense based upon or arising by reason of (i) any disability or other defense of any Loan Party or any other person or entity or (ii) any lack of authority of any agent or any other person or entity acting or purporting to act on behalf of any Loan Party or PAO TMK, or (iii) any failure by Senior Lender or any of its Affiliates to properly perfect any Lien in any asset of any Loan Party; (e) Senior Lender's or any of its Affiliate's election, in any proceeding instituted under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §101 et seq.) (the "Bankruptcy Code"), of the application of Section 1111(b)(2) of the Bankruptcy Code; and/or (f) any borrowing or grant of a security interest under Section 364 of the Bankruptcy Code.

10.     Senior Lender and/or any of its Affiliates may, at any time and from time to time, without the consent of or notice to PAO TMK, without incurring responsibility to PAO TMK, and without impairing or releasing, any of its rights, or any of the obligations of PAO TMK hereunder, do any of the following:

(a)     Change the amount, manner, place, or terms of payment or change or extend the time of payment of or increase, renew or alter the Senior Debt, or any part thereof, or enter into or amend in any manner any other agreement (including any related loan agreement, promissory notes and collateral documents) relating to the Senior Debt.

(b)     Sell, exchange, release, or otherwise deal with all or any part of any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Senior Debt, or any part thereof;

(c)     Release anyone liable in any manner for the payment or collection of the Senior Debt, or any part thereof;

(d)     Exercise or refrain from exercising any rights against any Loan Party and/or others (including PAO TMK); and

(e)     Apply any sums, by whomsoever paid or however realized, to any of the Senior Debt in such order as Senior Lender, in its discretion, deems appropriate.

11.     PAO TMK will advise each future holder of all or any part of the PAO TMK Debt that the PAO TMK Debt is subordinated to the Senior Debt in the manner and to the extent set forth in this letter agreement, and will place a legend on each document and instrument evidencing or related to the PAO TMK Debt indicating that such instrument or document is subject to this letter agreement.

12.     PAO TMK hereby assumes responsibility for keeping itself informed of the financial condition of the other Loan Parties, any endorsers and any guarantors of the Senior Debt and of all other circumstances bearing upon the risk of nonpayment of the Senior Debt or the PAO TMK Debt that diligent inquiry would reveal.  PAO TMK hereby agrees that neither Senior Lender nor any of its Affiliates shall have any duty to advise PAO TMK of information known to Senior Lender or any of its Affiliates regarding such condition or any such circumstances.  If Senior Lender, in its absolute discretion, undertakes, at any time or from time to time, to provide any such information to PAO TMK, Senior Lender shall not be under any obligation (a) to provide any such information to PAO TMK on any subsequent occasion, or (b) to undertake any investigation not a part of Senior Lender's or any of its Affiliate's regular business routine.  Neither Senior Lender nor any of its Affiliates shall be under any obligation to disclose any information which, pursuant to accepted or reasonable commercial lending practices, Senior Lender or any of its Affiliates wishes to maintain confidential.

13.     This letter agreement embodies the entire agreement between the parties and supersedes all prior agreements regarding the subordination of certain indebtedness of the Borrower owed to PAO TMK to indebtedness of the Loan Parties now or hereafter owed to Senior Lender.  This letter agreement may be amended only by an instrument in writing signed by both PAO TMK and Senior Lender.

14.     PAO TMK represents and warrants that the execution and delivery of this letter agreement, and the fulfillment of or compliance with the terms and provisions hereof, will not conflict with, or result in a breach of the terms, conditions, or provisions of, or constitute a default under, any agreement or instrument to which PAO TMK, or any of its assets, is now subject.

15.     Notice of acceptance of the agreement contained in this letter agreement is hereby waived.

16.     This letter agreement may be assigned by Senior Lender in connection with any assignment or transfer of the Senior Debt, or any part thereof.  This letter agreement shall be binding on and inure to the benefit of the Borrower, PAO TMK, Senior Lender and their respective successors and assigns, *provided*, that the Borrower may not delegate or assign any of its duties or obligations in respect of the Senior Debt without the prior, written consent of Senior Lender.

17.     The validity, enforceability and interpretation of this letter agreement shall be governed by the laws of the State of Texas other than its conflicts of laws principles.

*[Remainder of page left intentionally blank]*

This letter agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this letter agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

PAO TMK,
a Public Joint-Stock Company incorporated and acting under the laws of the Russian Federation

By:
Name:
Title:

CONSENTED AND AGREED TO
Effective as of the date set forth above:

OFS INTERNATIONAL LLC,
a Delaware limited liability company

By:
Name: Konstantin
Title: CEO

JPMORGAN CHASE BANK, N.A.

By:
Name:
Title:

This letter agreement may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this letter agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

<div style="margin-left:50%">

Very truly yours,

PAO TMK,
a Public Joint-Stock Company incorporated and acting under the laws of the Russian Federation

By: _____
Name: _____
Title: _____

</div>

CONSENTED AND AGREED TO
Effective as of the date set forth above:

OFS INTERNATIONAL LLC,
a Delaware limited liability company

By:_____
Name: _____
Title: _____

JPMORGAN CHASE BANK, N.A.

By: _____
    Christy L. West, Authorized Signatory

# EXHIBIT A
## TO INTERCREDITOR AGREEMENT

(See attached Loan Agreement)

DATED  July 13, 2018


ПАО «ТМК»
as Lender

and

OFS International LLC
as Borrower


## AMENDMENT
## TO LOAN AGREEMENT

---

13 июля 2018 года


ПАО «ТМК»
«Займодавец»

and

OFS International LLC
«Заемщик»


## ИЗМЕНЕНИЕ
## К ДОГОВОРУ ЗАЙМА

## AMENDMENT
## TO LOAN AGREEMENT

**THIS AMENDMENT** is made on the day of July 13, 2018

**BETWEEN**

**PAO "TMK"**, a company duly incorporated and acting under the laws of the Russian Federation with its registered address at Russian Federation, 105062, Moscow, Pokrovka street, 40, building 2A, represented by the Deputy General Director for Economics and Finance Mr. Tigran I. Petrosyan, acting on basis of the Power of Attorney (hereinafter referred to as the **"Lender"**), and

and

**OFS International LLC**, a limited liability company, organized and existing under under the laws of United State of America with the registered address at 7735 Miller Rd.#3, Houston, TX 77049, duly represented by its Director, Mr. Konstantin Semerikov (the **"Borrower"**),

together named as the Parties,

**WHEREAS:**

A) The Parties have concluded the Loan Agreement dtd 19/09/2017 (hereinafter – Loan Agreement);
B) The Parties have an intention to amend the terms of Loan Agreement,

**NOW IT IS HEREBY AGREED** to amend the Loan Agreement as follows:

**1. Definitions:**

In this Agreement, the following terms have the meanings given to them as follows:

**"Business Day"** means a day (excluding Saturdays and Sundays) on which banks generally are open in Houston, Texas, USA

---

## ИЗМЕНЕНИЕ
## К ДОГОВОРУ ЗАЙМА

**НАСТОЯЩЕЕ ИЗМЕНЕНИЕ** составлено 13 июля 2018 года.

**МЕЖДУ**

**Публичное акционерное общество «Трубная Металлургическая Компания»**, общество, учрежденное в соответствии с законами Российской Федерации, зарегистрированным по адресу: Российская Федерация, 105062, г. Москва, ул. Покровка, д.40, стр. 2А в лице Заместителя Генерального директора по экономике и финансам Петросяна Тиграна Ишхановича, действующего на основании Доверенности (далее именуемое "**Займодавец**"), и

и

**OFS International LLC**, общество с ограниченной ответственностью, учрежденное и существующее по законодательству Соединенных Штатов Америки, с адресом места нахождения: 7735 Миллер роуд №3, Хьюстон, Техас 77049, в лице его Директора, г-на Константина Семерикова (the "**Заемщик**"),

вместе именуемые Стороны,

**ПРИНИМАЯ ВО ВНИМАНИЕ, ЧТО:**

A) Стороны заключили Договор займа от 19.09.2017 г. (далее – Договор займа);
B) Стороны имеют намерение внести изменения в условия Договора займа.

**ТАКИМ ОБРАЗОМ, СТОРОНЫ СОГЛАСИЛИСЬ** изложить Договор займа в следующей редакции:

**1. Определения:**
В настоящем Договоре перечисленные ниже термины имеют значение, указанное в данном пункте.

"**Рабочий день**" означает день (кроме субботы и воскресенья), в который

and in Russia for the transaction of normal banking business;

большинство банков в Хьюстоне, Техас, США и в России открыты для проведения сделок по обыкновенным банковским операциям;

"**Disbursement Date**" means the date of crediting the Borrower's account with the Loan Amount. When the Loan is granted in instalments the date of the crediting the Borrower's account with first instalment; and

«**Дата предоставления займа**» дата зачисления Займа на счет Заемщика. При предоставлении Займа отдельными Платежами – дата зачисления первой суммы Займа на счет Заемщика;

"**Loan Amount**" means a principal amount of up to **25,000,000.00 USD** (Twenty-five million US dollars) which may be disbursed to the Borrower either in one advance or in more than one advance (each, an "**Advance**").

«**Заем**» означает сумму основного займа в размере до **25.000.000,00 USD** (Двадцать пять миллионов долларов США), который может быть предоставлен Заемщику одним или несколькими платежами (далее «**Платеж**»);

"**Repayment Date**" means the date of crediting the Lender's account with the repaid Loan amount.

«**Дата погашения займа**» означает дату зачисления суммы возвращаемого Займа на счет Займодавца.

2.  **Loan:**

2. **Заем:**

2.1 The Lender shall disburse amounts requested by the Borrower (which shall not exceed in the aggregate the Loan Amount) to the Borrower, either in a single Advance or in more than one Advance, on dates requested by the Borrower following the date of this Agreement and as is agreed between the parties hereto.

2.1 По договоренности между Сторонами, Займодавец предоставляет сумму Займа Заемщику одним или несколькими Платежами, в любой день, следующий за датой настоящего Договора.

2.2 The Lender shall pay each Advance into the Borrower's Account set forth below, unless, however, an Event of Default, as defined below, has occurred.

2.2 Займодавец обязуется перечислять каждый Платеж на счет Заемщика по реквизитам, указанным ниже, кроме, Событий невыполнения обязательств, которые перечислены далее в Договоре.

Beneficiary: **OFS International LLC**
Address of the beneficiary: 7735 Miller Rd.
#3, Houston, TX 77049
Bank of the Beneficiary: JP Morgan Chase, N.A.
IBAN No: n/a
SWIFT: CHASUS33
ABA # 021000021
№ счета: 157809130

Получатель: **OFS International LLC**
Адрес получателя: 7735 Миллер роуд №3, Хьюстон, Техас 77049
Банк получателя: JP Morgan Chase, N.A.
IBAN №: не применимо
SWIFT: CHASUS33
ABA # 021000021
№ счета: 157809130

3. **Interest:**

3.   **Проценты:**

**3.1** The interest on the Loan Amount shall be simple interest calculated at the rate of 7.25% per annum on the basis of a 365/366 day year consisting of 12 months.

**3.2** The interest is calculated on the unpaid Loan Amount outstanding from time-to-time following the Disbursement Date until the Repayment Date (inclusive).

**3.3** Interest shall accrue on the amounts outstanding from the Loan Amount from time to time.

**4. Duration, repayment, prepayment:**

**4.1** The Loan is granted for a period until 20/12/2021 ("Maturity Period").

**4.2** By agreement of the parties the Maturity Period of this Agreement may be extended for another period of time which will be established by the parties by means of a written amendment to this Agreement duly signed by the parties.

**4.3** Payment of interest shall be made by the Borrower as following:
- First interest payment (except interest paid earlier together with prepaid loan amounts) shall be made on 20/12/2018 (First interest payment date);
- Next interest payments shall be made each 6 months from the First interest payment date;
- Last interest payment shall be made on the date of full repayment of the Loan Amount.

**4.4.** If the Repayment Date or interest payment date falls on a day, which is not a Business Day, then repayment of the Loan and/or interest payment shall be made on the last Business Day previous to it.

**3.1** Проценты за пользование Займом рассчитываются по ставке 7.25% в год, исходя из 365/366 календарных дней в году, состоящего из 12 месяцев.

**3.2** Проценты рассчитываются на сумму непогашенного Займа с даты, следующей за Датой предоставления Займа, до Даты погашения Займа (включительно).

**3.3** Проценты начисляются на сумму фактической задолженности по Займу.

**4. Срок, погашение, досрочное погашение:**

**4.1** Заем предоставляется на срок до 20.12.2021г. («Срок займа»).

**4.2** По взаимному соглашению между Сторонами и после окончания Срока займа, Договор может быть продлен на дополнительный срок, который будет определен Сторонами посредством подписания должным образом письменного дополнительного соглашения к настоящему Договору.

**4.3** Выплата процентов за пользование займом производится Заемщиком в следующем порядке:
- Первая выплата процентов (за исключением процентов, оплаченных ранее при досрочном погашении) производится 20.12.2018 г. (Дата первой выплаты процентов);
- Последующие выплаты процентов производятся через каждые 6 месяцев с Даты первой выплаты процентов;
- Последняя выплата процентов производится в дату полного погашения суммы Займа.

**4.4** Если Дата погашения займа или дата выплаты процентов приходится на день, не являющийся Рабочим днем, то погашение займа и/или выплата процентов должна быть осуществлена в последний Рабочий день, предшествующий нерабочему.

**4.5** The Borrower shall repay the Loan Amount and the accrued interests to the Lender not later than last day of the Maturity Period.

**4.6** The Borrower - at its sole discretion - is entitled to prepay the Loan Amount (or parts thereof) together with any interest accrued thereon (or on its part) without penalty. The Borrower shall notify the Lender by written notice 3 (three) days prior to the prepayment date.

**4.7** The Lender has the right to hire consultants for negotiation of terms and provisions of any agreements with other lenders of the Borrower and the Borrower shall reimburse to the Lender any costs and expenses incurred by the Lender or pay for services rendered by the consultants directly.

**5   Payments:**

**5.1** All payments due from the Borrower hereunder shall be paid by the Borrower by way of wire transfer of immediately available funds in US dollars in accordance with the following bank account details:

PAO "TMK"
INN 7710373095
Russian Federation, 105062,
Moscow, Pokrovka street, 40, building 2A
Beneficiary's bankAO «ALFA-BANK»
S.W.I.F.T.         ALFARUMM
Beneficiary's Acc. №     407 02 840 701
200 000 475
Correspondent bank of beneficiary's bank
CITIBANK NA
S.W.I.F.T.CITIUS33
Acc. with correspondent
Bank №36310481

---

**4.5** Заемщик обязуется погасить сумму Займа и проценты, начисленные на фактическую задолженность. Займодавцу не позднее последнего дня Срока займа.

**4.6** Заемщик – по своему собственному усмотрению – имеет право досрочно погасить сумму Займа (или его часть) вместе с процентами, начисленными на него (или его часть). Заемщик обязан уведомить Займодавца посредством направления письменного уведомления за 3 (три) дня до планируемой даты досрочного погашения.

**4.7** Займодавец вправе привлечь консультантов для согласования условий соглашений с другими кредиторами Заемщика, при этом Заемщик обязуется возместить Займодавцу понесенные им расходы или оплатить услуги, оказанные консультантами, напрямую.

**5   Платежи:**

**5.1** Все выплаты, подлежащие уплате Заемщиком, должны быть им выплачены банковским переводом доступных денежных средств в долларах США по следующим банковским реквизитам:

Публичное акционерное общество «Трубная Металлургическая Компания»
ИНН 7710373095
105062, Российская Федерация, г. Москва, ул. Покровка, д.40, стр.2А
Beneficiary's bank         AO    «ALFA-BANK»
S.W.I.F.T.         ALFARUMM
Beneficiary's Acc. №     407 02 840 701
200 000 475
Correspondent bank of beneficiary's bank
CITIBANK NA
S.W.I.F.T.CITIUS33
Acc. with correspondent
Bank №36310481

(or to such other bank account(s) of the Lender as the Lender may designate in writing.

**5.2** All payments made by the Borrower under or with respect to the present agreement will be made without withholding or deduction for or on account of any present or future tax, duty, levy, etc.

**6**     **Events of Default and Remedies:**

**6.1** An "Event of Default" shall exist hereunder if any one or more of the following events shall occur and be continuing:

(a) the Borrower fails to pay any principal of, or interest upon, this Agreement when due and payable and such failure continues for a period of ten days after written notice of such failure is given by Lender to Borrower;

(b) the Borrower (i) applies for or consents to the appointment of a receiver, trustee, custodian, intervenor or liquidator of the Borrower or of all or a substantial part of its assets, (ii) files a voluntary petition in bankruptcy, or admits in writing that it is unable to pay its debts as they become due or generally does not pay its debts as they become due, (iii) makes a general assignment for the benefit of creditors, (iv) files a petition or answer seeking reorganization or an arrangement with creditors or to take advantage of any bankruptcy or insolvency laws, or (v) files an answer admitting the material allegations of, or consents to, or defaults in answering, a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or

---

(или любой иной(ые) счет(а) Займодавца, который Займодавец может указывать письменно).

**5.2** Все платежи, осуществляемые Заемщиком по настоящему Договору и в исполнении настоящего Договора, должны быть сделаны без каких-либо удержаний на счет настоящих или будущих налогов, пошлин, взиманий и др.

**6**     **События невыполнения обязательств и средства правовой защиты:**

**6.1** «Событие невыполнения обязательств» возникает, в случае наступления одного или нескольких событий:

(а) Заемщик не может выплатить основную сумму Займа или проценты по настоящему Соглашению в срок, и такое невыполнение обязательств продолжается в течение десяти дней после того, как Займодавец предоставил Заемщику письменное уведомление о таком нарушении;

(b) Заемщик (i) подает заявку или соглашается на назначение получателя, доверительного управляющего, хранителя, посредника или ликвидатора Заемщика всей или значительной части его активов, (ii) подает ходатайство о добровольном банкротстве или признает письменно, что он не может погасить свои долги по мере наступления срока их погашения или вообще не выплачивает свои долги по мере их возникновения, (iii) делает общую уступку в пользу кредиторов, (iv) подает ходатайство или заявление о реорганизации или реструктуризации долга с кредиторами или в целях извлечения выгоды от использования каких-либо законов о банкротстве или несостоятельности или (v) подает ответ, в котором допускаются материальные необоснованные заявления или согласия или непредоставление ответов на него, ходатайство, поданное против него, в ходе любого процесса банкротства,

(c) an involuntary petition or complaint is filed against the Borrower seeking bankruptcy or reorganization or the appointment of a receiver, custodian, trustee, intervenor or liquidator of the Borrower, or of all or substantially all of its assets, and such petition or complaint is not dismissed within 60 days of the filing thereof; or an order, order for relief, judgment or decree is entered by any court of competent jurisdiction or other competent authority approving a petition or complaint seeking reorganization of the Borrower or appointing a receiver, custodian, trustee, intervenor or liquidator of the Borrower, or of all or substantially all of its assets.

6.2   Upon the occurrence of any Event of Default, the Lender may, at its option, declare the entire unpaid balance of principal and accrued interest on the Loan Amount to be immediately due and payable and exercise any and all remedies permitted by applicable law; provided, however, upon the occurrence of any of the Events of Default described in Section 6.1(b) or 6.1(c) above and to the extent permitted by applicable law, the entire unpaid balance of principal and accrued interest upon this Loan Amount shall, without any action by the Lender, immediately become due and payable without demand for payment, presentment, protest, notice of protest and non-payment, or other notice of default, notice of acceleration and intention to accelerate or any other notice, all of which are expressly waived by the Borrower.

реорганизации или несостоятельности; или

(с) неправомерное ходатайство или жалоба подана против Заемщика, который добивается банкротства или реорганизации, или назначения получателя, хранителя, попечителя, посредника или ликвидатора Заемщика всех или практически всех его активов, и такое ходатайство или жалоба не отклонена в течение 60 дней после их подачи; или распоряжение, распоряжение об освобождении, судебном решении или указе вносится любым судом компетентной юрисдикции или другим компетентным органом, утверждающим ходатайство или жалобу, требующую реорганизации Заемщика или назначающего получателя, опекуна, попечителя, посредника или ликвидатора Заемщика всех или практически всех его активов.

6.2   При возникновении любого случая невыполнения обязательств Займодавец может по своему усмотрению потребовать погасить весь невыплаченный остаток основного долга и начисленных процентов на сумму займа незамедлительно, а также использовать все средства правовой защиты, разрешенные действующим законодательством; однако, при возникновении любого из событий невыполнения обязательств, описанных в разделе 6.1 (b) или 6.1 (с) выше, и в пределах, разрешенных действующим законодательством, весь невыплаченный остаток основного долга и начисленные проценты на сумму займа, без каких-либо действий Займодавца, немедленно становятся подлежащими уплате без требования оплаты, представления, протеста, уведомления о протестах и неуплате или иного уведомления о невыполнении обязательств, уведомления об ускорении и намерении ускорить или любого другого уведомления, от которых Заемщик отказывается в прямой форме.

| | |
|---|---|
| **7   Security:** | **7   Обеспечение обязательств:** |
| **7.1** The Lender is entitled to the benefits of that certain Security Agreement and Deed of Trust, by and between the parties and to the benefits of any other security now or hereafter granted. This Agreement will be secured by the Collateral (as defined in the Security Agreement), pursuant to the terms of the Security Agreement and Deed of Trust. | **7.1**   Займодавец имеет право на преимущества, предоставленные Соглашением об обеспечении обязательств и Договором о доверительном управлении, заключенными между Сторонами и в отношении любого обеспечения, предоставленного в настоящее время или в дальнейшем. Настоящий Договор будет обеспечен Обеспечением в соответствии с условиями Соглашения об обеспечении обязательств и Договором о доверительном управлении. |
| **7.2** The Borrower will, on request of the Lender, execute, acknowledge, deliver, procure and record or file such further instruments (including deeds of trust and financing statements) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of securing the Loan Amount with the Collateral and protecting or perfecting the security interest of the Lender in such Collateral. | **7.2**   Заемщик, по требованию Займодавца, будет обязан исполнять, признавать, доставлять, приобретать и регистрировать или подавать такие дополнительные документы (в том числе документы о доверительном управлении и финансовые заявления) и предпринимать такие дальнейшие действия, которые могут потребоваться, желательны или подходят для более эффективного обеспечения исполнения Договора займа, а также защиты или совершенствования обеспечительного интереса Займодавца в таком Обеспечении. |
| **7.3** The Borrower agrees to provide pro forma financial statements to the Lender upon the request of the Lender in the form and within the time period established by the Lender, but in any case not later than 20 days after the end of calendar month. In case of failure to provide such reporting in time, the Borrower undertakes to pay the Lender a fine of 50 000.00 (Fifty thousand) US dollars for each such violation. | **7.3** Заемщик по запросу Займодавца будет предоставлять ему финансовую отчетность по форме и в сроки, требуемые Займодавцем, но в любом случае не позднее 20 дней после окончания календарного месяца. В случае непредоставления такой отчетности в срок Заемщик обязуется выплатить Займодавцу штраф в размере 50 000,00 (Пятьдесят тысяч) долларов США за каждое такое нарушение. |
| **8 Assignment and amendments:** | **8   Уступка прав и Изменения:** |
| **8.1** Neither party hereto shall be entitled to assign any of its rights or transfer any of its obligations herewith without the prior written consent of the other party hereto. | **8.1** Ни одна из сторон не будет иметь право передавать права и обязанности по настоящему Договору без |

8.2 Neither this Agreement nor any of the terms hereof may be amended, except by an instrument in writing signed by all the parties hereto.

## 9    Miscellaneous:

9.1 If at any time any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect, such illegality, invalidity, unenforceability or ineffectiveness shall not affect the legality, validity or enforceability of the remaining provisions of this Agreement or the legality, validity or enforceability of such provision under the law of any other jurisdiction.

9.2 The rights and remedies provided by this Agreement are cumulative and not exclusive of any rights or remedies provided by law.

9.3 No failure by a party to exercise, nor any delay by a party in exercising, any right or remedy under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any such right or remedy prevent any further or other exercise thereof or the exercise of any other such right or remedy.

## 10  Governing Law:

This Agreement shall be governed by and construed in accordance with, and the rights of the parties shall be governed by, the law of the State of Texas excluding any choice of law principles that would require the application of the laws of a jurisdiction of another state or country. Lender and the

---

предварительного письменного согласия другой стороны.

8.2 Ни настоящий Договор, ни какие бы то ни было его положения не могут быть изменены, кроме как путем подписания обеими Сторонами дополнительного документа о таком изменении.

## 9  Разное:

9.1 Если какое-либо из положений настоящего Договора потеряет законную или юридическую силу в любом отношении, подобная незаконность, недействительность или отсутствие юридической силы не повлияет на законность, действительность или юридическую силу остальных положений настоящего Договора, либо на факт законности, действительности или юридической силы этих положений в любой другой юрисдикции.

9.2 Права и средства защиты прав, предоставляемые по настоящему Договору, являются кумулятивными и не исключительными в отношении любых прав или средств защиты прав, предоставляемых согласно законодательству.

9.3 Неисполнение или задержка в использовании одной из сторон, целиком или частично, своих прав либо средств защиты прав, предоставляемых по настоящему Договору, не будет считаться отказом от этих прав или средств защиты прав, а также использование таким правом или средством защиты прав, целиком или полностью, не исключает их дальнейшего использования.

## 10  Применимое право:

Настоящий Договор составлен и регулируется, а также права Сторон регулируются, в соответствии с законодательством Штата Техас, исключая любой выбор правовых принципов, которые потребуют применения законов юрисдикции

Borrower consent and agree that the state courts located in Harris County and the United States District Court for the Southern District of Texas (Houston Division) each shall have personal jurisdiction and proper venue with respect to any dispute arising out of or in connection with this Agreement.

другого государства или страны. Займодавец и Заемщик подтверждают и согласны с тем, что государственные суды, расположенные в округе Харрис и окружном суде Соединенных Штатов для Южного округа Техаса (Хьюстонская дивизия), должны иметь личную юрисдикцию и надлежащее место в отношении любого спора, возникающего из или в связи с настоящим Соглашением.

**AS WITNESS** this Amendment has been signed on behalf of the parties and delivered on the day and year first before written.

**В ЗАВЕРЕНИЕ** настоящего Изменения от имени Сторон оно было подписано в число и год, указанные на первой странице.

For and on behalf of the Lender
Name: Mr. Tigran Petrosyan
Title: Deputy General Director

За и от имени Займодавца
Имя: Тигран Петросян
Должность: Заместитель Генерального директора

For and on behalf of the Borrower
Name: Mr. Konstantin Semerikov
Title: Director , CEO

За и от имени Заемщика
Имя:  Константин Семериков
Должность: Директор , CEO

## EXHIBIT B
## TO INTERCREDITOR AGREEMENT

(Real Property Collateral Locations)

ODESSA, TEXAS

3420 Rasco Ave.
3333 Brazos Ave., Suite B
2111 W 34th Street
3420 A Rasco Ave. #A
4000 Rasco Ave.

HOUSTON, TEXAS

7801 Miller Road 3
7735 Miller Road 3
7813 Miller Road 3
15214 Miller Road 1

# EXHIBIT C

| Week Ending | 31-May Forecast | 7-Jun Forecast | 14-Jun Forecast | 21-Jun Forecast | 28-Jun Forecast | 5-Jul Forecast | 12-Jul Forecast | 19-Jul Forecast | 26-Jul Forecast | 2-Aug Forecast | 9-Aug Forecast | 16-Aug Forecast | 23-Aug Forecast |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | June | | | | | July | | | | August | |
| **I. Cash Flows** | | | | | | | | | | | | | |
| **Operating Receipts** | 780,069 | 1,040,091 | 1,040,091 | 2,080,183 | 260,023 | 664,881 | 886,508 | 2,216,271 | 664,881 | 606,131 | 808,175 | 808,175 | 1,616,349 |
| Total Collections | 780,069 | 1,040,091 | 1,040,091 | 2,080,183 | 260,023 | 664,881 | 886,508 | 2,216,271 | 664,881 | 606,131 | 808,175 | 808,175 | 1,616,349 |
| | | | | | | | | | | | | | |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Royalties | | | | | | | | 230,000 | | | | 230,000 | |
| Maintenance & Supplies | 33,083 | 44,110 | 44,110 | 88,220 | 11,028 | 32,967 | 43,956 | 109,889 | 32,967 | 32,833 | 43,777 | 43,777 | 87,554 |
| Transportation | 1,320 | 1,760 | 1,760 | 3,520 | 440 | 1,320 | 1,760 | 4,400 | 1,320 | 1,320 | 1,760 | 1,760 | 3,520 |
| Office & Facility | 2,753 | 3,670 | 3,670 | 7,340 | 918 | 2,753 | 3,670 | 9,175 | 2,753 | 2,753 | 3,670 | 3,670 | 7,340 |
| Ordinary Course Professional Fees | - | | 35,000 | - | - | | | 35,000 | - | | | 35,000 | - |
| Pipe purchase | 880,000 | | | | | 880,000 | | | | 880,000 | | | |
| Insurance | - | 5,000 | 100,000 | - | - | 34,000 | | - | - | - | 34,000 | - | - |
| Restructuring Costs | - | - | - | - | 300,000 | - | - | 30,109 | 679,000 | - | - | - | - |
| Subtotal | 917,155 | 54,540 | 184,540 | 99,080 | 312,385 | 951,039 | 49,386 | 418,573 | 716,039 | 916,905 | 83,207 | 314,207 | 98,414 |
| | | | | | | | | | | | | | |
| **Operating Cash Flow** | (137,087) | 985,551 | 855,551 | 1,981,103 | (52,362) | (286,158) | 837,123 | 1,797,698 | (51,158) | (310,774) | 724,968 | 493,968 | 1,517,936 |
| | | | | | | | | | | | | | |
| **Payments PPP Loan** | | | | | | | | | | | | | |
| Payroll | - | 499,340 | - | 499,340 | - | 473,101 | - | 473,101 | - | 442,701 | - | 442,701 | - |
| Benefits | | | 190,000 | | | | | 190,000 | | | | 190,000 | |
| Utilities | 11,000 | 11,000 | 11,000 | 11,000 | 32,000 | 11,000 | 11,000 | 11,000 | 32,000 | 11,000 | 11,000 | 11,000 | 11,000 |
| Lease Payments | 12,280 | 13,300 | 71,015 | 21,495 | 60,422 | 20,580 | 67,015 | 8,508 | 66,129 | 12,280 | 13,300 | 71,015 | 21,495 |
| Subtotal | 23,280 | 523,640 | 272,015 | 531,835 | 92,422 | 504,681 | 78,015 | 682,609 | 98,129 | 465,981 | 24,300 | 714,716 | 32,495 |
| | | | | | | | | | | | | | |
| PPP Loan Open Balance | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 1,495,319 | 1,417,304 | 734,696 | 636,567 | 170,586 | 146,286 | - |
| PPP Loan Close Balance | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 1,495,319 | 1,417,304 | 734,696 | 636,567 | 170,586 | 146,286 | - | - |
| | | | | | | | | | | | | | |
| **Total Disbursements** | 940,435 | 578,180 | 456,555 | 630,916 | 404,807 | 1,455,720 | 127,401 | 1,101,182 | 814,168 | 1,382,886 | 107,507 | 1,028,922 | 130,909 |
| **Net Cash Flow** | (160,367) | 461,911 | 583,536 | 1,449,267 | (144,784) | (790,839) | 759,108 | 1,115,089 | (149,287) | (776,755) | 700,668 | (220,748) | 1,485,441 |
| | | | | | | | | | | | | | |
| **II. Cash Balance** | | | | | | | | | | | | | |
| Beginning PPP Cash | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 1,495,319 | 1,417,304 | 734,696 | 636,567 | 170,586 | 146,286 | - |
| PPP Cash Disbursements | | | | | | 504,681 | 78,015 | 682,609 | 98,129 | 465,981 | 24,300 | 146,286 | - |
| Ending PPP Cash | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 2,000,000 | 1,495,319 | 1,417,304 | 734,696 | 636,567 | 170,586 | 146,286 | - | - |
| | | | | | | | | | | | | | |
| Beginning Cash Balance (excluding PPP Cash) | 253,253 | 664,907 | 525,038 | 725,553 | 465,528 | 1,674,078 | 56,794 | 481,359 | 823,445 | 1,054,441 | 95,688 | 1,015,031 | 150,545 |
| Operating Cash Activity | (160,367) | 461,911 | 583,536 | 1,449,267 | (144,784) | (286,158) | 837,123 | 1,797,698 | (51,158) | (310,774) | 724,968 | (74,461) | 1,485,441 |
| Cash Interest | - | - | - | - | (60,507) | | | - | | (50,020) | | | |
| Draw / (Paydown) on Loan | 572,021 | (601,780) | (383,022) | (1,709,292) | 1,413,841 | (1,331,126) | (412,557) | (1,455,612) | 282,154 | (597,959) | 194,376 | (790,025) | (670,648) |
| **Ending Cash Balance (excluding PPP Cash)** | 664,907 | 525,038 | 725,553 | 465,528 | 1,674,078 | 56,794 | 481,359 | 823,445 | 1,054,441 | 95,688 | 1,015,031 | 150,545 | 965,338 |
| | | | | | | | | | | | | | |
| **Ending Loan** | 13,072,021 | 12,470,241 | 12,087,219 | 10,377,927 | 11,842,191 | 10,511,065 | 10,098,508 | 8,642,896 | 8,925,049 | 8,368,773 | 8,563,149 | 7,773,124 | 7,102,476 |